ST. LOUIS SOUTHWESTERN RY. CO. v.
HENWOOD et al.

SOUTHERN PAC. CO. v. SAME.

DAVIS et al. v. SAME (two cases).

MEYER v. SAME.
Nos. 12882–12886.

Circuit Court of Appeals, Eighth Circuit.
Aug. 26, 1946.

As Amended on Denial of Rehearing
Oct. 22, 1946.

Jacob M. Lashly, of St. Louis, Mo., for St. Louis Southwestern Ry. Co., debtor.

Ben C. Dey, of San Francisco, Cal., and George L. Buland, of New York City (Charles L. Minor, of New York City, and Claude O. Pearcy, of St. Louis, Mo., on the brief), for Southern Pacific Co.

Edward Greensfelder, of St. Louis, Mo. (Forrest M. Hemker and Greensfelder & Hemker, all of St. Louis, Mo., on the brief), for Horace A. Davis, et al., as Protective Committees (Nos. 12884, 12885).

Walter E. Meyer, of New York City, pro se.

Paul D. Miller, of New York City (S. Mayner Wallace, of St. Louis, Mo., and Nudge, Stern, Williams & Tucker, of New York City, on the brief), for Chase Nat. Bank of City of New York.

S. Mayner Wallace, of St. Louis, Mo., for Mississippi Valley Trust Co., made statement at opening of the Court that the position of his client and of the Chase Nat. Bank of City of New York represented by Mr. Miller was identical and therefore he would make no oral argument.

Edward W. Bourne, of New York City (Andrew Oliver, of New York City, Thomas W. White and G. Carroll Stribling, both of St. Louis, Mo., Alexander & Green, of New York City, and Fordyce, White, Mayne, Williams & Hartman, of St. Louis, Mo., on the brief), for Bankers Trust Company, Trustee of St. Louis Southwestern Ry. Co. Second Mortgage dated February 12, 1891, and other Mortgages, etc.

Alfred H. Phillips, of New York City (Allen C. Orrick, of St. Louis, Mo., Chadbourne, Hunt, Jaeckel & Brown, of New York City, and Nagel, Kirby, Orrick & Shepley, of St. Louis, Mo., were with him on the brief) for Chemical Bank & Trust Company, Successor Trustee under the General and Refunding Mortgage of the Debtor, dated July 1, 1930.

Henry S. Caulfield, of St. Louis, Mo. (Clarence M. Barksdale, of St. Louis, Mo., and James Piper, of Baltimore, Md., on the brief), for Protective Committee for Holders of First Terminal and Unifying Mortgage Bonds.

Edwin S. S. Sunderland, of New York City (Guy A. Thompson, of St. Louis, Mo., Thomas O'G. FitzGibbon and Davis, Polk Wardwell, Sunderland & Kiendl, all of New York City, and Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., on the brief), for Guaranty Trust Co. of New York, Trustee under Debtor's First Terminal and Unifying Mortgage.

Edward Dumbauld, Sp. Asst. to Atty. Gen. (Wendell Berge, Asst. Atty. Gen., Arne C. Wiprud and David O. Mathews, Sp. Assts. to Atty. Gen., James A. Tomlinson, Sp. Atty., of Columbia, S. C., and Harry C. Blanton, U. S. Atty., of Sikeston, Mo., on the brief), for the United States, amicus curiæ.

Before STONE, THOMAS, and JOHNSEN, Circuit Judges.

STONE, Circuit Judge.

These are five separate appeals from an order by the District Court for the Eastern District of Missouri approving a plan for reorganization of the St. Louis Southwestern Railway Company, Debtor. There is a consolidated record and, in addition to the parties immediately interested, the United States was heard on brief and oral argument as amicus curiæ.

Three of the appeals are in behalf of [1] or by [2] existing stockholders. The two other appeals are by protective committees of mortgage bonds issued by wholly owned subsidiaries of the Debtor, payment of which was guaranteed by it.[3]

### I.

#### Jurisdiction.

Before examining the merit issues in any of these appeals, a matter of jurisdiction must be determined. That issue arises from the situation now to be outlined. Judge Davis had conducted these reorganization proceedings from their inception. A Plan had been approved by the Interstate Commerce Commission and, with accompanying transcript, had been transmitted to the Court. Objections to the Plan were filed and evidence introduced in court. The evidence had been closed and arguments of counsel were being made. After all counsel (except for the Debtor and for Mr. Meyer) had presented arguments in chief, Judge Davis died. Thereafter, Judge Moore took over these reorganization proceedings.

Judge Moore called a conference of all counsel to discuss the method of further proceeding in connection with the Plan. The original positions of counsel were as follows: Mr. Meyer urged that he wished and was entitled to a new trial before the court; the other counsel denied that a new trial was a matter of right but was, at most, a matter of discretion in the Court; most of these other counsel urged that the proceedings should not be reopened for additional evidence but should be taken by the Court on the existing record after full reargument by all parties; two of those counsel suggested, not very strongly, that the Court might reopen the case for evidence additional to that presented before Judge Davis. After much argument by all counsel, the Court took the view that a new trial was not a matter of right but that it was discretionary as to reopening the case.

Mr. Meyer was the only party desiring to introduce further evidence although other counsel (while opposing reopening) thought that if the case was to be reopened for Mr. Meyer, similar opportunity should be given other parties. Later, it was suggested by counsel that Judge Moore set the case for argument "and then have the advantage of the record and all the arguments in determining whether the case should be reopened for further testimony."

---

[1] No. 12,882, by the Debtor.

[2] No. 12,883, by the Southern Pacific Company and No. 12,886 by Walter E. Meyer.

[3] No. 12,884, by Horace A. Davis et al., as a protective committee for holders of Central Arkansas & Eastern Railroad Co. First Mortgage bonds, and No. 12,885, by the same parties as a protective committee for holders of Stephenville North & South Texas Railway Co. First Mortgage bonds.

The comment of the Court thereon was: "I assume when I hear the arguments I might know a little bit more about this matter. This is thrown in my lap without any opportunity to know very much about it." Finally, suggestions (in rough form of an order) were made: (1) That the record before Judge Davis be submitted; (2) that oral arguments be heard on a specified date; (3) that "during or at the conclusion" of such arguments the Court would "entertain" motions by any party "respecting additional testimony or otherwise pertaining to the perfection of the record on the hearing of said plan." It was emphasized by the Court that Mr. Meyer or any party could, under the last suggestion, present any motions to reopen the matter for further evidence. An order was made along the above line (April 23, 1943), including provisions that "the record on the Plan of Reorganization as certified to this Court by the Interstate Commerce Commission and on the record as heretofore made before Judge Charles B. Davis be taken as submitted to this Court as of this date" and that "during or at the conclusion of said oral argument on May 31, 1943, the Court will entertain any motion or motions, if any be made by any party, respecting the taking of additional testimony or otherwise pertaining to the completion of the record on said Plan." From this order, Mr. Meyer took an appeal which he later dismissed. Under the above order, arguments were made and no motion was filed by any party in connection with the arguments. Later, the Court entered an order approving the Plan.

Based on the foregoing outlined situation, Mr. Meyer presents the issue that a new trial on the Plan and objections thereto was a matter of right upon the death of Judge Davis and, therefore, Judge Moore had no power to deny such to a party demanding that right.

Various parties contend here that Mr. Meyer waived his right, if any, to object to the procedure followed by Judge Moore; and that, absent such waiver, no *right* to new trial existed but the matter was one of discretion.

*As to waiver.* The parties rely upon any or all of the following: (1) Expressions of Mr. Meyer indicating acquiescence in the procedure adopted by the Court; (2) voluntary dismissal of appeal taken by him from the order of April 23, 1943; (3) participation in the arguments and filing brief at the hearing under that order.

There were expressions by Mr. Meyer during the preliminary conference before Judge Moore which, taken alone, might be construed as approaching acquiescence in the procedure adopted; yet, throughout the conference, he made clear his preference for a new trial and, after the Court had announced the lines along which an order would be made, Mr. Chubb stated "we are adhering to the position, Your Honor, that we are entitled as a matter of right to a new trial or a rehearing of this matter" and Mr. Meyer stated "I understand under the law a new trial is necessary and the Court has no power to continue this proceeding." In the light of these statements it is clear that there was no acquiescence by Mr. Meyer in advance of the entry of the order prescribing the procedure but quite to the contrary.

This opposition is further evidenced, after the entry of order, by his appeal therefrom. Whether this order was of such finality as to be appealable is, at least, doubtful but we need not resolve that matter since that appeal was later dismissed. Whether the order, when made, was appealable or not, it is clear that it could be challenged in an appeal from the order approving the Plan and it is so challenged on the present appeal. Standing alone, the dismissal of the appeal from the order is not, in this situation, enough to be a waiver of the validity of the order.

Nor is participation, by argument and brief, in the hearing under the order sufficient to constitute waiver even though Mr. Meyer did not therein reiterate his right to new trial. There is no solid ground for contending that any party or the Court has acted in the belief that Mr. Meyer, by any or all of these things, was waiving his objection to the action of the Court in entering or in acting under the order defining

this method of proceeding. The facts do not support the contention of waiver.

■ *Right to new trial.* Theoretically and actually, a "Court" is a continuing and continous institution. Life & Fire Ins. Co. of New York v. Wilson's Heirs, 8 Pet. 291, 303, 8 L.Ed. 949, and see Hume v. Bowie, 148 U.S. 245, 254, 13 S.Ct. 582, 37 L.Ed. 438. Normally, matters therein flow uninterruptedly onward to finality. A change in personnel of judges during the course of litigation presents a problem of interruption. Such changes have occurred at different stages of suits and with varying results as to whether the successor judge could go forward or should retrace some of the ground travelled by his predecessor.[4]

■ An examination of the reasoning underlying the opinions and producing their results is convincing that the flow of a suit is interrupted by changes in personality of judges only where justice—for which courts exist—seems so to require. Unless justice demands something else, a different judge takes up litigation where the former judge left off. Where this is not done, it is, broadly, because of something in the past course of the litigation which cannot be found in the status and record existing when the new judge takes hold and which it is necessary for him, in all fairness to the parties, to know. Where it is necessary for him to gain this absent information, he must set back the litigation to the place where he can obtain it.

How and by whom is the existence of such necessity to be determined? In some instances, the law speaks through some affirmative legal requirement. Malony v. Adsit, 175 U.S. 281, 20 S.Ct. 115, 44 L.Ed. 163, changed by 31 Stat. 270, 28 U.S.C.A. § 776. In other instances, the successor judge has power, through the exercise of a reviewable judicial discretion, to determine on the situation in which he finds himself.[5]

■ The present situation is similar to cases ruling the power of a successor judge to pass upon a motion for new trial and that power has existed in United States courts since Life & Fire Ins. Co. of New York v. Wilson's Heirs, 8 Pet. 291, 303, 8 L.Ed. 949.[6] This situation is, therefore, within that class where the successor judge has such discretion. Hence, this issue resolves itself into whether Judge Moore abused his discretion. That depends upon what he did and the situation in this litigation when he acted.

■ The situation was that all evidence before the Commission had been stenographically reported and Judge Davis had only the paper record as transmitted from the Commission. As to this, Judge Moore was in the same position as was Judge Davis. This brings the matter down to the record on the hearing before Judge Davis. All that occurred before Judge Davis was transcribed and before Judge Moore. The only difference was that Judge Davis had seen the witnesses testify while Judge Moore had not. In short, all that Judge Moore lacked was the opportunity to estimate the credibility of these witnesses from their appearance and demeanor on the stand.

There was considerable oral testimony before Judge Davis but even more documentary. Such matters as bore upon credibility arose principally from claimed differences between oral testimony and prior written statements of a witness. Such differences speak from their face and little aid in judging credibility is gained by viewing the witness. For the most part, the

---

[4] For a variety of situations, see annotations in 54 A.L.R. 952; 58 A.L.R. 848 and 114 A.L.R. 435.

[5] As examples where he has sufficient information as to what has taken place at the trial—through stenographic record or otherwise—he may sign a bill of exceptions and deny a new trial (28 U.S.C.A. § 776; Guardian Assur. Co. of London v. Quintana, 227 U.S. 100, 105, 33 S.Ct. 236, 57 L.Ed. 437) but, where such information is lacking, he may not.

Penn Mut. Life Ins. Co. v. Ashe, 6 Cir., 145 F. 593, 596, 7 Ann.Cas. 491.

[6] Also, see Simons v. United States, 9 Cir., 119 F.2d 539, 546; Missouri State Life Ins. Co. v. Langreder, 7 Cir., 87 F. 2d 586, 593; Cahill v. Mayflower Bus Lines, 2 Cir., 77 F.2d 838, 839; King v. United States, 6 Cir., 25 F.2d 242, 244; Thomas-Bonner Co. v. Hooven, Owens & Rentschler Co., 6 Cir., 284 F. 386, 392, 393; and Meldrum v. United States, 9 Cir., 151 F. 177, 182, 10 Ann. Cas. 324.

principal witnesses were the same as before the Commission. While Judge Davis ruled that the evidence before him would be confined to matters subsequent to the hearing before the Commission, considerable earlier documentary evidence prior to that time was received. Considering this situation, we cannot say that Judge Moore abused his discretion in proceeding upon the record as it came to him.

## II.

Motion to Stay Appeal or to Remand.

Mr. Meyer has filed in this Court a "Motion that appeal be stayed or, in the alternative, that the proceedings be remanded to the District Court." This motion was briefed and argued to the Court but, upon further consideration, the Court set aside the submission thereof without prejudice and set the motion for hearing in connection with presentation of the appeals.

The grounds for the relief sought by the motion are stated thus:

"(1) The greatly increased balance of assets over liabilities and the greatly improved financial condition and earnings of the debtor since the supplemental report of the Commission of March 9, 1942; and

"(2) The suit by the Government under the Sherman Antitrust Act against The Association of American Railroads et al., and the facts revealed by the allegations of the complaint in the said suit and the 'Western Agreement' annexed as an exhibit to the said complaint."

*As to the first ground.* Three of the appeals (by Mr. Meyer, the Southern Pacific Company and the Debtor) directly present inter alia the issue as to "changed conditions" and challenge the Plan upon that basis. Changes in earnings and other conditions after promulgation of a Plan by the Commission are pertinent in consideration of the fairness and equity of such Plan. Ecker v. Western Pac. R. Corp., 318 U.S. 448, 506, 63 S.Ct. 692, 87 L.Ed. 892; Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 542, 63 S.Ct. 727, 87 L.Ed. 959. Such changes may, of course, be shown in evidence before the District Court considering the Plan. Further, the appellate court may, within proper bounds, consider showing of facts later than

the trial where such bear upon changed conditions. Ecker v. Western Pac. R. Corp., 318 U.S. 448, 507, 63 S.Ct. 692, 87 L.Ed. 892; Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 542, 63 S.Ct. 727, 87 L.Ed. 959. In this situation, the logical and orderly procedure is to examine and determine in connection with the merits of the appeals the effect of any claimed changed conditions, giving consideration to any proper factual matters presented after the trial, rather than to attempt determination upon this motion.

*As to the second ground.* The basis of this ground is that "the facts revealed by the allegations of the complaint * * * and the 'Western Agreement' annexed as an exhibit to the said complaint" in an Anti-Trust action filed by the United States against The Association of American Railroads et al., August 23, 1944, constitute newly discovered evidence relevant and important to the issues herein. This complaint and exhibit are attached to the motion as an exhibit. The prayer of the motion is to stay these appeals pending final disposition of this Anti-Trust suit; or, alternatively, to remand this proceeding to the District Court with directions to remand to the Commission "in order that the Commission may decide in its discretion whether to await further developments in the said suit of the Government against The Association of American Railroads and others, or to institute an investigation into the facts alleged by the Government in its said suit and the effect upon the earnings of the debtor of a successful termination of the said suit."

The complaint in this Anti-Trust action is against The Association of American Railroads (a voluntary organization composed of all the major steam railroads in the United States, operating over 85% of the railway mileage), The Western Association of Railroad Executives (a voluntary organization composed of representatives of most of the railroads operating west of Chicago), two investment banking houses (J. P. Morgan & Co. and Kuhn, Loeb and Company), forty-seven railroad companies or trustees thereof (being most of the railroads in the "Western District," com-

prising west of the Mississippi River and some territory in Illinois, Wisconsin and Michigan), and ninety odd individuals. It charges that defendants, from "some time prior to 1932," have been engaged in a conspiracy in restraint of interstate trade through eliminating competition in rates and charges, services and facilities resulting in collusive rates, suppression of improvements in facilities and services. Also, it is charged they have conspired to restrain other competitive types of transportation. The complaint particularizes as to twenty ways in which the conspiracy has operated to prevent independent action by parties to the conspiracy in charges and operation of the member railroads. It alleges that defendant Western Association of Railway Executives (called WARE) originally formed in 1928, is an instrumentality used in carrying out the conspiracy upon which was "superimposed" an arrangement set forth in the "Western Agreement," or "Commissioner Plan, Western District" (effective December 1, 1932), by which WARE has since functioned as a "separate entity." A copy of this agreement is attached as Exhibit A. It is charged that after the Western Agreement was brought to the attention of the Department of Justice and a copy had been requested on April 9, 1943, the parties thereto stated that, by an amendment thereto of April 23, 1943, the Agreement had been cancelled but that nevertheless the unlawful practices inaugurated thereunder had been continued.

The basis of the relief sought by the motion is newly discovered evidence revealed by the complaint and attached exhibit in the Anti-Trust suit. The record in this reorganization proceeding establishes clearly that Mr. Meyer knew of the existence of this Western Agreement and that, in December, 1932, he voted (as a director of Debtor) for Mr. De Forest who was to represent Debtor on WARE which was to select the "Commissioner" under that Agreement. Thus, several years before this reorganization proceeding, he had knowledge which would have enabled him to present to the Interstate Commerce Commission, during these proceedings before it, any matters now suggested by this Anti-Trust complaint, which he thought pertinent to this reorganization. Mr. Meyer did present an anti-trust issue before the Commission in these proceedings and it is one of the matters before us on the merits in this appeal. However, that matter had, for the most part, to do with claimed particular acts of certain named railroads which were in direct control of Debtor or of named individuals and railroads which influenced such controlling railroads in their attitude toward the Debtor. The motion must be denied as this is not newly discovered evidence.

### III.

#### Merits of Appeals.

Of these five appeals, two (Nos. 12,884 and 12,885) present special problems applicable to the participation, accorded by the Plan, to the bondholders of the Central Arkansas & Eastern Railroad Company and of the Stephenville North & South Texas Railway Company, respectively. The three other appeals (Nos. 12,882, 12,883 and 12,886) present the broad contention that the basic valuation by the Commission is too low and improperly excludes the stockholders from all participation in the Plan. The matter now to be considered under this heading will be that urged by the above three appellants in behalf of stockholders.

The appeal (No. 12,886) of Mr. Meyer attacks the valuation of the Commission as of the time it was made. All three appeals urge such changed conditions affecting valuation since adoption of the Plan, as require resubmission to the Commission.

(a) *The valuation by the Commission.* The Commission found the value for new capitalization "should not exceed approximately $75,000,000.00." Generally, this amount was (as stated by the Commission) the result of consideration of "all the data of record on property valuation and past and prospective earnings."

Included in the "property valuation" were: Investment in road and equipment less accrued depreciation ($116,980,340); book value, as of December 31, 1939 ($114,080,573); and reproduction cost less depreciation, as of December 31, 1935 (made by the Bureau of Valuation of the Commission) in a total of $68,523,903.

As to past earnings, the ten year period of 1927–1936 was used as a basis although later earnings were also considered. There was a vast amount of evidence bearing upon earnings and upon matters affecting earnings going back as far as 1915. As to prospective earnings, the direct testimony was the estimates of witnesses for the Trustee as to operating revenues for the several years 1937 to 1941, inclusive, and the actual earnings for 1937 to the first four months of 1941.[7]

Among other important matters considered were the existing fixed debt charges and the amount the road could safely carry following reorganization. This latter sum was placed at "about $1,500,000.00 a year."

A supplemental report of the Bureau of Valuation showed deferred maintenance of $3,173,500 had accumulated.

After the original decision of the Commission was filed, the proceeding was reopened and much additional evidence introduced. The valuation in the original decision was challenged by several parties but was not modified.[8] This decision was made as of March 9, 1942.

---

[7] The original decision of the Commission was June 30, 1941.

[8] This portion of the supplemental decision of the Commission is as follows: "Total new capitalization.—The debtor and other petitioners representing stockholder interests, either directly or indirectly, request an increase in the total new capitalization now approved at $75,-000,000, as does the Southern Pacific Company, which is also a secured creditor, although holding a larger proportion of the stock than it does of any of the bond issues. The debtor asks for an increase of about $20,000,000 in common stock, and the Southern Pacific asks for an increase in common stock such as will produce a total capitalization of not less than $100,000,000 and be sufficient to provide for a distribution to holders of the old stock of not less than $9,-086,357 of the new common stock. Mason B. Starring, Jr., and others ask for a modification so as to provide for distribution of new stock and option warrants to the holders of preferred stock, and to creditors for the unsatisfied portions of their claims. Walter E. Meyer argues that if a lease is made, coupled with one-line solicitation with the Southern Pacific, earnings would warrant a capitalization equal to the present capitalization of the debtor. Carl Rosenberger asks for a valuation of the property sufficient to reflect a substantial value in the old preferred and common stocks. As for creditor interests other than the Southern Pacific, Horace A. Davis and others ask for an increase in total new capitalization to approximately $80,000,000, and no other request is made for an increase in such capitalization.

"The debtor, in attempting to establish its contentions, is critical of the report of our Bureau of Valuation and of the time in which it was filed (after the conclusion of the hearing other than those on Meyer's allegations), but does not ask for a further hearing on that report and is not deterred from adopting the same report as the basis of one of the two analyses offered in support of its assertions. Neither of these analyses is impressive. The one, an attempt to set up the original cost of the property and base new capitalization thereon, fails to take into account the physical depreciation of the particular property or the functional depreciation of this and a great deal of other railroad property brought about by competing forms of transportation; and the other analysis, an examination of earnings, leads to the result desired by the debtor only through casting out of the computation all earnings except those of the period January 1, 1940, to June 30, 1941. The outcome is, apparently, a proposed normal future capitalization of some 23.8 times earnings during a period comparable to wartime, adjusted upward from recorded accounts on the theory that deferred maintenance was made good during the base period, but unadjusted for prospective increases in taxes and other costs. And the railroad in question is one which receives no small part of its earnings from business handled to and from St. Louis and Memphis partly over lines in which it has only trackage rights—which, clearly, are not capitalizable assets. Alabama & W. F. R. Co. Stock, 150 I. C.C. 243.

"The Southern Pacific Company supports its request with arguments similar to those advanced by the debtor, although its request is for a somewhat greater increase in new capitalization than is that of the debtor. The greater increase, to $102,754,256, which would assure the Southern Pacific of numerical control (while the lesser increase to $95,-000,000 sought by the debtor might leave it short of such control), would represent nearly the railway system capitali-

(B) *Present challenges of valuation.* These three appeals urge that change in conditions since such valuation are of such nature and extent as to invalidate the valuation even if it were proper as of the time it was made. Appellant Meyer challenges the valuation as of the time made. The broad difference in the position of Mr. Meyer and of the two other appellants (Debtor and Southern Pacific) is that Mr. Meyer urges strongly the invalidity of the valuation when made while the two other appellants—while not conceding that the valuation was then correct—base their contentions on the proposition that conditions have so changed since the valuation that it is shown to be presently wrong even if it were proper at the time made. This situation thus poses two major problems: (1) Mr. Meyer's contention that the valuation was unsound

zation of December 31, 1931, a date after which no further increase in capitalization or floating debt except through borrowing from the Reconstruction Finance Corporation and the Railroad Credit Corporation was possible. Railway system capitalization on December 31, 1931, was $106,378,950, including loans and bills payable, and $89,192,850, including loans and bills payable, but exclusive of the common stock, on which no dividend has ever been paid.

"Mason B. Starring, Jr., and others point out that the trustee's reports for the first 6 months of 1941 show a net railway operating income of $3,032,280; calculate that this is at a rate of earning which would approximate $8 per share on the present preferred stock issue; and ask how, under the circumstances, it can be said that the equity of the holders of preferred stock has no value. What is apparently meant is that, during the 6 months, fixed charges of the 6 months were earned, and in addition some $8 a share on the preferred stock, on the basis of present capitalization. But present capitalization is no longer controlling, since large sums of overdue interest have accumulated. Also, the 6 months in question were abnormal owing to threatening war conditions and cannot serve as a basis for the formulation of a plan of reorganization. As for the issue of option warrants to holders of preferred stock, this is not possible unless creditors' claims are satisfied in full, which in turn is not possible within the limits of the capitalization we have approved.

"Walter E. Meyer's contention that we should base new capitalization on earnings which might be received after a lease of the property by the Southern Pacific is not sustained. Such a lease under present law cannot be forced upon the Southern Pacific, since there appear no prospects of such a lease until after reorganization is consummated, and since it is impossible to determine the earnings of the property under a lease until the terms of the lease are agreed upon and made known.

"Carl Rosenberger, who was permitted to intervene after the issue of our prior report, is of the view that in fixing new capitalization we have failed to give due consideration to earnings of the immediate present and the immediate future. This matter has been sufficiently discussed above. As regards past earnings, he presents (for the first time in the petition) a statistical study of maintenance expenditures from 1925 to 1940, with the purpose of showing that recorded earnings have been less than true earning power by some $707,339 annually on the average from 1926 to 1940, owing to excess maintenance expenditures. The study is based on the theory that normal maintenance has at all times during the period in question required the expenditure of 28 percent of operating revenues, regardless of the volume of traffic, the earnings per ton-mile, equipment rentals paid and received, and other highly important factors; and the 28 percent was ascertained from the results shown by four other railroads, apparently without examination of the comparability of conditions. The study in our opinion affords no sound basis for the conclusions of the petitioner.

"Horace A. Davis and others point to nothing specific in support of the contention they make in this connection, except the earnings during the first 5 months of 1941. As previously indicated, we are of the view that such earnings have been sufficiently considered.

"In fixing the total new capitalization for the approved plan, there were considered all the data of record, although necessarily it was not possible to make specific mention of all of these in our prior report, wherein we confined ourselves to what we regarded as the most significant of the evidence. Traffic and earnings to the latest available date were thus considered, as were also future prospects of traffic and earnings. We find no valid reason in the petitions for modification to change the approved total new capitalization."

when made; and (2) the contention of the three appellants of the effect of changed conditions upon the valuation.

(1) *Validity of the valuation when made.* The validity of the valuation of the Commission at the time it was made is challenged upon four general grounds as follows: First, it is contended that, during such period, there was diversion of freight from Debtor causing revenue loss to it, by other railroads controlling Debtor. Second, it is contended that, during this period, certain kinds of freight were forced upon Debtor by a controlling railroad (Pacific) and from carriage of which, Debtor suffered loss in revenue. Third, it is contended that during the period, there was wastage of Debtor's assets by a controlling railroad. Fourth, that there was a continuing conspiracy by those controlling Debtor to use Debtor for their selfish purposes to its harm.

### (1a) *Diversion of Traffic*

The source of the claimed diversion of freight from Debtor is the control over Debtor by other railroads secured through ownership of stock in Debtor. Prior to March 11, 1925, Edwin Gould (son of Jay Gould) held the dominant stock interest in Debtor. On this date, the Chicago, Rock Island and Pacific Railway Company acquired this Gould stock. This stock, with other held by interests friendly to the Rock Island, gave it practical control of Debtor. May 4, 1925, the Rock Island applied to the Commission for authority to acquire control of Debtor under par. 2 of section 5 of the Interstate Commerce Act, 49 U.S.C.A. § 5(2). This application was referred to the Bureau of Finance of the Commission. Faced with a proposed adverse report by the Assistant Director of the Bureau, the Rock Island sold this stock to the Kansas City Southern Railway Company, in October, 1925. In July, 1926, the Southern applied to the Commission for authority to acquire stock control of the Debtor and also of the Missouri-Kansas-Texas Railroad Company. In 1927, the Commission denied this application—stating that the acquisition of stock controls of Debtor and of M-K-T "without our approval, appear to have constituted violation of section 7 of the Clayton Anti-trust Act [15 U.S.C.A. § 18] and perhaps also of the Sherman Act unless section 5 of the Interstate Commerce Act, as amended by the Transportation Act, 1920, by implication allows such acquisitions in advance of the granting of authority to acquire control." In 1928, the Commission brought proceedings to compel the Southern to divest itself of its stock interests in these two roads. On April 15, 1929, and while this proceeding was pending, the Southern holdings in Debtor's stock was acquired by a syndicate composed of New York Investors, Inc., and others. From late in 1929, the Southern Pacific Company began buying stock in the Debtor on the market until, by April, 1930, it had acquired 42,600 shares of common, of which 171,861 shares were outstanding. July 15, 1930, Southern Pacific purchased 87,200 preferred stock in Debtor from the Syndicate—the outstanding preferred being 198,936 shares—and contracted with Kuhn, Loeb and Company (as intermediary) to purchase further from the Syndicate 59,380 preferred and 24,700 common stock in Debtor. All of the above purchases gave Pacific about 57% of the outstanding stock of Debtor. Also, Pacific applied to the Commission for authority to acquire stock control of Debtor which was granted. Under this grant of authority, Pacific was required to exchange its own stock, on a stated ratio, for outstanding stock of the Debtor not held by it. The final result was that, at the time of this reorganization proceeding, Pacific had acquired 87.37% of Debtor's outstanding stock for which it had paid approximately $19,-493,000 and had exchanged 49,110 shares of its own stock. In addition thereto, Pacific had made good its guaranty of a loan from the Reconstruction Finance Corporation to Debtor by taking over the loan and paying $17,882,250—a total cash outlay of approximately $37,375,000.

The claimed diversions of freight traffic are alleged to have resulted from and during these controls of Debtor, successively, by the Rock Island, the Southern, the Syndicate and the Pacific.

Unless one is an expert in railroad traffic matters or unless one has studied a record such as this it is highly difficult, if not

impossible, to have much comprehension of the very great complexity of the subject. An understanding of such traffic involves so many and various elements which, alone or in some co-action, may influence the amount, character or revenue-producing value. Among these elements, may be stated: whether the traffic is purely local to the particular road, is interline (either originating or terminating on the road) or is "bridge" or "overhead" (where the road is an intermediate carrier); whether it is long or short haul on the road; whether there is a high or low return or a loss per ton mile in revenue; who controls the routing.

Purely local traffic may be passed by as it is entirely moved on the one road. Where traffic originates or terminates upon a road,

the existence of different junction points with other roads enters into the problem. Bridge traffic depends, within certain physical or geographical limitations, upon the route chosen at origin or destination.

Debtor is largely dependent upon bridge traffic. Bridge traffic is the most susceptible to diversion where the bridge road has competitive routes between the termini of any shipment. Debtor has immediate (North and South) and connecting competitors who, one or the other, reach most of the important points on its road. Two maps are inserted—one showing the more immediate competitors in the Southwest or "Gulf" region and the other showing the larger picture of connecting lines which might use or might avoid use of Debtor as a bridge or as a terminal receiving line.[9]

---

[9] This competition is stated by Mr. Meyer as follows:

"Missouri-Kansas-Texas is competitive with St. Louis Southwestern from St. Louis to Dallas, Ft. Worth and Waco, and with St. Louis Southwestern-Southern Pacific joint routes for such points as San Antonio, Houston and Galveston.

"Roads whose termini are at Kansas City and other Missouri River gateways are competitive for considerable amounts of traffic with roads whose termini are at St. Louis. The Wabash and a number of other roads, for traffic originating east of the Mississippi and destined to points in Central and Southern Texas and beyond, prefer to route this traffic for their long haul to Kansas City rather than give it up at St. Louis. Thus Kansas City Southern and other roads from Kansas City offer competition to St. Louis Southwestern for traffic destined to Texas and Louisiana and even for traffic terminating on St. Louis Southwestern. Kansas City Southern intersects the tracks of St. Louis Southwestern at Texarkana, and traffic thus hauled to Kansas City and delivered to Kansas City Southern may be hauled by Kansas City Southern, to Texarkana and distributed from Texarkana up and down the line of St. Louis Southwestern.

"Kansas City Southern maintains routes jointly with Missouri-Kansas-Texas competitive with St. Louis Southwestern. It was planned to increase traffic going over the joint routes by using Missouri-Kansas-Texas tracks from St. Louis to Eve, a point where Missouri-Kansas-Texas intersects the tracks of

the Kansas City Southern, 99 miles south of Kansas City, thence the tracks of Kansas City Southern (F.D. 5679–5680, Record, pp. 372–375, 426–428).

"Your petitioner in 1929 was reliably informed that 25% of the traffic of Missouri-Kansas-Texas and 12% of the traffic of Kansas City Southern was competitive with St. Louis Southwestern.

"Illinois Central is competitive with St. Louis Southwestern from St. Louis to Shreveport, and with St. Louis Southwestern-Rock Island-Texas & New Orleans joint routes to New Orleans.

"Missouri Pacific is competitive with St. Louis Southwestern from St. Louis to such points as Memphis, Little Rock, Dallas and Shreveport, and with St. Louis Southwestern-Southern Pacific joint routes to San Antonio, Houston, Galveston and New Orleans.

"Southern Pacific through its ownership of Southern Pacific Company of Mexico extends far down the West coast of Mexico. Missouri Pacific and other lines competes with St. Louis Southwestern-Southern Pacific joint routes for traffic moving between St. Louis and points in Mexico.

"St. Louis & San Francisco is competitive with St. Louis Southwestern from St. Louis to Dallas and Ft. Worth. St. Louis & San Francisco jointly with other lines is competitive with St. Louis Southwestern-Southern Pacific joint routes to San Antonio and Houston.

"Chicago, Rock Island & Pacific is competitive with St. Louis Southwestern by a somewhat circuitous route from St. Louis to Kansas City and thence south to Fort Worth, Dallas, Houston and Galveston. This route, however, is

From these maps and from the statement in the footnote, it is clear that Debtor is so located as to other lines that it is *naturally* subject to much competition whether the traffic originates distantly or not.

■ Within these competitive areas,

Intermediate Carriers of the Gulf Southwest and adjacent Regions and Southern Pacific Lines.

considered a practicable competitive route.

"Routes competitive to St. Louis Southwestern-Southern Pacific joint routes maintained by Southern Pacific.

"Southern Pacific, for traffic moving between points north of the Ohio and east of the Mississippi and the Gulf Southwest, with other roads maintain joint routes which are competitive with St. Louis-Southwestern-Southern Pacific joint routes. Southern Pacific interchanges traffic at the following points with these roads.

Railroads of the Gulf Southwest and Transcontinental Railroads

Debtor is naturally open to diversion of traffic both as to its important bridge traffic and, to a much less degree, as to traffic terminating upon its own line even though every effort be made by it or those controlling it to secure traffic. If this be true because of natural location, it is obvious that this situation *might* be much more precarious where Debtor was controlled by some other road or by those more interested in some other road. In short, such control affords opportunities for diversion when it is to the interest of the controller. But opportunity to do harm is alone not proof of harm done, although clearly it requires closer scrutiny of acts done. That the Rock Island, the Southern, the Syndicate and the Pacific had such opportunities to harm Debtor during the successive periods of control is true. Whether they, or any of them, took advantage of those opportunities and used such control to harm Debtor is the question.[10] Our immediate concern is whether the showing before the Commission justified its determination that no improper material diversions of traffic resulted from such controls of Debtor occurred. In determining this matter, we act under definite limitations. We cannot, as would a court in an equity suit, take the evidence before the Commission and declare an opposite conclusion if, in our judgment, the weight of the evidence was against the determination of the Commission. The Commission is the agency selected by the Congress to determine such

fact matters. If there is substantial support in the evidence for its determination, we must accept it as settled. Reconstruction Finance Corporation, et al., v. The Denver & Rio Grande Western R. Co., 66 S.Ct. 1282; Ecker et al. v. Western Pacific R. Co., et al., 318 U.S. 448, 473, 512, 63 S.Ct. 692, 87 L.Ed. 892.

Our examination involves, of course, a test comparison of the various essential fact statements of the Commission with the evidence bearing upon each material statement to ascertain whether there is substantial support for the finding in the evidence or the action of the Commission was arbitrary. Considering the great number of separately advanced particulars in each of which Mr. Meyer urges positive proof of diversion and the several thousand pages of evidence involved, these testing comparisons have required an enormous burden of reading, study and classification of the evidence. This burden has in no respect or particular been avoided. We have reached the conclusion that the results stated by the Commission are in every instance supported by substantial evidence and, therefore, the capitalization value of the Debtor as determined by the Commission must be sustained as of the time it was announced and, by supplemental report, later affirmed.

In the footnote,[11] is set out most, but not all, of the discussion by the Commission in its report and supplemental report on

---

"With the Missouri-Kansas-Texas at Denison, Houston, San Antonio and Waco, Texas.

"With St. Louis & San Francisco at Sherman, Paris and Ft. Worth, Texas.

"With the Texas Pacific at Dallas and Ft. Worth, Texas, and Shreveport, Louisiana.

"With the Missouri Pacific System at Alexandria and Lake Charles, Louisiana, and Houston, Texas.

"With the Kansas City Southern at Shreveport and Lake Charles, Louisiana, and Beaumont, Texas.

"With the Illinois Central at Shreveport and New Orleans, Louisiana.

"With the Rock Island at Ft. Worth and Dallas, Texas, and Alexandria and Eunice, Louisiana.

"With the Louisiana and Arkansas at Shreveport, Louisiana.

"At Tucumcari, New Mexico, South-

ern Pacific has a heavy interchange with Chicago, Rock Island & Pacific in connection with the transcontinental movement of traffic.

"Southern Pacific has a heavy interchange with the Texas Pacific at El Paso in connection with transcontinental routes."

[10] An important consideration bearing upon the extent of opportunity of one controlling a "bridge" railroad to divert traffic to or from it is whether the shipper or receiver of freight designates the route it shall take. The evidence here shows that such designations are common and particularly so with large concerns which usually have their own traffic managers.

[11] From the supplemental report the following:

"Meyer in his petition further asks that we reopen the proceeding for the

purpose of receiving evidence of facts previously unknown to him which, he contends, tend to confirm his charges that there were diversions of traffic in 1926 from the debtor to the Kansas City Southern or the Missouri-Kansas-Texas under four heads, namely, (1) automobiles and autotrucks and parts; (2) agricultural implements; (3) fresh meats and other packing-house products; and (4) iron and steel articles. The additional facts referred to are those contained in Report 25, Part 12, of the Senate Committee on Interstate Commerce of the Seventy-Sixth Congress on the 'Control of the Chicago Great Western—Bremo Corporation,' dated October 24, 1940, or somewhat over a year after the conclusion of the hearings herein. The question raised is considered hereinafter.

\* \* \* \* \*

"The petitioner's point VI is that we should reopen the proceedings for the purpose, among others, of receiving evidence of facts previously unknown to him which he believes tend to confirm the truth of his charges that there were diversions of traffic. The additional facts referred to were brought to light in the Senate committee investigation of the Bremo Corporation above referred to. In that investigation, it was found that stock in the Bremo Corporation sold to traffic managers of large shippers. The Bremo Corporation was a holding company owning shares in the Chicago Great Western, and the traffic managers investing in it were expected to work for their investment by diverting freight to the Great Western from its competitors. Meyer does not make a point of any effects of the Bremo venture on the debtor's traffic, but suggests that an earlier scheme of like character may have been devised and had such effects in its operations.

"Meyer alleges that Ladenburg, Thalmann & Company acquired large blocks of stock of the Kansas City Southern and evidently after we denied the application for unification with it of the debtor and Missouri-Kansas-Texas, which was on May 3, 1927. He suggests that the purchase of this stock at some time between the close of the hearings on the application for unification (November 13, 1926) and March 1929 points to a probability that it was acquired from men in the traffic, railroad, and financial worlds who had been induced to purchase it and use their influence in diverting traffic to the Kansas City Southern. These men, he says, would have looked to Ladenburg, Thalmann & Company to take the stock off their hands when it

became evident that a unification of the three railroads was not to be accomplished. He asks that we, through our Bureau of Inquiry, call upon Ladenburg, Thalmann & Company to render a statement showing the dates and amounts of their purchases of stock for firm account and for individual partners of the firm during the period from the close of the hearing upon the applications for unification of the three roads in 1927 to 1932, from whom the stock was purchased, and whether the purchases were made at public or private sale.

"Petitioner has alleged that there were diversions of traffic from the debtor to the Kansas City Southern or the Missouri-Kansas-Texas under four heads, namely, (1) automobiles and autotrucks and parts; (2) agricultural implements; (3) fresh meat and other packing-house products; and (4) iron and steel articles. He regards it as a striking fact that, as was disclosed by the investigations of the Senate committee, there were unethical practices on the part of the traffic managers of large shippers dealing in commodities under these four heads. He says that the companies whose traffic managers were revealed as indulging in these unethical practices were important companies, with the possible exception of the company dealing in iron and steel products. He believes that the Bremo Corporation revelations and the diversions of traffic from the debtor which he has alleged under the four commodity heads are more than a mere coincidence, and asks that we investigate further as to whether there were diversions from the debtor in these commodities.

"The number of shares of stock of the Kansas City Southern held in the name of Ladenburg, Thalmann & Company as of December 31 of each of the years 1925-32, inclusive, is shown in the annual reports of that railroad company to us to have been as follows: 12,520, 9,540, 21,446, 27,823, (not reported as among the 20 largest holders in 1929), 11,633, 11,033, and 18,189.

"In the fact that Ladenburg, Thalmann & Company increased its holding of Kansas City Southern stock in 1927 and again in 1928, we see no probability that it was the reluctant purchaser of stock which disappointed adventurers wished to dispose of. The debtor's traffic of the period on automobiles and autotrucks and parts, agricultural implements, fresh meats and other packing-house products, and iron and steel articles has been considered and discussed at length in our prior report; and the

petitioner's contention that there were indications of diversion in this traffic were, for reasons shown, not sustained. We adhere to those views."

From the original report the following: "(f) Freight and passenger revenues and net railway operating income.—(1) Meyer's statistical comparisons.—Meyer's next effort is to show the amount by which the debtor's earnings suffered during the period March 12, 1925, to December 31, 1932, as a result of the alleged illegal control, first by the Rock Island, then by the Kansas City Southern, then by the syndicate, and lastly by the syndicate acting together with the Southern Pacific. The period of control by the Southern Pacific with our authorization, he reserves for discussion in a subsequent part of his case. By a comparison with the Kansas City Southern, Missouri-Kansas-Texas, St. Louis-San Francisco, and Missouri Pacific, he estimates for the several periods a total loss in freight revenues of $27,626,157; or, as an alternative, by comparison with the revenues of the Southwestern region, exclusive of the debtor's own, a loss of $23,676,728. He also estimates a loss in passenger revenues of $3,121,326; and a loss in net railway operating income of $18,787,152. These are the most important of Meyer's contentions, and require the most intensive and careful consideration.

"It appears that the debtor's average daily freight revenues for the period January 1, 1921, to March 11, 1925 (the period of independent operations immediately preceding the purchase of stock of the debtor by the Rock Island), were $61,380. For the succeeding period, March 12, 1925, to October 14, 1925 (the period when the Rock Island held a large block of the debtor's stock), the debtor's average daily freight revenues were $57,191, thus showing a decline of 6.82 percent from the level of the preceding period of independent operations. In like manner, average daily freight revenues for the period October 16, 1925, to April 15, 1929, the period of Kansas City Southern control, show a decline of 1.87 percent from the period of independent operations; revenues for the period April 16, 1929, to July 15, 1930 (the period when a large block of the stock of the debtor was held by the syndicate), show a decline of 1.25 percent; and revenues for the period July 16, 1930, to December 31, 1932 (the period immediately following the contract of the syndicate to sell its stock of the debtor to the Southern Pacific), a decline of 34.75 percent.

Meanwhile, freight revenues of other roads of the Southwest were not showing similar declines. For the period January 1, 1921, to March 11, 1925, the total average daily freight revenues of the Kansas City Southern, the Missouri-Kansas-Texas, the St. Louis-San Francisco, and the Missouri Pacific were $562,559; and for the period March 12, 1925, to October 14, 1925, they were $636,840. Thus the later period showed an increase for these four roads of 13.20 percent over the earlier period, while the debtor's freight revenues were declining 6.82 percent. In like manner, freight revenues of the four roads for the period October 15, 1925, to April 15, 1929, showed an increase of 15.99 percent over the period January 1, 1921, to March 11, 1925, while those of the debtor showed a decline of 1.87 percent; freight revenues of the four roads for the period April 16, 1929, to July 15, 1930, showed an increase of 14.70 per cent over the period January 1, 1921, to March 11, 1925, while those of the debtor showed a decline of 1.25 percent; and freight revenues of the four roads for the period July 16, 1930, to December 31, 1932, showed a decline of 23 percent below the period January 1, 1921, to March 11, 1925, while those of the debtor showed the greater decline of 34.75 percent.

"Taking the debtor's freight revenues of the period January 1, 1921, to March 11, 1925, as normal for that period, and the percentages of variation from the revenues of that period shown for the four roads for subsequent periods as normal for the debtor as well as the four roads, Meyer makes computation to show that the debtor's freight revenues under a normally competent and independent management would have been $27,626,157 in excess of what they actually were under conditions as they existed.

"If traffic yielding revenues of $27,-626,157 was in fact diverted from the debtor, as Meyer contends, it must have been diverted to some other road or roads, and this necessary postulate of Meyer's theory has been ignored in the foregoing computations. Making adjustment for the discrepancy on an approximate basis, Meyer reduces the debtor's loss of freight revenues to $24,-619,635, which is reasonably close to the amount of $23,676,728 which Meyer computes as the loss by similar comparisons of the debtor's freight revenues with those of the entire Southwestern region, exclusive of the debtor's. By a fourth method, Meyer computes the loss

of freight revenues as $19,876,656; but he does not consider the results in this instance as offering as accurate a standard as the others. By like statistical studies he computes the loss in passenger revenues to December 31, 1932, at $3,121,236; and the loss in net railway operating income at $18,787,152. And that is not all. As the gross and net earnings were as alleged being subjected to this impairment, Meyer computes that the property was undermaintained to the extent of $5,575,751. These are arresting figures, to be sure.

"Meyer further contends that his estimates do not reflect the full extent of the losses incurred by the debtor in freight revenue and net railway operating income, since they do not take into account the fact that (1) during 1921, 1922, and a part of 1923, all within the test period he took as representing normal conditions, coal-burning locomotives were operated where oil-burning locomotives might have been operated at a lower cost; (2) droughts and floods from March 12, 1925, to December 31, 1932, in the territories of the railroads he took for comparison depressed their freight revenues and net railway operating income; (3) despite the shopmen's strike which, according to the contentions of his adversaries, had the effect of enhancing the debtor's earnings in 1922 and 1923 to a level above normal, both the Kansas City Southern and the Missouri Pacific showed a greater increase in 1923 as compared with 1922 than did the debtor; and he has not attempted to assess and take into account the amount of increased earnings from the reconstruction of line from Mount Pleasant to Corsicana and the acquisition of the St. Louis Basin route, which should have resulted in order to justify the expenditure of money involved.

"A statistical study of this character is open to many objections. In any group of five railroads, one must stand last in point of progress; and the successive intervals of progress and decline of freight revenues will not be the same for all throughout a period of 12 years. Some roads will fare better on the whole than the average, and some not so well. Similarly, some will make their best comparative showings at the beginning of the 12 years, and some at the end. It does not follow inevitably that merely because the debtor made its best comparative showing at the beginning, failure to maintain its relative position thereafter is proof that traffic was diverted from it pro tanto, let alone diverted in the interest of a group of conspirators bent on depressing its earnings

and thus the quotations for its stock on the stock exchange. An examination of the fairness of the comparison is necessary before the results can be used for any of the purposes of this case.

"First, without reference to the rebuttal testimony, solely from the figures presented by Meyer, between 1923 and 1924, during the period of the debtor's unquestioned independence, the debtor's freight revenues showed a decline of 11 percent, while those of the Missouri Pacific showed an increase of 12 percent. Meyer regards this, or at least accepts it without question for the purposes of his computation, as entirely consistent with proper management of the debtor. But subsequent declines of very much smaller proportions he denounces as the handiwork of a conspiracy. Other incongruities are also obvious in the conclusions. Thus, on the one hand, the Kansas City Southern, for whose benefit the alleged conspirators were presumed to be diverting traffic from the debtor, was on the basis of these studies faring little better than the debtor throughout the 12 years, and not so well at the end; and, on the other hand, the sums of money involved were so great that it is difficult to see how the alleged conspirators could have hoped to recoup them through purchase of the debtor's outstanding stock at depressed prices.

"The $18,787,152 of net railway operating income of which the debtor was allegedly deprived, and the $5,575,751 of alleged under-maintenance total $24,362,903, or $65.70 for each share of all capital stock, both preferred and common, or $122.11 for each share of all capital stock other than that sold to the Southern Pacific by either the syndicate or Kuhn, Loeb & Company. Meyer contends that $100, paid for the preferred by the Southern Pacific, was fraudulently high; and he sold common stock of his own on October 25, 1929, for as low as 73½, at a time when he was, as he says, attempting to support the market.

"The debtor shows that its earnings during the period just preceding the Rock Island acquisition of stock of the debtor were not a fair standard of comparison, either for its gross or its net earning power. This is shown to have been due in part to the temporary increase in freight in 1922 and 1923, when the debtor, at the time of the shopmen's strike, as the only open railroad in the Southwest, was handling traffic usually carried by other carriers. It was due in further part to the fact that the average revenue per ton-mile of the other carriers, which prior to 1921 had been about the same on the average as that

of the debtor, thereafter declined rapidly until 1926, while that of the debtor declined much less during the same period, and did not begin a decline similar to that of the other carriers until after 1927. Further, the dissimilarity is shown to have been due in still further part to the increase in traffic density on the Missouri Pacific, which resulted from the expansion of its system lines.

"(2) Investigations on our own motion.—Investigations of the questions here raised made on our own motion likewise failed to sustain Meyer's contentions. We directed our Bureau of Inquiry to prepare a report for filing in these proceedings, based on data in its possession procured in the course of an investigation made in 1927, 1928, and 1929 for use in the Clayton Act case heretofore referred to. The report, as filed of record herein pursuant to our direction, deals with the question whether the stock acquisitions assailed in the Clayton Act case had affected the traffic of the Kansas City Southern, Missouri-Kansas-Texas, and the debtor. Stated otherwise, the report dealt with the question whether there was evidence of a diversion of traffic from the debtor in consequence of the control over it of the two other railways. Approximately 11 months had been spent on this investigation by a special agent of the Bureau during the course of our preparation for the Clayton Act case.

"In making the investigation, the conclusion was reached by the Bureau at the outset thereof that it would be most difficult to prove a diversion of traffic by any set of figures; and statements were compiled showing traffic, tonnage, and revenue data for the years 1924, 1925, 1926, and 1927, including for all originating carriers data as to interline freight received, the rebilled local, the rebilled beyond, and the overhead-tonnage which the Kansas City Southern, Missouri-Kansas-Texas and the debtor had handled, and also the revenue derived therefrom. The statements also show the local tonnage and revenue of the three systems for the same period, and the entire revenue from all traffic, including the classes mentioned and also interline forwarded. All these statements are of record herein.

"From such basic data a statement was prepared which shows (a) the tons of interline received and of overhead freight originating on 51 selected principal railroads of the country which were transported by each of the three railroads named during 1924, 1925, 1926, and 1927; and (b) the revenues derived therefrom by the three roads. Another

statement was prepared showing and comparing both tonnages and revenues for the years 1925 and 1926 of the traffic originated on the same 51 railroads and handled by the three roads as interline received and overhead. Traffic originating on the three lines and delivered by them to connections was not studied, on the assumption that none of these lines would short-haul itself.

"The years 1925 and 1926 were selected for the comparison, because the Rock Island's stock acquisitions were consummated in 1925, and it was believed accordingly that any change of traffic movements might be expected to show its effects in 1926. The comparison fails to disclose any decrease of overhead traffic handled by the debtor. That traffic is clearly the most easily diverted, and is the traffic which a carrier would be expected to lose if traffic were being diverted from it. The debtor's increase in overhead for 1926 expressed in tons was 74.64 percent, the Kansas City Southern's increase 22.89 percent, and the Missouri-Kansas-Texas' increase 17.09 percent. Expressed in revenues the increases were 74.09 percent, 8.07 percent, and 27.62 percent, respectively.

"A part of the debtor's increase in overhead traffic was undoubtedly due to the many changes from junction waybilling to interline waybilling effected in 1926, but, in the opinion of the Bureau, not enough to account for all the large gain in overhead. The comparison shows for interline freight received a loss of 4.87 percent in tonnage, but a gain of 1.6 percent in revenues. The combined gains of revenues from both interline received and overhead traffic was 14.51 percent for the debtor, 14.28 percent for the Kansas City Southern, and 17.77 percent for the Missouri-Kansas-Texas.

"All three systems lost revenue on rebilled local traffic, apparently due to changes from junction to through billing. The Missouri-Kansas-Texas and the Kansas City Southern gained substantially in revenue on interline received, as was reasonably to be expected from the change in billing practices; but the debtor suffered a small loss. Thus, on the whole, a loss of traffic by the debtor during 1926 was indicated, but the commodities in which the loss occurred could not be determined.

"Some 90 to 95 percent of the debtor's foreign line traffic destined to Texas points from points in the North, East, and Southeast was moved through St. Louis, Memphis, and Thebes. On the combined interline received and rebilled local carload traffic of the debtor moving

through St. Louis there was a loss in 1926, as compared with 1925, of 4,540 tons and $41,388 of revenues; on similar traffic moving through Memphis a loss of 1,361 tons and $30,572 of revenues; and on similar traffic moving through Thebes, no change in tonnage and a gain of $9,706 in revenues. On less-than-carload tonnage moving through the three gateways, there was a loss of about 4,621 tons and $60,500 of revenues. These losses appear to be accounted for in part by a decrease of 448 carloads in traffic from the Cincinnati, Louisville, Pittsburgh, Detroit, Chicago, and New York territories.

"In carload shipments of automobiles and parts handled by the debtor, 1926 shows a small gain over 1925.

"The traffic originated on the various Southern Pacific lines and handled as interline received or overhead tonnage by one or another of the three systems investigated shows gains for 1926 over 1925 in some instances, and for some Southern Pacific lines, and losses in others. The totals from all Southern Pacific lines show small gains in tonnage and revenues for both the Kansas City Southern and the Missouri-Kansas-Texas, but a loss of 10.64 percent in tons and 1.18 percent in revenues for the debtor.

"In addition to making the foregoing traffic analyses, during the course of its investigations in the Clayton Act case the Bureau interviewed the traffic officials of a number of carriers, and examined their correspondence files for evidence of diversion of traffic. Although instances of loss in traffic and revenues by the debtor were disclosed, and gains in traffic and revenues by the Kansas City Southern and the Missouri-Kansas-Texas, the Bureau could reach no other conclusion than that no proof of diversion of traffic had been found.

"Meyer, in a study made for his reply brief, rearranged some of the basic data of the Bureau's report and added other data, and shows that, comparing the average results of the years 1925, 1926, and 1927 with the results of 1924, the debtor's revenues from interchanges with 48 other railroads increased less or decreased more than did those of the Kansas City Southern and Missouri-Kansas-Texas combined, or decreased while those of the Kansas City Southern and the Missouri-Kansas-Texas increased; and that only in the case of 9 other roads, including, however, the Southern Pacific and Illinois Central, was the comparison more favorable to the debtor than to the Kansas City Southern and

the Missouri-Kansas-Texas. Further, the debtor's interchanges with the Kansas City Southern declined less than did those of the Missouri-Kansas-Texas. He also shows that, comparing the period 1926 to 1930 with the earlier period 1921 to 1925, the tonnage of the various commodities handled by the debtor was a smaller percentage in most instances of the total tonnage handled by 8 Southwestern railroads during the later period than it was during the earlier period. These showings, it would appear, were to be expected from the other studies Meyer has made, heretofore discussed, and add nothing to the Bureau's efforts to analyze the data in an effort to determine whether or not the debtor's failure in subsequent periods to maintain its position of 1921 to 1924 was due to diversions of traffic.

"Meyer urges that the Bureau's report is no evidence that there were or were not diversions of traffic from the debtor to the Kansas City Southern or the Missouri-Kansas-Texas. He argues that it was not necessary in connection with the Clayton Act proceedings to ascertain whether there were diversions of traffic, but merely to determine whether the effect of the acquisition of stock might be to substantially lessen competition. He stated at the hearing that the primary compilations of data on which the report was based had little meaning; and that he had not been in close contact with the investigator. He believes that the report shows a lack of confidence on the part of the Bureau in the investigation; says that the investigation was not such as might disclose a substitution of less desirable traffic for more desirable traffic; and suggests that compilations of data in greater detail and scope might bring to light matters which the investigation made did not reach.

"Meyer says that when the investigation was made the traffic files of the debtor contained a great many letters which show that traffic had been diverted by the Southern Pacific to the Rock Island, to the St. Louis-San Francisco, and to other railroads; and that the debtor's traffic relations with other railroads, including the Texas & Pacific had been impaired. This is so, he says, notwithstanding the statements made in the report that the correspondence files of traffic officials of a number of carriers were examined, and that no proof of diversions of traffic was found. He makes no reference in this connection to any such letters presented for the record of this proceeding.

"As to the conclusions of the report with reference to automobile traffic, he

points out that notwithstanding the statement therein made, that an analysis of carload shipments of automobiles and parts handled by the debtor during 1925 and 1926 through several important junctions shows that there was a slight gain in this traffic, the analysis referred to, which was made a part of the report, shows that at some of the junctions such traffic decreased; and his own studies show a decrease of 12.8 per cent in automobiles, autotrucks, and parts. The investigation was on the basis of carloads, while Meyer's studies were on the basis of tonnage.

"Further, with reference to the Bureau's report, Meyer points to the many changes made in 1926 from junction waybilling to interline waybilling mentioned in the report, as indicating that it would be impracticable to make reasonable deductions from the data; and requests that if the Bureau has further data not embodied in the report referred to, it render a supplemental report embodying the further data. The report in our view shows that a diligent effort was made to ascertain whether there were in fact diversions of traffic; and, while not conclusive, it is to a considerable degree persuasive that since no evidence of diversions of traffic was found, probably none, or none of importance, occurred. And it does not appear that a further report such as Meyer requests is needed.

"We conclude and find from the entire record, including matters hereinafter more specifically referred to, and particularly automobile tonnage, agricultural implements, packing-house products, and iron and steel articles, that Meyer's contention that the debtor suffered heavy losses in freight revenues, or any such losses, attributable to the alleged illegal control, is not sustained. His contention as to losses of passenger revenue, supported only by indiscriminate statistical comparisons with other railroads, are likewise not sustained. And it follows from these findings, and our previous finding on his allegations as to unduly high operating ratios, that his contentions as to losses in net railway operating income cannot be sustained.

"(g) Meyer's contentions as to harmful influences brought to bear on debtor's traffic.—(1) Rock Island period.—Meyer elaborates further his contentions as to the damaging effect on the debtor's traffic of the alleged illegal control by the Rock Island from March 12, 1925, to October 14, 1925, by attempting to show all or part of the ways in which harmful influences were brought into play. Apparently, the stock of the debt-

or held by the Rock Island during this period, although not a numerical majority, was sufficient to enable it to exercise working control, and it appears that the Rock Island and the debtor took various steps looking toward unification of operations and cooperation in traffic. Meyer in this connection asserts first that the acquisition by the Rock Island had a deleterious effect on the morale of the debtor, its officers, and employees because of the sense of uncertainty he believes it prompted regarding the officers' and employees' continued employment. He has nothing but speculation to offer in support of his contentions except for a letter into which he attempts to read things not expressed. The letter, dated March 19, 1925, and referring to the traffic offices at San Francisco and Los Angeles, says that the uneasiness created by newspaper and stock-exchange reports had been set at rest, and the entire force was functioning in their usual and loyal manner. Be that as it may, there is nothing to indicate any loss of business caused in this manner.

"Meyer next asserts that the debtor, beginning at the time of Rock Island control, changed its solicitation practices so as to favor the Rock Island with traffic at the expense of its traffic relations with other railroads. He argues that it may fairly be presumed that on March 11, 1925, the debtor's traffic relations with other railroads were, at least in the judgment of its management, on the basis of what was most advantageous to the debtor. Notwithstanding this, the debtor did not, when its new relations with the Rock Island were consummated, refrain from and resist all changes in established traffic routings; but, on the contrary, it made an earnest effort to increase its interchanges with the Rock Island, necessarily, so Meyer argues, to the detriment of the debtor's relations with carriers competing with the Rock Island. And the detriment to the debtor is illustrated and proved, in Meyer's opinion, by the fact that deliveries by the Rock Island to the debtor increased in 1925 at Brinkley and Fordyce and fell off at Fort Worth and Dallas, from which he argues that the conclusion is unavoidable that the debtor was permitting itself to be short-hauled. Further, while both receipts from and deliveries to the Rock Island increased, deliveries to the Missouri Pacific increased, but receipts from the Missouri Pacific fell off.

"Manifestly, the theory that any disturbance of the debtor's previously existing traffic relations, when the Rock

Island assumed control, must have reacted to the disadvantage of the debtor, is no more tenable than a general theory that all consolidations must be detrimental to one or the other and perhaps to both participants. And it is unreasonable to assume that the debtor's traffic relations were immutable and perfect, even in the opinion of its management. As to Meyer's charge based on a falling off of interchanges with the Rock Island at Fort Worth and Dallas, accompanied by an increase at Fordyce and Brinkley, his evidence shows that the debtor's receipts from the Rock Island at Fort Worth and Dallas were abnormally high in 1924 compared with both prior and subsequent years, and, in addition, that Fort Worth and Dallas are the southern termini in Texas of both the debtor and the Rock Island. Since there are no important points on the Rock Island in Texas north of Dallas and Fort Worth, the possibilities of short-hauling the debtor on traffic coming from the Rock Island by routing by Brinkley or Fordyce in preference to Dallas or Fort Worth are relatively inconsequential. The falling off in deliveries to the debtor by the Missouri Pacific might have resulted in whole or in part from the effects of efforts of that carrier to retaliate for losses in traffic sustained through the closer relations of the debtor with the Rock Island; but there is no showing of record that it did or that, if it did, the debtor was not fully compensated by some part of the larger gains in the debtor's interchanges with the Rock Island made possible by the closer relations with that carrier.

"Meyer next asserts that a large number of new routes for traffic handled jointly with the Rock Island were opened which resulted, almost of necessity, in the impairment of the debtor's traffic relations with other railroads. He suggests that the new routes were opened without proper consideration given to the question, (a) to what extent by the opening of these routes could the debtor be short-hauled, and (b) to what extent the opening of the routes would have an unfavorable effect on the debtor's long-standing relations with other railroads. The most important of the new routes established were that by Fordyce, Ark., for the north-bound movement of lumber and cotton originating on the lines of the Rock Island south of Fordyce, which theretofore had been hauled by the Rock Island and delivered to the St. Louis-San Francisco at Memphis; and that on traffic between St. Louis and points beyond to Rock Island points in Oklahoma, which also had

been moving over other routes. The debtor adduced testimony showing that the opening of the new routes materially increased the St. Louis Southwestern revenues, and that in no case was it short-hauled thereby. No substantial basis can be found for Meyer's complaint against the opening of new routes which he has attacked; and even the traffic agents of the debtor, to whose correspondence Meyer frequently refers for support of other contentions, do not appear to have found any fault with opening of these routes. Meyer also alleges that the opening of these new routes disturbed more valuable relations with other railroads, but without making reference to any specific supporting evidence. His contentions are not sustained for lack of evidence, particularly in view of the public interest in the opening and keeping open as nearly as practicable, of all economical routes and channels of trade.

"Meyer next asserts that the Rock Island was favored with unrouted traffic, on the basis, as he believes, of the fact that it was in control of the debtor. The record indicates that the debtor's deliveries to the Rock Island of traffic for which the routings had not been specified by the shippers were proportionately much greater in 1925 than in 1924 or years subsequent to 1925. Accordingly, in the absence of another explanation, the inference that this was one of the effects of the closer relationship that had been brought about between the two carriers at that time appears reasonable; but there is nothing to show either that the favoring of the Rock Island with unrouted traffic, or that the net effects of the new relationship in their entirety, were detrimental to the debtor.

"Meyer next asserts that the Rock Island and the debtor exchanged information regarding traffic on which the one furnished with the information was interested, and the one furnishing it was not; and that this was harmful to the continuation of the debtor's good relationships with other railroads. He says that an arrangement was entered into by the two carriers most dangerous to the continued existence of good will between the debtor and railroads other than the Rock Island. He shows that an arrangement for exchange of information was contemplated, at least on the part of the Rock Island. Even assuming that the arrangement was made as contemplated, nothing of record shows that it was harmful or dangerous, or that it was not a practice consistent with sound managerial policies.

"Meyer next asserts that any arrangements initiated during the period of Rock Island control from which the debtor may have benefited were of a temporary nature only.

"He says that later the Rock Island favored the Kansas City Southern for the purpose of securing acquiescence by the Kansas City Southern in diversions of traffic from Southern Pacific-debtor joint routes to Southern Pacific-Rock Island joint routes.

"Receipts by the debtor from the Rock Island at Fordyce, after an increase from 44,984 tons in 1923, reached 217,-113 tons in 1926, and declined thereafter to 76,202 tons in 1931, and receipts at Brinkley declined from 156,-000 tons in 1926 to 69,000 tons in 1931. And the traffic files of late 1931 and early 1932 indicate apprehension that traffic was being lost to the St. Louis-San Francisco, the Rock Island having a longer haul with that carrier through Bridge Junction than with the debtor through Fordyce. Previously, a substantial increase in receipts from the Rock Island by the debtor had occurred; and the percentage increase of 1926 over 1924 had been greater in the case of the debtor than in the case of either the Kansas City Southern or the Missouri-Kansas-Texas. In 1927, however, the debtor's receipts from the Rock Island showed a decline from 1926, and in comparison with 1924 were not so favorable as were those of the Kansas City Southern, although better than those of the Missouri-Kansas-Texas. However, some very unusual movement appears to have taken place or begun in 1927 in the Kansas City Southern's receipts from the Rock Island, since figures for 1927 were more than five times those for 1926. And, on the other hand, by 1935, the debtor's receipts from the Rock Island at Fordyce had increased to an amount greater than in any previous year except 1926. Meyer's contentions are not sustained by the evidence he points out.

"Meyer next asserts that the effect on the debtor's relations with the Southern Pacific of the Rock Island's acquisition of control of the debtor was of great harm to the latter. He says that the Southern Pacific took advantage of Rock Island control to divert much traffic from the joint route maintained with the debtor to the route by way of Tucumcari and the Rock Island. As he reserves his discussion of the evidence on which he relies for these assertions for a later part of his case, the question will be considered by us later herein.

"With the latter contention, Meyer with the exception of certain references to the Southern Pacific hereinafter discussed, concludes his efforts to show the particular methods adopted unfavorably affecting the traffic and earnings of the debtor during the period of Rock Island control from March 12, 1925, to October 14, 1925. We are not impressed by the evidence presented.

"(2) Period from October 15, 1925, to December 31, 1932, in general.—Meyer next turns to the period October 15, 1925, to December 31, 1932, in an attempt to show that there were modifications of the debtor's traffic policies which were the occasion at that time of loss of traffic by the debtor and impairment of its earnings. He prefaces this discussion with the assertion that, by taking and exercising control over the debtor and the Missouri-Kansas-Texas, the Kansas City Southern saved itself from a dangerous position and otherwise greatly benefited itself. However, we are not concerned in this proceeding with the advantages gained by the Kansas City Southern, unless they were gained at the expense of the debtor.

"Meyer also makes the further prefatory statement that the files of the debtor on its relations with the Kansas City Southern are meager, and the files on its relations with the Missouri-Kansas-Texas even more so, suggesting, so he concludes, that there may have been adopted a policy of reducing to writing as little as possible of the matters concerning these relations. This the debtor denies. However, such a policy, Meyer believes, may have been adopted following our decision in the Unification case, supra, dated May 3, 1927, as a result, on the one hand, of our findings therein and, on the other hand, of active endeavors then made by the minority stockholders to protect the debtor's interests. In the latter activities Meyer always took the leading part. Whatever the facts may be as to policies adopted or practices put into effect with regard to the making of records, mere dearth of records does not support contentions for which there is no other proof. Conspiracy must be found upon evidence of its existence, and not upon the lack of such evidence.

"Meyer's first direct attempt to show that modifications of policies were adopted which occasioned the debtor loss of traffic and impairment of earnings is through a comparison of the debtor's net railway operating income for the years 1921 to 1936 with that of the Kansas City Southern. Our views as to the

conclusions which may. be drawn from comparison of the debtor's revenues and net railway operating income with those of not only the .Kansas City Southern, but also the Missouri-Kansas-Texas, the St. Louis-San Francisco, and the Missouri Pacific, have already been stated.

"Meyer next asserts that during the period of Kansas City Southern control the debtor's earnings may have been wrongfully and illegally impaired in many ways other than by diversion of traffic to the Kansas City Southern. This potentiality, we recognize and will bear in mind as we consider whether our investigation of the matters alleged by Meyer has been adequate. But we find in the matters brought to attention in this connection no suggestion of modification of traffic policies, the particular question with which apparently Meyer here wishes to deal; and no proof of detriment to the debtor in any manner.

"Meyer next asserts that there was a high degree of competition between the debtor and other railroads, so that only a slight impairment of the debtor's competitive ability might have had the effect of causing it to lose traffic seemingly out of proportion to the impairment. Much of the debtor's traffic undoubtedly is highly competitive, but neither the meaning nor the purpose of the conclusion we are asked to draw from that fact is clear, and we do not find substantiation therefor in the record.

"Meyer next asserts that his endeavors as a director of the debtor to obtain information from the management were unsuccessful. He says that in his opinion his requests were not unreasonable and did not involve an undue amount of work; that if there had not been diversions of traffic from the debtor to the Kansas City Southern the quickest way of establishing the fact would have been to comply with his requests for information and to extend every aid to a director who desired to obtain the information; and that the deliberate withholding of information by Upthegrove was in the nature of an admission by conduct that there was a great deal to conceal.

"Meyer as a director of the debtor was a trustee, and presumably entitled to such information as was necessary to the carrying out of his trust. The debtor defends the conduct of its management as follows:

"Intervenor [Meyer] was a director of the company during all save four years of the decade preceding bankruptcy. During this incumbency, in his dealings with them, he was highly obnoxious and offensive to his fellow directors. A review of intervenor's own testimony of how he conducted himself while a member of the board of directors will show that he at no time ever made a constructive proposal, but confined his efforts to dividends upon the common stock or to obstructing all proposals of the other directors and the management and invariably impugning their honesty and motives.

"Intervenor [Meyer] early learned that no better way of harassing and embarrassing railway management can be found than continuously to ask for data either confidential in that it should not be exposed to competitors, or data which can only be obtained by special studies. In 1926 intervener was given permission to inspect complete files on all subjects specifically designated by him, but was refused the right to fish through all of the correspondence of the executive officers of the company, but did not avail himself of the opportunity thus offered after it had been given. Throughout the period 1926 to 1931, intervener was continuously requesting data and statistics, many of which would have had to be prepared for him at prohibitive costs. Intervener also went over the property with experts upon at least two occasions. As any data given intervener immediately was broadcast, frequently after distortion, the management soon found that it was most unwise to give him confidential information such as interchange with particular connections at particular junctions and divisions of through rates with various connections. The lack of sincerity in all these requests, however, was clearly revealed in 1931, when upon being given the unconditional right to examine in detail all of the books and records of the company, after several days' dispute over the extent of the examination, he immediately abandoned the request and returned to New York.

"The materiality of this controversy to the purposes of this proceeding is similar to that of the policy, which Meyer says may have been adopted, of reducing to writing as little as possible of matters concerning the debtor's relations with the Kansas City Southern and the Missouri-Kansas-Texas. Whatever the facts may be as to whether Meyer's rights as a director were overridden—and there is enough in the record to indicate that for motives which were deemed to be in the interest of the corporation, officers of the debtor did deny him access to information to which he was legally entitled—we cannot take such conduct as support for contentions not otherwise proved, nor do we believe

that it can be taken as ground for the further investigation of matters already investigated at very great length.

"Meyer next asserts that Loree endeavored to alter the points of interchange between the debtor and the Southern Pacific in a manner which would have facilitated diversions of traffic. The attempt referred to was to move to Dallas the interchanges then made at Corsicana, in view of the character of the line between Corsicana and Mount Pleasant; and the question was raised whether to move the point of interchange to Beaumont, where the line would have been somewhat longer, but the difference in grades would have enabled the traffic to be handled at a lower cost. It was suggested that the shift could have been made without materially affecting the divisions, and, perhaps, the divisions could be left as they were. Under the second alternative, it was proposed that the debtor should have the haul north of Shreveport, and the Kansas City Southern the haul between Shreveport and Beaumont. But, as to the latter, Meyer believes that the Kansas City Southern would have been able to hold the traffic for the long haul to Kansas City, and thence to points east of the Mississippi and north of the Ohio. And the shift to Dallas, he believes, would, since the Missouri-Kansas-Texas meets the Southern Pacific at that point, have facilitated diversions of traffic from the debtor to the Missouri-Kansas-Texas.

"Meyer's contention that a change from Shreveport to Beaumont would have carried with it a decreased revenue to the debtor, although the haul over the debtor was in no way decreased, is not supported by the evidence. However, as to the entire proposal, there is nothing to indicate that anything to the debtor's disadvantage was intended, and in any event, since the proposal was never carried out, the debtor was not hurt. On the other hand, Meyer's alarm at the proposal to shift the point of interchange from Corsicana appears inconsistent with his charge, hereinbefore discussed, that the rehabilitation of the line from Corsicana to Mount Pleasant was a waste of the debtor's assets.

"Meyer next points to the testimony of L. J. Spence, executive officer of the Southern Pacific, in the Unification case, to the effect that the common control of the Kansas City Southern, the Missouri-Kansas-Texas, and the debtor as proposed would have created an incentive to divert traffic from the Southern Pacific to the Kansas City Southern at Shreveport, from the Southern Pacific to the Missouri-Kansas-Texas at north Texas gateways, and from the Southern Pacific-debtor joint routes to the long haul of the Missouri-Kansas-Texas at San Antonio, Houston, Galveston, and other Texas points, in order to derive the greatest revenue. Meyer does not contend that there is any evidence that the incentives urged did lead in point of fact to any of the diversions of traffic of which Spence was apprehensive.

"Meyer next asserts that an exchange of memoranda by the debtor, the Kansas City Southern, and the Missouri-Kansas-Texas on business which, it was believed, could have been rerouted in event of unification, facilitated diversions of traffic. He suggests that in considering the problem to what extent traffic was diverted from the debtor it may well be that these memoranda will afford a useful clue. No evidence that any traffic was in fact diverted is offered in this connection.

"Meyer next asserts that there are indications that there were during the years 1926 to 1928 diversions of traffic from the debtor to the Kansas City Southern or the Missouri-Kansas-Texas on automobiles, autotrucks and parts, agricultural implements, fresh meat and other packing-house products, iron and steel articles, and peaches and tomatoes. A memorandum discussing most of these alleged diversions was submitted by Meyer to Paul Shoup, vice chairman of the Southern Pacific, on March 15, 1933; and Meyer urges that Shoup's failure to comment or reply is in the nature of an admission on the part of the Southern Pacific. We can find no reason to construe Shoup's omission or disinclination to discuss the matter with Meyer as an admission on Shoup's part of any of Meyer's contentions. However, the contents of the memorandum will be considered as a part of Meyer's testimony.

"From 1925 to 1926, tonnage carried of automobiles, autotrucks, and parts, for the southwestern region as a whole, increased 2.6 percent, for the Kansas City Southern 32 percent, and for the Missouri-Kansas-Texas 11.2 percent, while for the debtor it decreased 12.8 percent. The debtor's showing in automobiles, autotrucks, and parts was thus in Meyer's view unsatisfactory as compared with the showing of neighboring roads.

"In agricultural implements the debtor experienced a decrease of 2.1 percent, while the Kansas City Southern showed an increase of 23.9 percent, and the Missouri-Kansas-Texas an increase of 1.3 percent. This comparison Meyer regards as the more impressive in the

light of the fact that in agricultural products originated on the line the debtor had an increase of 27.3 percent and the St. Louis Southwestern of Texas an increase of 8.7 percent, while the Kansas City Southern incurred a decrease of 8 percent. He considers it reasonable to expect traffic on agricultural implements to vary with some consistent relation to agricultural products. Traffic on agricultural implements in 1927 and 1928 continued to exceed 1925 on the Kansas City Southern, and continued to fall short of 1925 on the debtor. The Kansas City Southern stated that its increase originated on its own line, and therefore could not have been diverted from the debtor's; but Meyer insists that it was entirely practicable for the shippers to have given the Kansas City Southern increased tonnage at Kansas City at the expense of the Missouri-Kansas-Texas, at the same time giving the Missouri-Kansas increased tonnage at St. Louis at the expense of the debtor.

"In fresh meat and other packing-house products, the debtor had a decrease in tonnage carried from 1925 to 1926 of 3.9 percent, while the Kansas City Southern had an increase of 16 percent. Over 1925, in 1928, the debtor had an increase of 5.2 percent, the Kansas City Southern an increase of 37.3 percent, and the Missouri-Kansas-Texas a decrease of 14.13 percent. The Kansas City Southern stated that the greater part of the increase was in tonnage originated on its own line, and only a smaller amount of the increase was in traffic received from connections; and that there was also a considerable increase in tonnage at Kansas City, whether originating there or received from connections. It argues accordingly that there was no possibility of diversions of traffic from the debtor to the Kansas City Southern. Meyer urges that Loree or somebody acting at his instance could easily have induced the packers to take tonnage away from the Missouri-Kansas-Texas at Kansas City, and give it to the Kansas City Southern there, and make good this tonnage to the Missouri-Kansas-Texas at St. Louis with tonnage taken from the St. Louis Southwestern.

"In discussing iron and steel articles, Meyer, for reasons not stated, adopts a somewhat different basis of comparison, and directs attention to the changes in total tonnage from the 3-year period 1923–25, to the 3-year period 1926–28. The debtor's tonnage in commercial steel showed an increase of 7.9 percent in the second period over the first, the Kansas City Southern's an increase of 17 percent, and the Missouri-Kansas-Texas' an increase of 33 percent. And the greater relative progress of the Kansas City Southern and the Missouri-Kansas-Texas is the less easily to be explained, in Meyer's opinion, in view of the fact that while the debtor's purchases of rail fell off only 11.8 percent, those of the Kansas City Southern fell off 18 percent, and those of the Missouri-Kansas-Texas increased by only 5.7 percent. Meyer believes that recognition from the steel mills for rail purchases can be obtained in the form of additional tonnage of commercial shipments.

"Meyer, in connection with the latter contentions, which were first presented to us in his petition to reopen the Clayton Act case, makes reference to the reply of the Kansas City Southern filed in that proceeding. In the reply are stated the explanations given for the Kansas City Southern's increases in automobiles, autotrucks and parts, agricultural implements, fresh meat and packing-house products, and iron and steel articles. Meyer takes note of the explanations given for agricultural implements and packing-house products, and attempts to refute them, as hereinbefore shown. He does not refer, however, to the explanation given for automobiles, autotrucks and parts, and iron and steel articles.

"The Kansas City Southern's increase in iron and steel articles is shown to have come from three sources, none of which could have been supplied by diversions from the debtor. The most important of the three was the building, completed in August 1925, of 20 miles of line to a connection at Baxter Springs with the Kansas, Oklahoma & Gulf. Prior to the building of this connection, the Kansas City Southern could not participate to any extent with the K., O. & G. in this class of traffic, as the latter handled it through direct connections such as the Missouri Pacific and the St. Louis-San Francisco. The increase in tonnage of iron and steel articles delivered by the Kansas City Southern to the K., O. & G. at Baxter Springs was 114,205. All this tonnage was received by the Kansas City Southern from its northern connections at Kansas City. If this increase were eliminated, the Kansas City Southern's showing would have been a net loss as compared with the debtor's substantial increase. In like manner, it is apparent from the Kansas City Southern's reply that for all automobile tonnage other than that handled in connection with K., O. & G., the Kansas City Southern had a decrease in

1926 as compared with 1925 of 6 percent, instead of an increase of 32 percent; and a decrease in 1928 as compared with 1925 of 2 per cent, instead of an increase of 46.5 percent. Apparently, on traffic handled in connection with the K., O. & G. the debtor could have no participation, so that the Kansas City Southern's increase therefrom was not at the expense of the debtor.

"As to tomatoes and peaches, it appears that Upthegrove in conversation with Meyer on July 9, 1928, stated that in the previous year there had been shipped by way of Kansas City a considerable amount of this tonnage that had theretofore been carried by the debtor to St. Louis, but that all the lost business had been recovered, and the heavy tomato and peach crop had swelled the amount. Meyer suggested that Upthegrove may have thus referred to a diversion of traffic from the debtor to the Kansas City Southern. Upthegrove was apparently not questioned at the time of the conversation as to whether he referred to such a diversion; and, although present at the hearing, was not questioned there on this matter.

"In our view, Meyer's contentions that there are indications that there were, during the years 1926, to 1928, any material or significant diversions of traffic from the debtor to the Kansas City Southern or the Missouri-Kansas-Texas on automobiles, autotrucks and parts, agricultural implements, fresh meat and other packing-house products, iron and steel products, and peaches and tomatoes, are not sustained.

"Meyer next asserts that the debtor's traffic department endeavored through solicitation to increase its interchange with the Kansas City Southern, with results unfavorable to the debtor's relations with other roads. It appears from the evidence presented by Meyer, in the way of correspondence of the debtor's traffic officers of the time, that to a great extent the solicitation forces of the debtor and the Kansas City Southern worked together to increase interchanges in both directions—a practice which, however, had been in effect for many years. But there was, on the other hand, at least one complaint on the part of the Kansas City Southern that it was unable to work with the debtor's solicitors, for the reason that after traffic was worked up jointly to move by both lines, with the debtor to receive a short haul, the debtor's solicitors would change their approach and induce the shippers to route so as to give the debtor its long haul.

"Apparently in other instances the working together did not go to the extent of soliciting jointly; and one of the debtor's general traffic managers, who advised the Kansas City Southern that the debtor thoroughly appreciated the excellent tonnage which had been moving the debtor's way from the Kansas City Southern, and that every effort was being made to increase the debtor's deliveries to the Kansas City Southern, nevertheless advised the head of the debtor's freight traffic department that joint solicitation with the Kansas City Southern was not generally practiced; that the debtor had always worked preferentially with the Kansas City Southern and had given the Kansas City Southern considerable business solicited by the debtor's men, but had always protected the debtor's long haul when it was to the debtor's interest to do so. While these practices were going on, Meyer shows that the debtor's interchanges at Texarkana with the Kansas City Southern increased, but that there was some falling off in the debtor's interchanges with the Missouri Pacific at the same point. The latter Meyer attributes to the Kansas City Southern control of the debtor. There is nothing but Meyer's speculation to connect the losses of Missouri Pacific interchange at Texarkana with the debtor's relations with the Kansas City Southern; and in any event, nothing to show that in net effect the debtor was the worse off as a result of its relations with the Kansas City Southern.

"Meyer next asserts that routes were opened jointly with the Kansas City Southern impairing the debtor's traffic relations with other railroads, and affording opportunities for short hauling it. The evidence offered in support of this allegation includes a report incorporated in the petition filed March 21, 1930, by Meyer to reopen the Clayton Act case, and certain working papers prepared by the debtor apparently for use in connection with the Kansas City Southern's reply. The report was on an examination of joint-line tariffs in which both the Kansas City Southern and the debtor participated, and the routing instructions contained in such tariffs. The period covered was from 1924 to sometime in 1930. Owing to pressure of time, only a limited number of tariffs were examined. The conclusions of the report were that, as it appeared from the tariffs examined, that since the Kansas City Southern took control in November 1925 routing changes had been made which benefited

the Kansas City Southern, giving it a haul on traffic in which it formerly could not participate jointly with the debtor; that this resulted in short-hauling the debtor; and that during all that time there had been no changes benefiting the debtor to the detriment of the Kansas City Southern.

"The report contained the further conclusion that since April 1929 no steps had been taken to close the routes opened during Kansas City Southern control to the detriment of the debtor, but, on the contrary, additional new routes had been opened which had the effect of benefiting the Kansas City Southern at the expense of the debtor. The report also stated that a number of tariffs examined did not contain specific routing instructions or restrictions, but were applicable to any routes made up of carriers parties to the tariffs. These routes, known as open routes, permitted the Kansas City Southern to solicit traffic over its line, with consequent shorthauling of the debtor. The report pointed out that in the case of such tariffs no changes were necessary to permit such solicitation. The working papers referred to are presented in order to show that in certain compiled lists of changes in tariffs and routings after January 1, 1925, opposite some of the items appears the notation 'don't use' or 'don't use as we are shorthauled.'

"The working papers appear to show nothing except that some of the new routes short-hauled the debtor. This was to be expected; and it would be surprising if the contrary were the case —in the opening of a large number of new joint routes a maximum haul had been provided for the debtor in all instances. The conclusions of the report manifestly could not have been drawn from a mere examination of tariffs; and must rest largely on the opinions of the writer. The writer was not presented for cross-examination. His opinions are, we are convinced, in error; and the testimony persuasively shows that the new routes were opened in the regular course of business without regard to stock control, and that they were opened at the instance of the debtor to enable it to participate in traffic which for one reason or another was routed through Missouri River gateways, rather than over routes giving longer hauls to the debtor. It is better to obtain a short haul rather than none at all. There is no evidence of record that the opening of the new routes adversely affected the debtor's relations with other railroads.

"Meyer next asserts that the opening of Missouri River gateways offered opportunities for short-hauling the debtor which were availed of to its damage. Meyer argues that the Wabash, the Chicago, Milwaukee & St. Paul, and other railroads, in order to obtain the long haul, were under an inducement to carry freight traffic, originating east of the Mississippi and north of the Ohio, to Kansas City, rather than to St. Louis, if joint rates permitted roads from Kansas City to haul this traffic to points on the debtor. He says that in 1930 the debtor departed from the policy that it had theretofore pursued of insisting upon receiving all traffic at St. Louis for the long haul over its line to points south, and at that time proposed to remove, effective March 17 and April 16, 1930, routing restrictions then in force in certain tariffs affecting the routing of traffic originating at St. Louis and points east of the Mississippi, with certain specified exceptions, and destined to points on the debtor's lines in Arkansas and Louisiana.

"Meyer opposed the change at the time, but was induced to withdraw his objection when the management of the debtor represented to him that a delay in opening the new routes would cause the debtor the loss of much traffic, and stated that they would convince him by data that he was wrong. Meyer withdrew his protest, but the data were not furnished, Upthegrove advising that he had been mistaken as to the manner in which the records were kept, and that the information would cost $2,000 to compile. This contention, so far as material to the case now before us, appears to be the same as the one last preceding, except for the period of time covered. For the same reason it is likewise not sustained.

"Meyer next asserts that the debtor's relations with the Missouri-Kansas-Texas were injurious to it under the alleged common control of the debtor and the Missouri-Kansas-Texas by the Kansas City Southern. He says that the debtor is keenly competitive with the Missouri-Kansas-Texas from St. Louis to Dallas and Fort Worth, and all the way to Houston, Galveston, and San Antonio, and also for transcontinental traffic. Further, the testimony of a witness for the Southern Pacific in the Unification case indicated that common control of the debtor and the Missouri-Kansas-Texas might create an incentive to divert traffic from the joint route of the debtor and the Southern Pacific to the long haul of the Missouri-Kansas-Texas. Being made before the traffic reached

the debtor, any such diversion would not be disclosed, Meyer believes, in the figures showing tonnage interchanged between the debtor and the Missouri-Kansas-Texas.

"In a letter dated September 21, 1927, John F. Lehane, vice president of the debtor, complained to George T. Atkins, vice president of the Missouri-Kansas-Texas, that, while the debtor was using every opportunity to favor the Missouri-Kansas-Texas lines, he did not believe it was receiving the same reciprocal treatment from the Missouri-Kansas-Texas lines. Lehane was continually asking the Missouri-Kansas-Texas' Dallas office to favor the debtor, and calling its attention to the debtor's increased tonnage deliveries to the Missouri-Kansas-Texas, as against a decreased tonnage received from the Missouri-Kansas-Texas. He was also, he said, confronted with the fact that at every opportunity that could be availed of, where business had been routed via the Missouri-Kansas-Texas and the debtor, principally via the Greenville Junction, the routing was disregarded and was carried to destination via the Missouri-Kansas-Texas lines; and he had, in every case, to call attention to the diversion in order to have the billing turned over to the debtor, which he said was done, of course.

"In a letter dated October 7, 1927, Atkins wrote that it was true that the Missouri-Kansas-Texas had diverted from the debtor's line some competitive business, especially at Dallas, and that the Missouri-Kansas-Texas regretted it. Lehane's letters were not all written in a spirit of complaint; on November 14, 1927, he again wrote Atkins expressing himself as well satisfied with the Missouri-Kansas-Texas efforts in the debtor's behalf, and thanked him for getting the debtor a share of the haul on 75 cars of pipe for Rotan, Tex.

"Meyer further shows that on May 2, 1928, the Southern Pacific complained that 1,500 tons of rail for the debtor had been routed against the Southern Pacific; and that on May 8, 1928, on 5,000 tons of traffic for the debtor which the Southern Pacific could have handled to advantage, the debtor routed against the Southern Pacific. This was not, so the Southern Pacific urged, in accordance with the spirit of its understanding with the debtor.

"In considering this evidence, as regards both the Missouri-Kansas-Texas and the Southern Pacific, we are mindful that the railroads concerned were competing or should have been competing, for the same traffic, although the competition was apparently to some extent restrained, or intended to be restrained, by certain understandings believed to be of mutual advantage. The established fact that these adversaries were watching each other with [a] jealous eyes, and at times were outspoken in their complaints against what they conceived to be infractions of common understandings, not only fails to support the theory that all were dominated by the alleged sinister policies of the same group of conspirators, but is definitely inconsistent with any such theory. Moreover, the record does not show that the debtor was to any extent injured by its relations with the Missouri-Kansas-Texas in the instances referred to or otherwise.

"Meyer next asserts that instructions were sent to the debtor's solicitors on November 23, 1925, designating the Missouri-Kansas-Texas as an additional route for unrouted cotton traffic moved to Gulf ports moving by Waco, Greenville, Dallas, Sherman, and Hillsboro; and that these instructions were contrary to the interests of the debtor. The record shows that on November 23, 1925, the Missouri-Kansas-Texas was added by supplementary tariff as one of the connecting carriers among which unrouted cotton originating at stations of the debtor in Texas would be divided equally at six junctions in Texas. This, the debtor says, was no more than was required by section 3(3) of the Interstate Commerce Act [49 U.S.C.A. § 3 (3)] ; and so it appears prima facie to have been, although the supplementary tariff was later in large part rescinded. Meyer argues that the debtor had nothing to gain; but this is a mere conclusion on his part reached without apparent examination of the circumstances, as is also his suggestion that the subsequent cancellation in part of the supplementary tariff is proof that it was not in the interest of the debtor in the first instance.

"With the exception of matters applying particularly to the Southern Pacific hereinafter discussed, Meyer thus concludes his efforts to show the particular policies and practices adopted and harmful influences brought to bear unfavorably affecting the traffic and earnings of the debtor during the period beginning October 15, 1925, with the Kansas City Southern's acquisition of the controlling stock, and extending through the period when the stock was in the hands of the syndicate to December 31, 1932, the closing date of the year in which the Southern Pacific was author-

ized by us to acquire the control. We are not impressed by the evidence presented.

"(3) Period from March 1925 to April 15, 1932, particularly with reference to the Southern Pacific.—Meyer next asserts that during the period of alleged illegal control of the debtor from March 1925 to April 15, 1932, the Southern Pacific, taking advantage of the opportunity afforded by such control, illegally and unconscionably conspired with those who controlled the debtor, and changed its traffic relations with the debtor to its own advantage and greatly to the disadvantage of the debtor; that the Southern Pacific conspiring first with the Rock Island, and then with the Kansas City Southern and others in alleged illegal control of the debtor, deprived the debtor of much valuable traffic, using the traffic thus diverted to other railroads to obtain from such other railroads, in return, additional traffic for its own lines. Included among the railroads to which he charges the traffic was diverted are the Rock Island, the St. Louis-San Francisco, the Kansas City Southern, and the Missouri-Kansas-Texas.

"He charges with like effect that the Southern Pacific, by bringing pressure to bear on the Kansas City Southern, was able to compel the debtor, controlled by the Kansas City Southern, to continue to solicit preferentially and exclusively for the debtor Southern Pacific joint routes, and to join in perishable-traffic schedules which resulted in the carrying of large amounts of traffic at a loss. And he asserts that by such wrongful and unlawful acts of the Southern Pacific the debtor's traffic was unfavorably affected and its earnings greatly impaired. In support of these general contentions with reference to the Southern Pacific, Meyer first asserts that deterioration in value of the debtor's traffic relations with the Southern Pacific, during the period 1925 to 1932, was the most important factor, among a number of causes, which contributed to the impairment of the earnings and of the financial condition of the debtor.

"In his discussion of the latter contention, Meyer proposes that for the purposes of consideration herein, the Southern Pacific's relations with the debtor be regarded as divided into two periods. The first, beginning on March 11, 1925, when the Rock Island acquired control of the debtor, and extending through the intervals of Kansas City Southern direct control and subsequent alleged indirect influence to April 15, 1932, when the Southern Pacific was authorized by us to take control, is the period with which we are now primarily concerned. Although he thus treats the intervals from October 19, 1929, to April 15, 1932, as a part of the first period, he points out that, in October 1929, the Southern Pacific began to accumulate stock of the debtor, and by July 15, 1930, had an investment of $19,501,171 therein. He urges that from the latter date the Southern Pacific should have been under an inducement to favor the debtor with traffic by every possible means. The second period he regards as beginning on April 15, 1932, when we authorized the Southern Pacific to take control.

"Having set out to discuss the period prior to April 15, 1932, he interpolates that the latter date should have marked the dawn of a new day for the debtor, since it then became part of an extensive and powerful railroad system. The language he chooses is metaphorical, but with his apparent meaning we do not agree. On the contrary, it appears that both prior and subsequent to April 15, 1932, both the debtor and the Southern Pacific were laboring under the impact of almost overwhelming adverse economic conditions, which they could neither escape nor control to any substantial extent. To combat the losses which the debtor was sustaining as a result of such conditions, the utmost efforts of the Southern Pacific to increase its interchanges of traffic with the debtor would, we are convinced, have been ineffectual. Meyer here not only has not shown that the Southern Pacific was the most important cause of the impairment of the debtor's earnings and financial condition either before or after April 15, 1932; he has not even shown that the Southern Pacific contributed in the least degree to that result. And the record, as will hereinafter appear, shows, to the contrary, that the debtor's relations with the Southern Pacific have been of much benefit to the debtor, as we hoped that they would be subsequent to April 15, 1932, when we approved and authorized the Southern Pacific's acquisition of control.

"Turning to the subject of the traffic relations of the debtor with the Southern Pacific prior to 1932, Meyer shows that in 1913, after the St. Louis-San Francisco canceled its traffic contract with the Southern Pacific, the latter entered into an agreement with the debtor for joint solicitation of merchandise traffic. Thereafter, in 1917, an agreement was entered into by which the debtor undertook to have all freight to or from Arizona and California actively solicited for the Southern Pacific lines west of Corsicana, Tex., or Shreveport,

La., and to bill and send by those lines all west-bound shipments not otherwise consigned and routed by the shippers. The Southern Pacific on its part undertook to have all west-bound and east-bound commercial freight between middle west territory and southern California solicited without discrimination against the debtor's route, and to have all west-bound and east-bound commercial freight between eastern territory and southern California solicited without discrimination against the debtor in favor of any other line except a longer haul of Southern Pacific lines east of El Paso. It will be observed that the agreement of 1917 fell short of complete mutuality, since the Southern Pacific merely agreed to solicit without discrimination against the debtor, while the debtor agreed to solicit for the Southern Pacific lines mentioned.

"Meyer points out that actual solicitation practice may vary from the terms of an agreement intended to govern it. There was nothing in the agreement which prohibited the Southern Pacific from going beyond its terms and soliciting preferentially for the debtor. Whether or not this was in fact done, the Southern Pacific's interchanges with the debtor increased substantially between 1921 and 1924, prior to Rock Island control. The Southern Pacific's deliveries to the debtor thereafter fell off slightly in 1925, and the debtor's deliveries to the Southern Pacific fell off substantially. The conditions appear to have culminated in what Upthegrove described in 1926 as an arrangement which had developed gradually through mutual effort, but had never been embodied in a formal written agreement. Under this arrangement, as Upthegrove understood it, the two railroads mutually and preferentially solicited the movement of traffic between Mississippi River crossings and central territory, including Illinois, on the one hand, and points reached via their line in Texas, New Mexico, Arizona, and southern California, on the other. Upthegrove at that time objected to signing a contract proposed by the Southern Pacific because it did not bind the Southern Pacific to maintain the routes, service, or preferential solicitation.

"There is also other evidence that may indicate that the Southern Pacific's solicitation was in practice preferential in the debtor's favor, but the Southern Pacific was clearly not bound to the practice of preferential solicitation, either in the contract of 1917 or in a later contract covering such matters entered into on July 30, 1926, to take effect upon the incorporation of its provisions as a condition in orders entered by us granting the applications then pending in the Unification case, supra. Since those applications were not granted, the later agreement never became operative.

"The joint traffic was of great value to both carriers. On it in 1925 the debtor earned $3,400,000, or in excess of 13 percent of the gross revenues of its system; and the traffic produced 50 per cent more revenue per ton for the debtor than the traffic interchanged with any other major system in the Southwest, and twice as much per ton as the average of all traffic interchanged with all such major systems other than the Southern Pacific. Assigning to this traffic its proportion of all expenses, the debtor received from it in 1925 nearly $850,000 in net railway operating income; and in all probability its loss would have meant a loss of between $1,500,000 and $2,000,000 a year in net income. The same traffic in 1925 yielded $2,785,993 in revenues to the Southern Pacific lines east of El Paso. The debtor's line and the Southern Pacific lines naturally supplement each other, and together form through routes and channels of trade and commerce which have been in existence for a long period of time.

"Meyer charges that the Southern Pacific with conditions being as thus described, anticipating Rock Island control of the debtor, took advantage of such control to enter into traffic relations with the St. Louis-San Francisco to the detriment of the debtor. Early in 1925, after negotiations, the Southern Pacific reached a new understanding with the St. Louis-San Francisco as regards solicitation of traffic via Sherman, Tex.; and on March 3, 1925, issued instructions to traffic managers to put the understanding into effect. The understanding reached and the instructions issued expressly and clearly stated that it was not intended to alter the Southern Pacific's existing obligation to the debtor, or any other connection, to solicit without discrimination against them; and the undertaking on the Southern Pacific's part was described as not a preferential working agreement, but a 'reciprocal' friendly understanding.

"Nevertheless, the debtor thereafter received word that a commercial agent of the St. Louis-San Francisco at Los Angeles was disseminating a report that the friendly relations theretofore existing between the Southern Pacific and the debtor had been transferred to the St. Louis-San Francisco; that the

Southern Pacific in Galveston was soliciting preferentially via the St. Louis-San Francisco and Texas Midland; and that in Houston the Southern Pacific was similarly soliciting, and lukewarm in its solicitation for the debtor. Interchanges as a whole between the Southern Pacific and the St. Louis-San Francisco fell off in tonnage from 1924 to 1925, but they increased in money value to the Texas & New Orleans, and they increased in money value to the St. Louis-San Francisco for tonnage received by it from the Southern Pacific lines in Texas and Louisiana. Increases in traffic were received by the St. Louis-San Francisco from the Southern Pacific at Sherman which were relatively large in both tonnage and money value.

"However, we find in the statistics no substantial support for a finding that the Southern Pacific did not carry out its agreement to solicit without discrimination against the debtor. Such traffic, if any, as the St. Louis-San Francisco may have taken from the debtor in competition through more effective but proper means is no concern of this proceeding. The only indications of any failure on the part of the Southern Pacific to perform fully its agreement were the incidents at Galveston and Houston, which, if they occurred as described, were apparently nothing more than the misdirected or perhaps intractable actions of a few among the many solicitors employed by the Southern Pacific. The importance of a few such incidents in a proceeding for the reorganization of the debtor is of small consequence.

"Meyer next asserts that the acquisition of control of the debtor by the Rock Island was followed by preferential solicitation and diversions of traffic from the debtor to the Rock Island route through Tucumcari. At this time the Southern Pacific was apparently under obligation, entered into in 1917, to solicit without discrimination against the debtor, and was or had been under obligation, also entered into in 1917, to solicit without discrimination against the Rock Island; and a short time prior thereto had acquired the El Paso & Southwestern, thus extending its lines northwardly from El Paso to a connection with the Rock Island at Tucumcari, and increasing its haul on the route through that point, which competes with the route by Corsicana in which the debtor is interested. Whether or not prompted by this extension of line, or by the debtor's relations with the Kansas City Southern, or by other considerations, at this time a new and superseding traffic agreement or a new working arrangement tanta-

mount thereto appears to have been entered into by the Southern Pacific. Some ground for such a new agreement or working arrangement appears from the fact that the business the Rock Island had been receiving was the melon and fruit business, which, because of the service required, produced a very small net revenue. As a result the Rock Island was making an effort to secure some of the nonperishable commodities which yielded a higher freight rate.

"Following the new agreement or working arrangement, A. W. Reese, Pacific coast agent of the debtor, wrote from Los Angeles on August 27, 1925, that he had been informed that a new agreement provided that the Rock Island was to be the preferential route on shipments originating in or destined to southern California, on the one end, and eastern defined territory west of group 'A' to, but not including, the north bank of the Ohio, on the other end. On September 9, 1925, Reese wrote that he had seen no adverse effects on the debtor's business due to the new traffic alliance of the Southern Pacific with the Rock Island. On September 16, 1925, he wrote that he had been advised that the Southern Pacific solicitation as respects the territory mentioned was to be for the Rock Island without discrimination in favor of any other line; but that to that date he had been unable to find that the debtor had lost any shipments as a result of the agreement.

"On November 9, 1926, however, Reese wrote that all shipments destined to or originating in Chicago territory, including Michigan and Wisconsin, were being solicited by the Southern Pacific by the Tucumcari route; and that citrus shippers would not consider giving the debtor any tonnage except diverted cars from south Texas points, without a fast schedule into St. Louis equal to those of competitors. On January 4, 1927, Reese wrote that the situation was gradually developing into an increased favoritism for the Rock Island on the part of the Southern Pacific soliciting force, which had been and still was injuring the debtor's interests in southern California. His reference was apparently to Chicago territory. As to such territory, the Southern Pacific represented that its instructions to solicitors did not provide for preferential solicitation in connection with the Rock Island, except to the extent that time was a factor in securing the business against the competition of the Chicago & North Western-Union Pacific or Santa Fe, where they were obliged to handle the business in connection with the Rock Island be-

cause of the shorter time by way of that route. As to the latter, Reese wrote on February 9, 1927, that since it was presumed that the Rock Island routing was the best the Southern Pacific could offer in point of time, the effect was to eliminate the debtor as a factor in the movement so far as constructive solicitation on the part of the Southern Pacific soliciting force was concerned. Apparently the elimination of the debtor was due to its inability to compete, and not to any discrimination against it by the Southern Pacific.

"On July 20, 1927, J. F. Lehane, vice president of the debtor, wrote Upthegrove that he had been informed that the Southern Pacific was working more closely with the Rock Island than with the debtor. On August 1, 1927, Lehane wrote that he was firmly of the opinion, from all information that he had, that the Southern Pacific had been working preferentially for the Rock Island. He expressed the view that the fact that the Southern Pacific had a faster schedule by Tucumcari did not release it from the obligation to solicit without discrimination against the debtor, any more than the fact that the debtor had a faster schedule with the Texas & Pacific permitted the debtor to solicit other than Southern Pacific long haul. On January 20, 1928, J. D. Watson, general traffic manager of the debtor, wrote to E. W. Clapp, traffic manager of the Southern Pacific lines at Chicago, stating that information had reached him from eastern territory that in the solicitation of Colton block and Imperial Valley block business the Southern Pacific was observing the Tucumcari route as the first preferred route and the Corsicana route as the second preferred route, in accordance with Clapp's instructions. Watson stated that in the Imperial Valley district he found the business was being preferentially solicited by Pacific system solicitors of the Southern Pacific by the Tucumcari route, with the result that the movement through Corsicana from the Imperial Valley district was exceptionally small.

"The evidence here has little to raise it above hearsay. It was given attention, and embodied in records made and preserved in the ordinary course of business; but it is all unconfirmed rumor and report, generated perhaps by the disappointment of the debtor in the traffic obtained. If we assume, without so holding, that the rumor and report are accurate as far as they go, it appears that the debtor was not providing adequate service for movement of citrus fruits by the Corsicana route; that the Rock Island was providing a faster service by Tucumcari; that the net revenues to the Rock Island on perishables received from the Southern Pacific by Tucumcari were small; and that the Rock Island was urging the small profits on perishables as a reason why the Southern Pacific should help it to obtain a greater amount of other and more profitable traffic. So far as permitted by its preexisting obligations, including its agreement to solicit without discrimination against the debtor, the circumstances would appear to have been such as to justify a reasonable effort on the part of the Southern Pacific to comply with the Rock Island's request.

"The Southern Pacific's agreement must be given a reasonable interpretation. When shippers had once refused to use the Corsicana route because of the unsatisfactory schedules, it would appear reasonable to assume that the Southern Pacific was at liberty to solicit by other routes, rather than by inaction to abandon the business to competitors. As for Chicago district nonperishable traffic, the solicitation practices of the Southern Pacific, at the time of Rock Island control or somewhat later, appear from the weight of such evidence as there is, to have been, to some extent, carried on in a manner that did not fully comport with the express terms of its obligation in writing to the debtor, particularly in view of the fact that the agreement now in force has been amended so as to permit preferential solicitation in favor of the Rock Island on this traffic. But apparently traffic agreements are made to continue in force only so long as mutually advantageous, and the presumption is that the debtor was on the whole satisfied with its traffic relations with the Southern Pacific, since it took no definite steps to dissolve or alter them.

"As to damage to the debtor's earning power it appears very doubtful that there was any which was fairly to be charged to the Southern Pacific. The debtor's inability to provide schedules on perishable traffic equal to those of competitive routes was apparently the cause for any loss of this and other traffic to and from the Chicago district as well as elsewhere, rather than any abuse of control by the Rock Island or the Kansas City Southern. But, as hereinbefore appears, the debtor's subsequent rehabilitation of its line from Corsicana to Mount Pleasant, in part designed to permit faster schedules and

to overcome this time handicap, is complained of by Meyer as resulting in a wastage of the debtor's assets.

"Meyer next charges that the Southern Pacific, through pressure exerted on the Kansas City Southern, in control of the debtor, forced the debtor to continue to solicit exclusively and preferentially for its joint routes with the Southern Pacific; while the Southern Pacific changed its practice from preferential solicitation for the debtor to preferential solicitation for other railroads. The aforesaid agreement entered into with the Southern Pacific on July 30, 1926, by the debtor in connection with the Unification case, supra, recites that it had been the practice of the Southern Pacific lines to solicit without discrimination against its through routes with the debtor in favor of any other route. Meyer asserts that this statement was false. He declares that if certain evidence is to be believed, including prior statements contained in certain letters of Upthegrove, who signed the contract for the debtor, the solicitation of the Southern Pacific for the joint routes had been preferential up to 1925. It appears that Upthegrove had at first been reluctant to enter into the contract, his reaction to it being similar to Meyer's, who regarded it as very unfair; but that later Upthegrove was inclined to enter into it in view of the great value of the joint traffic to the debtor and the Southern Pacific's control over that traffic.

"Meyer argues that through the alleged misstatement of fact the debtor was effectively prevented from ever thereafter claiming that the solicitation of the Southern Pacific had in practice been preferential; and that the Southern Pacific was provided with an effective weapon in its alleged threat to oppose, if its demands were not complied with, the applications for unification. He suggests that it may well be that diversions of traffic to the Kansas City Southern and the Missouri-Kansas-Texas had an influence in bringing about continued preferential solicitation by the debtor for the Southern Pacific; and asserts that it was in this way that the Southern Pacific was able to compel the debtor, controlled by the Kansas City Southern; to continue to solicit exclusively and preferentially for the Southern Pacific, while it later disregarded its reciprocal obligations to the debtor and diverted through traffic from the debtor to other railroads.

"Meyer here offers no evidence to show that the Southern Pacific diverted any traffic from the debtor to other railroads; and makes no attempt to show, at this point at least, what the solicitation practices of the Southern Pacific were, after the execution of the agreement of July 30, 1926. As before stated, this agreement by its terms never became operative, and that it ever had any effect in practice appears to be pure speculation. The testimony of general traffic officers of both the debtor and the Southern Pacific is to the effect that the statement in the contract that the Southern Pacific's practice prior to the execution thereof had been without discrimination against the debtor, but not preferential in favor of the debtor, is true; and it appears that Upthegrove's description of such solicitation as preferential up to 1925, in the letters previously referred to, was inaccurate, although no reason appears for considering it intentionally false. The intervener's contentions in this regard are not sustained by the record.

"Meyer next asserts that there is evidence of diversion of traffic by the Southern Pacific to the Kansas City Southern and the Missouri-Kansas-Texas in the increases between 1925 and 1926 of 4.04 percent and 12.55 percent, respectively, in the revenues received by the latter railroads on traffic interchanged with the Southern Pacific, as compared with a decline of 1.18 percent in revenues received by the debtor on traffic from the Southern Pacific. He further asserts that there is similar evidence in the decline from 1924 to 1930 in tonnage delivered by the debtor to the Texas & New Orleans at each of 10 junctions. The comparison of the changes from 1925 to 1926 in revenues from interchange traffic was noted in the report of our Bureau of Inquiry, herein referred to, and not found to be evidence of diversion of traffic. The decline in tonnage at the 10 junctions was offset to a large extent by increases at 3 other junctions. Meyer's contentions are not sustained.

\* \* \* \* \*

"Meyer's fourth point is that the Southern Pacific, after April 15, 1932, as the majority stockholder of the debtor, was under a legal duty to exercise control in the interest of all the debtor's security holders; and that the Southern Pacific having asked and obtained our authorization of control was under obligation to exert its competitive power to develop the debtor as a part of the Southern Pacific railroad system.

"In our view, the Southern Pacific, having undertaken the obligations which are necessarily a concomitant of the power of control, was under the clear

duty to see that the debtor had an honest and capable management, and to comply fully and fairly with the conditions of our order of January 12, 1932, in St. Louis S. W. Ry. Co. Control, supra, 216. We are also of the view that, except possibly upon a showing of fundamentally changed conditions, the Southern Pacific was further obligated fully and fairly to pursue and carry into effect those policies and purposes which it represented as having led it to seek, and which prompted us to grant, the authority to acquire control. The declared purpose of the authorization was stated in our report in the Control case as follows:

The investment in the Texas & New Orleans lines is in excess of $300,000,-000. The lines are described by the applicant [Southern Pacific] as essentially gatherers and distributors of traffic, the natural movement of which is mainly north and south. Of the total mileage operated in Texas and Louisiana, approximately 56 percent constitutes branch lines. It is contended that the length of haul which those lines secure on the major portion of the traffic handled is not commensurate with the burdens imposed upon them. They extend north to such points of interchange as Denison, Paris, Fort Worth, Dallas, Corsicana, and Waco, Tex., and Shreveport, La., at which points they interchange traffic with northern lines. The conclusion has been reached by the applicant that as a partial remedy for strengthening the lines in question and permitting them to function adequately and successfully in the proper interest of the public, they should be supplemented by an alliance providing substantially additional mileage to the important Mississippi River gateways, such as St. Louis and Memphis. Such an alliance, to be fully effective, must be of a permanent nature in order that long-time programs of betterment may be planned and carried out.

"In order to accomplish this purpose the applicant seeks authority in Finance Docket No. 8393, to acquire 59,380 shares of preferred stock and 24,760 shares of common stock of the Cotton Belt. * * *

"The principal benefit to the public will arise from the inclusion of the Cotton Belt as a system line with the Texas & New Orleans. Such a unification will insure a strong competitor for the Missouri Pacific in the Rio Grande Valley and will permit system handling of traffic to and from important Texas points from and to Memphis, St. Louis,

and points beyond. The Cotton Belt must depend principally upon bridge traffic for its continued existence, and the applicant is best situated and constituted for furnishing such traffic. At the same time, the communities served by the Cotton Belt will, under Southern Pacific control, be assured of a strong transportation system.

"To the Southern Pacific was left the choice of means, lawful and appropriate to the carrying out of these purposes. The Southern Pacific was not charged with the obligation of a general rerouting in favor of the debtor of all the traffic it controlled, without reference to the effect on its own lines; and it did not become the guarantor of a return on the debtor's stock or of the continued solvency of the debtor.

\* \* \* \* \*

"Power of Southern Pacific to influence traffic to debtor, and alleged failure to do so.—Meyer shows that the Southern Pacific as an originating and terminating carrier has the power to influence a large amount of traffic to the debtor's rails, and that, if the debtor be regarded as a part of the Southern Pacific system, routing in connection with the debtor would give such system the long haul for traffic moving between St. Louis and Memphis, and points in Texas, Louisiana, and to the Pacific coast.

"An analysis was made by the debtor, shortly after acquisition of control by the Southern Pacific, of the flow of traffic then moving, with a view to ascertaining the revenues available to the system (treating the Southern Pacific and the debtor as one system) upon traffic originated and terminated by it, the amount of such available revenues then enjoyed, and the ways, if any, by which the latter could be increased by the adoption of a system policy of solicitation. The analysis was confined to interline traffic originated or terminated, not only because the existing and potential strength of the system lay in what was considered to be the immense amount of such traffic, but also because an originating or terminating carrier, particularly on traffic to or from local points or to or from its own industries at common points, was thought to enjoy a great advantage over its competitors. It was believed that as a rule the patrons of an originating or terminating carrier would cooperate toward obtaining for it its longest haul so long as rates and service were equal.

"On the basis of 1931 traffic it was estimated that the annual revenues of

the greater system were some $30,000,-000 less than they would have been if such system had received its longest haul on all originated and terminated traffic. Of this $30,000,000, some $12,-700,000 represented traffic moving under the Central Pacific agreement, and some $17,000,000 traffic not covered by that agreement. The $17,000,000 was equal to somewhat more than 50 percent of the revenues which were then received from the traffic not covered by the agreement. The amount estimated as loss to the debtor through short-hauling the greater system on traffic not covered by the Central Pacific agreement was about $14,035,087, offset in part, however, through gains by the Pacific lines and the Texas & New Orleans through the same short-hauling of the system. It does not appear that these amounts were necessarily attainable, since they represented merely the amount by which revenues might have been increased in 1931 if the routing of all originated and terminated traffic (other than traffic coming under the Central Pacific agreement) had been procured via the Southern Pacific-debtor long haul, and there had been no retaliation by competitors on other traffic.

"With further reference to the possibilities of Southern Pacific solicitation for the system long haul, including the debtor as part of the Southern Pacific system, Meyer estimates that in 1929 the Texas & New Orleans interchanged 5,346,028 tons of freight with the debtor and competing routes, of which 921,-360 tons were interchanged with the debtor, and 4,424,678 tons were interchanged with competing routes. He believes that a very large proportion of the latter could have been readily diverted by the Southern Pacific to the debtor. The tonnage he classes as Texas & New Orleans interchange does not include interchanges by Pacific Lines with the Rock Island at Tucumcari amounting to 1,443,796 tons, nor does it include interchanges by Pacific Lines with the Texas & Pacific at El Paso amounting to some 663,470 tons, nor any traffic going over routes in which the Southern Pacific did not participate, of which he believes there was a large amount which might have been obtained for the debtor. His estimate does not include less-than-carload traffic, traffic moving via the Southern Pacific Steamship Lines, or local traffic.

"Meyer points out that the tonnage the debtor delivered to and received from the Texas & New Orleans for the years indicated was as follows:

| | Delivered | Received |
|---|---|---|
| Year 1925 | 371,048 | 327,655 |
| Year 1929 | 333,668 | 587,692 |
| Year 1931 | 472,767 | 493,743 |
| Year 1937 | 946,045 | 751,342 |

"By approximation Meyer estimates an increase between 1931 and 1937 of $3,-014,580 in the debtor's revenues was received from traffic interchanged with the Texas & New Orleans, which may be compared with the $14,035,087 resulting from the debtor's analysis of traffic possibilities made in 1932, as above referred to. In making the comparison, however, as he suggests, there should be taken into account an increase between 1931 and 1937 from 8,724,809 tons to 9,633,577 tons in Texas & New Orleans interchanges with all connections, and an increase from 12,248,108 tons to 16,120,940 tons in Pacific lines interchanges with all connections. And even the $3,014,580 he does not concede as being all a permanent improvement, an increase of 361,777 tons in interchange tonnage in 1937 being due largely to an unusual movement of crude oil and gasoline from northeast Texas fields to Texas ports. However, the increase from 1929 to 1936 was 50 percent in tonnage received from the debtor by the Texas & New Orleans.

"Meyer also refers to a letter dated January 12, 1934, written by E. W. Oliver, a director of research for the debtor, in which Oliver expressed the belief that the time would not be far distant when the debtor would have system-haul traffic passing over its lines, rather than those of competitors, to a degree which would entirely change the burden then being carried.

"Still with this contention in view, Meyer submits a general analysis of the Texas & New Orleans' interchanges with connections. Of 10 connecting carriers he mentions, the debtor fared by far the best. Its interchanges with the Texas & New Orleans increased from 8.37 percent of the total in 1929 to 17.-26 percent of the total in 1937. For comparison, the interchanges of the St. Louis-San Francisco increased from 3.73 per cent of the total to 4.05 percent, and the Louisiana & Arkansas interchanges from 2.52 percent to 4.22 percent. All others, including the Illinois Central, declined, the latter from 8.56 percent to 4.-86 percent. The Kansas City Southern declined from 5.16 percent to 4.97 percent, and the Missouri-Kansas-Texas from 7.67 percent to 6.15 percent. The Kansas City Southern, although showing a decline from 1929, has shown a steady though small increase since 1933. The

Texas & Pacific has also shown a small increase since 1932.

"Good as it was both relatively and absolutely, Meyer is dissatisfied with this showing by the debtor, and not only contends that there is still a large amount of traffic the Southern Pacific continues to interchange with intermediate carriers, and which could readily be diverted to the debtor, but also urges that only in more recent years, after the reorganization proceedings had impaired the debtor's earnings, were there further increases in the debtor's proportion of the total of interchanges. He also argues that the debtor was caused to favor the Kansas City Southern and the St. Louis-San Francisco in carrying out the wishes and policies of the Southern Pacific.

"The facts were that the debtor's interchanges with the Texas & New Orleans increased from 8.37 percent of the latter's interchanges with all connections in 1929 to 13.99 percent in 1935.

"It is shown that tonnage delivered to or received from the debtor by the Texas & New Orleans increased from 8.37 percent of the total of all Texas & New Orleans interchange tonnage in 1929, to 14.26 percent in 1936, and 17.26 percent in 1937. Meyer undertakes to demonstrate that of a gain of 289,805 tons between 1932 and 1935, only 99,271 tons was due to the Turney-Saunders agreement. The showing that the revenues of the Texas & New Orleans on traffic interchanged with the debtor increased from 5 percent of the Texas & New Orleans gross freight revenues in 1925 to 16.1 percent in 1937, indicates to Meyer only benefit to the Texas & New Orleans, and not to the debtor. And with the showing that the debtor's tonnage interchanged with the Texas & New Orleans increased from 13.1 percent of the debtor's interchange tonnage in 1925 to 31.4 percent in 1937, Meyer suggests

that the increasingly important role played by the Southern Pacific may have been due to a decrease in interchanges of the debtor with other railroads. The facts were that the debtor's interchanges with the Texas & New Orleans increased by 1,070,502 tons from 1925 to 1937 (including the movement in 1937 of 361,777 tons of crude oil and gasoline, heretofore mentioned), while its interline tonnage with railroads other than the Texas & New Orleans declined 288,058 tons.

"On the other hand, as Meyer points out, the debtor's decline in total interline tonnage subsequent to 1929 was proportionately greater than that of the Texas & New Orleans. Interline tonnage of the debtor from Pacific lines of the Southern Pacific increased from 194,600 tons in 1932 to 327,771 tons in 1937, but, expressed as a percentage of all Southern Pacific tonnage from Oregon and California by all long-haul gateways, was less in 1937 than in 1931. Company material of the Southern Pacific hauled by the debtor was in much greater tonnage from 1934 to 1937 than in 1933, although the Turney-Saunders agreement was in effect in 1933, as well as in subsequent years; but the effects of the depression were, of course, more severe in 1933 than later. Upon a showing by the Southern Pacific that carload deliveries to the debtor by the Texas & New Orleans of nonperishable freight increased from 26.1 percent of such deliveries of all carload freight in 1932 to 50.7 percent in 1937, Meyer points out that there was a decrease in perishable traffic; and calls attention to his admonition that unless perishable traffic is moved in very large amounts it will not pay.

"The interchanges of the Texas & New Orleans with various connections expressed in percentages of its total interchanges with all connections, for the years 1929, 1932, 1935, and 1937, were as follows:

| Connection— | 1929 Percent | 1932 Percent | 1935 Percent | 1937 Percent |
|---|---|---|---|---|
| Debtor | 8.37 | 11.95 | 13.99 | 17.26 |
| Missouri Pacific | 10.53 | 12.97 | 9.76 | 8.44 |
| Illinois Central | 8.56 | 6.16 | 6.59 | 4.86 |
| St. Louis-San Francisco | 3.73 | 3.53 | 4.15 | 4.05 |
| Rock Island | 6.05 | 5.13 | 5.42 | 5.31 |
| Kansas City Southern | 5.16 | 5.07 | 4.56 | 4.97 |
| Santa Fe | 10.64 | 11.73 | 9.29 | 6.81 |
| Louisiana & Arkansas | 2.52 | 3.57 | 5.11 | 4.22 |
| Missouri-Kansas-Texas | 7.67 | 7.60 | 6.00 | 6.15 |
| Texas & Pacific | 5.34 | 4.61 | 3.60 | 3.91 |
| Louisville & Nashville ......) | | | | |
| Gulf, Mobile & Northern ....) | ...... | 5.47 | 6.27 | ..... |
| New Orleans & Northwestern) | | | | |

"The interchanges of the Pacific lines of the Southern Pacific with the connections named, expressed in percentages of total interchanges with all connections, for the years 1929, 1932, 1935, and 1937, were as follows:

| Connection— | 1929 Percent | 1932 Percent | 1935 Percent | 1937 Percent |
|---|---|---|---|---|
| Rock Island at Tucumcari ...... | 7.2 | 9.7 | 9.2 | 7.3 |
| Texas & Pacific at all junctions .. | 5.34 | 4.61 | 3.60 | 3.91 |

"It is apparent that on a comparative basis, the debtor's gains in tonnage interchanged with the Southern Pacific were impressive, even though not so large as Meyer contends they should have been.

"The debtor's freight revenues in 1937 exceeded those of 1932 by 71.62 percent, while the Texas & New Orleans' freight revenues of 1937 exceeded those of 1932 by 63.46 percent. Meyer argues from these figures that acquisition of the debtor redounded greatly to the advantage of the Texas & New Orleans, but, he argues, the latter was in a position to do a great deal more for the debtor than the debtor was to do for it. The Texas & New Orleans is not in reorganization.

"Meyer argues from the foregoing that it was within the power of the Southern Pacific to influence very large amounts of traffic to the debtor, as an integral part of the Southern Pacific system, for the system long haul; and that this it failed to do. He sets up no standard of duty for the Southern Pacific in assisting the debtor to increase its traffic, unless he means to imply that the Southern Pacific was obligated to see to it that all traffic, either originated or terminated on its lines, should be routed by the debtor wherever the latter could have participated in some part of the haul between origin and destination. But roads to the north and east of St. Louis and Memphis were also interested in the routing of this traffic, as well as the Southern Pacific; and the shippers had the statutory right to route their shipments as they desired. Much has been accomplished in the debtor's behalf. In Meyer's opinion this was not enough, but we cannot sustain his contentions that a breach of duty has prevented the showing from being better than it was.

"6. Alleged failure of the Southern Pacific to exercise control over the debtor in the debtor's interest, and to exert its competitive power in the debtor's behalf.—(a) Turney-Saunders agreement.— In November 1932, the Southern Pacific entered into a traffic agreement with the debtor, commonly called the Turney-Saunders agreement. By this agreement the Southern Pacific undertook actively and preferentially to solicit all competitive traffic which could be handled by the debtor, in connection with that line, provided that the maximum gross revenue was thereby yielded to the system, including within that term the lines of the debtor, subject, however, (1) to the maintenance of a fair interchange with other connections as determined by Southern Pacific traffic officers, (2) to the contract with the Union Pacific made in connection with the Central Pacific lease, and (3) to the traffic agreement with the Rock Island obligating the Southern Pacific to solicit traffic between points in Mexico, Arizona, and Southern California, and middle western territory, without discrimination in favor of any route other than the Rock Island. Meyer alleges that the Southern Pacific deliberately broke its contract to solicit preferentially for the debtor, and that, if the contract had been carried out, the debtor would have earned an amount greatly in excess of its interest requirements.

"In support of this contention, Meyer points out that the Turney-Saunders agreement was never approved by the Southern Pacific board of directors, although, as he believes, such approval was required by the bylaws of the company. However, it appears that the agreement was entered into and executed on behalf of the Southern Pacific lines by J. T. Saunders, vice president in charge of system freight traffic for the Southern Pacific transportation system, with the approval of the president of the Southern Pacific; and that it was not customary to submit traffic contracts of the kind to the board of directors or a committee thereof. The contract was signed on behalf of the debtor by J. R. Turney, vice president of the debtor, and was approved by the debtor's board of directors. The Southern Pacific has never disclaimed the agreement made in its name by its traffic vice president, and we cannot infer from the fact that it was not approved by the board of that company that it was repudiated, considered a nullity, or not performed.

"Meyer in this connection also points to the testimony of Upthegrove, the debtor's president, in 1935 at the hearing before the court on the issues raised by Meyer's answer to the debtor's petition

for reorganization. Upthegrove then testified that the nature of the solicitation by the Southern Pacific in 1927 was such that it would solicit without discrimination in favor of the debtor; and that the practice had not been changed subsequently, except that under the Turney-Saunders agreement the Southern Pacific had agreed to consider the debtor as a part of the Southern Pacific system in the solicitation of the long haul and the best revenue for the system. He said that the Southern Pacific did not solicit preferentially in 1935; it solicited without discrimination. But he also said that the Southern Pacific lived up to the Turney-Saunders agreement absolutely, so far as he knew, explaining that in his dealings with a friendly connection he had never seen any actual difference between preferential solicitation and solicitation without discrimination.

"However, in a letter dated June 26, 1926, Upthegrove wrote to L. J. Spence, executive officer of the Southern Pacific, that the Southern Pacific and the debtor were mutually and preferentially soliciting the movement of traffic between Mississippi River crossings and central territory, including Illinois, on the one hand, and points reached by the lines of the two railroads in Texas, New Mexico, Arizona, and southern California, on the other. In the same letter, he pointed out that the agreement, proposed to be entered into at that time in connection with the Control case, did not bind the Southern Pacific to maintain the routes, services, or preferential solicitation. Meyer submits that in this letter Upthegrove not only recognized a distinction between preferential solicitation and solicitation without discrimination, but attached great importance to it.

"Meyer argues that Upthegrove's entire ignorance, as alleged, of the terms of the Turney-Saunders agreement would be conclusive without other facts to show that the agreement was never seriously carried out by the Southern Pacific, and that the debtor never made any serious attempt to compel the Southern Pacific to do so. There is, however, other and more decisive evidence, hereinafter discussed, as to whether the Turney-Saunders agreement was observed. We think Upthegrove cannot fairly be charged with ignorance of the terms of the agreement, even though he characterized the Southern Pacific solicitation in 1935 as without discrimination, rather than preferential, when the agreement was to solicit for the system long haul, including the debtor as part of the system, but subject to the conditions above stated as to the discretion of the South-

ern Pacific traffic officers in determining what was required of the Southern Pacific. The agreement by its terms apparently could not be construed with any degree of certainty except by the Southern Pacific traffic officers.

"Further on the subject of noncompliance by the Southern Pacific with this contract, Meyer points to certain letters in the traffic files of the debtor which, he contends, prove that the Southern Pacific did not carry out its agreement. He says that there seems to have been a remarkable degree of ignorance concerning the contract. On April 14, 1939, the debtor's solicitors were mailed copies of the agreement; and this is construed by Meyer as evidence of a necessity to acquaint them at that late date with the agreement preparatory to their testifying at the hearings herein. Also on January 28, 1936, W. F. Murray, general traffic manager of the debtor, wrote Saunders that St. Louis was being treated as a neutral point in connection with the Rock Island; and a general agent of the debtor wrote Murray on March 9, 1936, that he had called to the attention of the Southern Pacific general agent at St. Louis that the debtor was not receiving the full cooperation of the Southern Pacific force.

"In a letter dated June 23, 1933, the general agent of the Southern Pacific at Atlanta had been reported as saying that he could not solicit preferentially for the Memphis gateway (by the debtor) on traffic that had theretofore moved through New Orleans (excluding the debtor), which was a long-established route, as he was fearful that any action put forward to influence movement via Memphis might have had the effect of losing the traffic altogether, or causing him to be short-hauled. The general traffic agent of the Southern Pacific appeared to an agent of the debtor to think that an attempt should not be made to secure traffic by Memphis already routed through New Orleans, but efforts should be concentrated on developing a long haul for the Southern Pacific-debtor route in instances where firms were short-hauling the Southern Pacific by El Paso and the Texas & Pacific and connections.

"A commercial agent of the Southern Pacific reporting to a general agent was said to have stated that he was getting his pay from the Texas & New Orleans, and not from the Southern Pacific, and did not see why he should solicit hauls in connection with the debtor that would short-haul the Texas & New Orleans; and was said to have told the Southern Railway local agent that it should bill freight via New Orleans inasmuch as it received more revenue by way of that route. Solicitation in Augusta and Greenville also ap-

pears to have been such as to favor the New Orleans gateway over the Memphis gateway, as the result of the conditions at Atlanta described; and the conditions at Atlanta appear to have continued into 1934. Also, in 1934, a Southern Pacific agent appears to have attempted, notwithstanding the Turney-Saunders agreement, to have justified a routing by New Orleans in preference to Memphis, on the basis of net revenue to the system, taking into account that not all the debtor's stock was owned by the Southern Pacific.

"A letter dated January 28, 1933, written by a general agent of the debtor at Atlanta indicates that the Southern Pacific solicitation forces were failing to give complete support to the debtor, to the extent of working against the package car operated from Columbus to Houston; and that this was because of apprehension of losing the good will of other railroads participating in the haul of this car, and in-influential in securing certain traffic for other hauls with the Southern Pacific.

"As regards the Rock Island and the Tucumcari route, the Pacific coast agent of the debtor, A. W. Reese, on January 26, 1934, wrote that in the course of the efforts of the debtor to obtain all or a part of certain traffic then moving by that route, Saunders of the Southern Pacific issued instructions to the Southern Pacific agent at Detroit that he should not solicit against the Rock Island. Reese characterized this as prima facie evidence that the debtor was working without any assistance, and that the Southern Pacific in Detroit was working hand in glove with the Rock Island.

"As to cantaloups from El Centro in 1938, it appears from a letter to an agent written by R. P. Harrington, general freight agent for the debtor at St. Louis, on June 4 of that year, that the Missouri Pacific and the St. Louis-San Francisco were making great inroads on business moving to consignees in the East which the debtor formerly handled. In former years the debtor had increased its business through reroutings on information furnished by the Pacific Fruit Express agent or otherwise, but in 1938 up to the date of the letter the debtor had lost by diversions rather than gained. Harrington requested a canvass of the receivers to ascertain why the debtor was not securing more of the cantaloup traffic. He does not suggest that there was any failure on the part of the Southern Pacific to carry out the terms of the Turney-Saunders agreement.

"The evidence presented, fairly considered, does not in our view sustain the charge that the Southern Pacific failed of reasonable compliance with the terms of the Turney-Saunders agreement. Isolated instances of traffic solicitation in a manner apparently contrary to its terms, during the initial period when the agreement was being put into effect, appear to have occurred; but so far as the record shows, neither the company nor any of its responsible traffic officers were in any instance willfully at fault. The major, if not the only, breach of the agreement appears to have been in the failure to constrain solicitors in the employ of the Texas & New Orleans to work more consistently for routing by Memphis and the debtor in preference to the older and established routings via New Orleans and the Texas & New Orleans. The change of routing which it was agreed, subject to the conditions previously stated, to work for on this traffic was manifestly a difficult one to make; and the extent to which, consistently with the terms of the agreement and its provisions for the maintenance of a fair interchange by the Southern Pacific with connections other than the debtor, preferential solicitation for the New Orleans route, or at least solicitation without prejudice against it, was permitted, does not appear.

"(b) Development of the Fordyce route. —Following acquisition of control by the Southern Pacific, that carrier and the debtor, with the cooperation of the Rock Island, developed a new north-and-south route between New Orleans and St. Louis by way of Alexandria and Fordyce. Within 15 months after the effective date of the Turney-Saunders agreement, the Southern Pacific issued instructions for solicitation over this route. Meyer charges that the route was tardily established, and that the alleged delay may have been due to the fact that traffic directed over this route would have been taken from the Illinois Central. The debtor shows that the route had to compete with recently established high-speed schedules over a shorter route by the Illinois Central, much of which was double-track; and we find no basis for holding that there was unreasonable delay on the part of the debtor and the Southern Pacific, in establishing and developing their new route.

"(c) Less-than-carload traffic; passenger traffic; unrouted traffic.—Meyer also charges that the Southern Pacific failed to take the most advantageous measures at its disposal to increase the less-than-carload traffic of the debtor. On July 1, 1933, a forwarder-traffic arrangement was made with Acme Fast Freight, Incorporated, a freight-forwarding company, although previously this arrangement had been proposed and recommended as promising by Turney, Upthegrove, and others, for the most

part at a time prior to acquisition of control by the Southern Pacific, when conditions accordingly were different from those prevailing at the time the arrangement was made. He then presents a statement of the debtor's revenues on less-than-carload road traffic for the years 1929–38, the figures offered showing a decline from $2,545,238 in 1929 to $1,093,186 in 1938. This does not indicate that the arrangement made with the Acme company was not the best available when it was made. The fact that the sum of revenues received from less-than-carload road traffic and from forwarder traffic showed only a very small decline from the high revenue of 1929 speaks well for the arrangement made.

"In the traffic agreement of June 1926, entered into by the Southern Pacific and the debtor to take effect upon the granting of the applications in the Unification case, supra, it was stipulated that in the event that the debtor should inaugurate passenger service between St. Louis and Houston, Tex., it should be in connection with the Southern Pacific. It also appears that such service was then in contemplation, and intended to be established whenever the rehabilitation of the Texas & New Orleans between Shreveport and Houston should permit it, but the service has not even now been established. Meyer believes that it would be exceedingly popular, and that an opportunity is being lost. The present record merely opposes Meyer's objection as against the managerial discretion of the company, which we are not here able to say was not properly exercised.

"For the month of December 1938, the Southern Pacific delivered to the debtor 60 cars of unrouted traffic; and the debtor delivered to the Southern Pacific 32 cars of such traffic. Meyer argues that it is obvious that the Southern Pacific was in a position to deliver a great deal more than twice the amount of this traffic that it received from the debtor. The matter is not one of great importance, but such matters do not prove themselves, and in the absence of proof, the contention is not sustained.

\* \* \* \* \*

"(f) Southern Pacific allegedly imposed its own policies on the debtor.—(1) Alleged pressure exerted by Southern Pacific in traffic matters.—On November 17, 1933, Charles S. Fay, of the traffic forces of the Southern Pacific lines at Houston, Tex., wrote to W. F. Murray, chief traffic officer of the debtor, as follows:

"'Your letter November 7th, file 610-04-O:

"'Regret you were not at first inclined to go along with our suggestion of November 13th and urge you to reconsider the matter. If any local agents of reasonable ability should not be able to protect the interests of our respective lines from a long haul standpoint, and those stations are not served by any other line, quite clearly they are not qualified to fill their jobs and we should ask our operating departments to remove such incumbents to other stations of lesser importance.

"'We note you refer somewhat at length to the situation at Jacksonville. We admit the correctness of everything you say concerning conditions at that point, but such questions are not under discussion.

"'We are aware that your forces are numerically greater in the Athens-Lufkin territory than ours. It is our disability, of course, but recognizing this as fully as we do, feel we must call upon you to go along with our suggestion to the end that our forces can be utilized for more important work. Possibly we have in mind the anomalous situation created by two lines forming part of one large system competing against each other at common points. Will you kindly advise your further views, \* \* \*.'

"Meyer presents this letter as evidence of pressure brought to bear in traffic matters by the Southern Pacific on the debtor and an imposition of policies by the Southern Pacific upon the debtor. When the letter was written, Murray was apparently under instructions from Turney dated November 23, 1932, that it should be the policy of the debtor's traffic department to coordinate its efforts with those of the Southern Pacific's officers, and in cases of differences of opinion to attempt to reconcile its views. If the differences of opinion could not be reconciled, the question was to be submitted for executive decision in matters where debtor-Southern Pacific system unanimity of opinion was desirable. Since the purpose of both carriers was to operate their respective properties much as if they were comprised as one system, the necessity for coordination of effort of this character was apparent.

"Fay's suggestion had been that, in the interest of releasing respective solicitation forces for other, more important work, the two carriers should consider Rusk, Commerce, and Athens, Tex., as local points on system rails, and discontinue working these points as actively as they had been doing. The debtor did not agree, believing that active solicitation was necessary to insure the long

haul against competitors of the system. Meyer says that Fay's letter ended the controversy, as he styles it; but we have no proof that discussion ceased with the letter mentioned, or whether Murray's or Fay's view prevailed, or, if Fay's views prevailed, that Murray was coerced and not persuaded.

"On August 30, 1938, W. F. Knobeloch, traffic manager of the detbor, issued instructions that, effective at once, all carload shipments (except those loaded in tank cars or other private equipment where empty car mileage was involved or where routed by other junctions) destined Nacogdoches, routed debtor thence Southern Pacific, should be routed through the Shreveport gateway regardless of what other junction might be specified on billing. The instructions did not cover instances where waybills indicated that shipments were to stop at some intermediate point for partial unloading, where the geographical location of the stop-over point or points made it necessary to forward by other authorized junctions in the tariff. Prior to issuing these instructions Knobeloch had written to the debtor's superintendent of transportation on March 31, 1938, that the debtor was being pressed to route all Nacogdoches carload freight through the Shreveport gateway, where it earned 5 percentage points less than via Athens and 10 percent less than via Jacksonville, on the theory that the more dependable and faster service was available through the Shreveport gateway. He desired to determine definitely if such was the case before giving further consideration to changing all such carload freight to route through Shreveport.

"On May 11, 1938, having received information on the question of service from the superintendent of transportation, Knobeloch wrote another letter indicating that he was still not convinced that the change should be made. This letter was addressed to Norman Lawson, the debtor's general traffic agent at Houston, who was urging the Shreveport route. On August 9, 1938, Lawson wrote Knobeloch again urging the Shreveport route in the interest of better service, and pointing out that insistence on the 10 percent greater division might result in a loss of the traffic, or a short haul of the debtor of 25 percent through bringing in the Louisiana & Arkansas (apparently as a result of Southern Pacific's solicitation) for a share of the haul. Knobeloch's instructions for the Shreveport routing, as above referred to, followed. Meyer says

that it is evident that the Southern Pacific had its own way.

"This was an instance where the debtor-Southern Pacific system was possessed of two alternate routes for the same movement of traffic with, however, different divisions of the joint rate between the two carriers. Cases of this kind are not specifically provided for in the Turney-Saunders agreement. But the objective of that agreement was, it appears, as near an approach to system operation of the two properties as was permitted under the existing circumstances. In system operations, the choice between alternate system routes is presumably a matter of service, operating convenience, and economy, into which questions regarding divisions of rates do not normally enter. Knobeloch's preference for the routings via Athens and Jacksonville rather than Shreveport, when and to the extent he entertained such a preference, was based solely on the greater revenues the debtor obtained by way of Athens and Jacksonville. He did not suggest that a better service could be furnished via Athens or Jacksonville, or that service via that route would be more economical or more convenient for system operations. The most that was suggested for the Athens or Jacksonville route was that an equal service might be provided for certain but not for all traffic.

"Lawson, on the other hand, was of the view that, in the interest of better service, routings should be through Shreveport, and that continued efforts to route by the other junctions might result in a loss of the traffic. The weight of the evidence supports the conclusion that Knobeloch's instructions to route by Shreveport were to the best interests of the greater system which included the debtor, and in harmony with the purposes of the Turney-Saunders agreement. On the other hand, any solicitation by the Southern Pacific for a route including the Louisiana & Arkansas, in preference to the system long-haul route, was apparently in violation of the Turney-Saunders agreement; but it does not appear that any such solicitation, although threatened, was ever resorted to. Knobeloch's assertion of his views is consistent with the theory of the debtor's independence of the Southern Pacific in operating matters.

"(2) Southern Pacific, as alleged, prevented debtor from doing business with other connections.—Meyer charges that the Southern Pacific prevented the debtor from doing business with other connections, and urges that this is evident

from a letter dated May 24, 1937, written from Houston, Tex., by T. W. Waldrop of the Southern Pacific Transport Company, to G. W. Frink, assistant general freight agent of the debtor at St. Louis. This letter follows.

"Some of our people in east Texas are of the opinion that a good many shipments originated by the Southwestern Transportation Company or the St. Louis Southwestern Railway Company destined to Palestine are interchanged with the I. G. N. either at Taylor or Jacksonville. In fact, our attention was recently called to a specific case originating at Memphis, Tennessee, which was delivered to Palestine on I.-G. N. freight bill of March 22, 1937. The Southwestern Transportation Company, I know, has no interline relation with the I.-G. N. and I am of the opinion that there would only be an occasional shipment so routed, particularly in view of the fact that our service through the Rusk gateway provides a continuous movement and affords much quicker delivery at Palestine than is available by the I.-G. N. However, in view of the report, I thought it best to bring the matter to your attention with suggestion that you check into your routing to see if some one is slipping up on the proper handling of this particular traffic to this destination.

"We find in this letter merely an indication of a possible understanding or working arrangement for mutual assistance in the solicitation and routing of traffic, such as was consistent with the terms of the Turney-Saunders agreement.

"Meyer further refers to a letter in which Southern Pacific traffic agents were described as complaining that while they were working for the debtor, the debtor was working against the Texas & New Orleans, and as objecting to the debtor handling business from Shreveport to Lufkin and from Lufkin to Houston via Jacksonville and the Missouri Pacific. No evidence of coercion of the debtor by the Southern Pacific can be seen in this, but, on the contrary, an apparent complaint, whether justified or not, that the debtor was not, on its part, carrying out the terms of the Turney-Saunders agreement, as those terms were understood by the particular Southern Pacific traffic agents.

"Meyer further points out that Murray in a letter to Upthegrove dated August 19, 1935, said that the debtor was watching its Big Sandy interchange, and that when cars were discovered that had been routed by the Texas & Pacific, where they could have moved via the Southern Pacific, the debtor's representatives were fully informed, and promptly solicited the shippers or consignees for system routing of future cars. Murray said further that the information was also furnished the Southern Pacific's agent, who also checked passing reports at El Paso, and notified his representatives of cars that moved by the Texas & Pacific instead of the Southern Pacific. Apparently, the Southern Pacific and the debtor in this instance were working together for what they considered their mutual advantage. Except for this, no effort on the part of the Southern Pacific to prevent the debtor from doing business with other connections appears.

"(3) Alleged pressure exerted on debtor to favor Illinois Central.—Prior to the Southern Pacific's acquisition of the debtor, the Southern Pacific had for a long time maintained close working arrangements in traffic matters with the Illinois Central, particularly at New Orleans. Preparatory to the acquisition, a memorandum of agreement was drawn up by traffic officers of the Southern Pacific and Illinois Central setting forth the new working arrangements proposed to be put into effect, with or without a signed contract, following the acquisition. Shortly after the acquisition, the traffic departments of the debtor, the Southern Pacific, and the Illinois Central apparently undertook to put the new working arrangements into effect (without a signed contract), although perhaps without complete success, as will be hereinafter shown. The memorandum of new working arrangements contained inter alia the following provisions:

"As to traffic between points on the Texas & New Orleans or debtor lines, and traffic originating or destined west of El Paso where secured for movement via Southern Pacific Lines east of El Paso, on the one hand, and, on the other hand, points in Missouri, Illinois, Wisconsin, Indiana, Kentucky, Tennessee, and Mississippi, on the Illinois Central systems and not on the debtor, where service was on a par with that via other routes, and subject to the necessity of maintaining a fair balance of traffic interchanged with other connections, the Texas & New Orleans-debtor was to treat the Illinois Central as the preferred connection at New Orleans, Baton Rouge, Shreveport, Memphis, Thebes and St. Louis, subject to the right reserved to solicit such traffic via whichever of the gateways named afforded the Texas & New Orleans-debtor the most favor-

able haul. The Illinois Central undertook a corresponding obligation. The key thought was that where the rails of the parties connected two points, making a reasonable, direct and feasible route via the gateways named, they would prefer each other in solicitation. 'Preferred' did not mean 'exclusive', and it was understood that necessities would at times arise, such as cases where the known preference of shippers in division of traffic or other reasons would require a somewhat flexible policy.

"As to traffic via the gateways named, not covered by the preceding paragraphs, the Southern Pacific-debtor was to solicit in connection with the Illinois Central without discrimination in favor of any other route. The Illinois Central undertook a corresponding obligation. The term 'preferred' or 'preferential' was to place the associate in a preferred status before all others. As distinguished from this, the term 'without discrimination' was intended to mean that no other line would be preferred before the associate, but left the party free to deal with more than one friendly connection on a parity.

"The Southern Pacific was to continue and foster close understanding and working relations between the solicitation forces of the Southern Pacific-debtor and the Illinois Central. The Illinois Central was to undertake the same obligation.

"The Southern Pacific was to instruct its soliciting organizations that, when shipping instructions had been issued showing route via lines of the Illinois Central-debtor-Southern Pacific, solicitation effort to secure the traffic via a more favorable gateway (with Illinois Central) than shown in shipping instructions should cease. The Illinois Central undertook a corresponding obligation. This was not to preclude either party from making an effort, whether before or after shipping instructions were issued, to have its own line substituted for that of a competing line in the through routing so far as it applied over lines of the other party.

"Meyer asserts that obviously the favoring, as alleged, of the Illinois Central by the debtor must have been at the expense of relations which the debtor had with other railroads at St. Louis and Memphis, and that the debtor had every reason to expect more, and in the past had undoubtedly received more, from such other railroads than it had from the Illinois Central.

"Dissatisfaction with the new arrangements or their effects was, moreover, as pointed out by Meyer, expressed by traffic agents of the debtor in a number of territories. On March 9, 1937, the general agent at Houston wrote, with reference to the matter, that knowingly to slash revenues was unreasonable, and that unless contrary instructions were received, the Illinois Central would be added to the 'must not' list. On January 17, 1939, the assistant general freight agent at Fort Worth wrote that contact with the Illinois Central representatives had been a one-sided affair, with that line neither offering any new traffic nor inviting assistance in receiving such traffic; that in fact the only contacts those representatives were making with the debtor's agent were in an effort to obtain a haul on traffic previously solicited successfully by the debtor's agents; and that the debtor's agents had endeavored to cooperate with the Illinois Central but with no appreciable results. He also called to attention that some time ago he had seriously complained about the Illinois Central's short-hauling the debtor either through Memphis or Shreveport. On January 7, 1931, a general agent at Nashville wrote that he did not know of any tonnage moving to or from the Nashville territory in the routing of which the debtor could participate that was specifically controlled by the Illinois Central; and that in that connection he would advise that the Nashville offices of the Illinois Central, in their solicitation of canned goods, dried fruit, etc., from Pacific coast origins, were soliciting preferentially in connection with their New Orleans gateway and the Texas Central Railroad.

"Nothing can be found in the evidence of record to indicate that the debtor's acceptance of the terms of the new working relations with the Illinois Central was other than wholly voluntary on its part. Such acceptance apparently with complete propriety, might have been made a condition of the Southern Pacific's entering into and continuing to be bound by the Turney-Saunders agreement for single-line solicitation. So far as can be seen, it was not so made a condition. Be that as it may, the debtor's understanding with the Illinois Central, either apart from the Turney-Saunders agreement or in connection therewith, should be considered in all its effects, if at all, including advantages and disadvantages alike; and this Meyer has made no serious attempt to do, relying on an assertion that the results were obvious. Even if the disadvantages were shown to outweigh the advantages, which does not appear, the

this subject of diversion of traffic by the four controllers of Debtor up to the filing of the supplemental report on March 9, 1942, on a submission as of October 8, 1941. We adopt this method of presentation in this opinion for several reasons. These extracts show the care, thoroughness and detail with which the Commission examined every one of the numerous matters bearing upon traffic diversion urged by Mr. Meyer. They show the great variety of elements presented and the complexity of the entire contention. When the character of our examination—to test the evidence to determine whether the findings of the Commission have substantial support therein—is considered and in view of our determination that there is such support, we think these extracts show ample reason why an unduly long and involved opinion treating separately each of these elements is not called for. In many instances, there was conflict in the evidence which the Commission might have ruled either way but such conflicts are for it, with its greater expert training and experience, to resolve and not for us. In other instances, suspicion, inference and possibility appeared in place of evidence of diversion.

We desire to add but an observation concerning one matter of evidence which seems impressive to us and which was not accented by the Commission. These are the graphs or charts made part of Exhibit 322, and evidence related thereto, which show the comparative monthly movement of bridge and of terminated traffic over the Debtor and over the Southern originated by each of the forty-nine railroads in the United States from which Debtor received as much as $25,000 of freight revenue during the years 1924 to 1927, inclusive. These graphs and this evidence are convincing that there was no material diversion during the part of this period that Southern had control.

### (1b) Unprofitable Traffic.

Mr. Meyer contends that perishable freight forced upon the Debtor caused losses in 1928 of $695,023.76; in 1929, of $1,160,375.66; in 1930, of $1,304,965.19; in 1931, of $1,322,273.51—a total loss of $4,482,638.12 in operating earnings during those years, thus materially contributing to impairment of earning and the financial condition of the Debtor.

The "perishables" consisted of fruit, melons (principally cantaloupes) and vegetables (mainly lettuce). These were grown in the southern part of California for the

---

record shows no compulsion brought to bear by the Southern Pacific on the debtor.

"The general contention that the Southern Pacific failed to exercise control over the debtor in the debtor's interest and to exercise its competitive power in the debtor's behalf is not sustained, for the reason that the Southern Pacific appears to have exercised its control over the debtor in the debtor's interest, to the full extent required, by the election of directors who provided the debtor with a competent and independent management loyal to the debtor's interest, and to have exercised its competitive power in the debtor's behalf to the full extent required, through the making and carrying out of the Turney-Saunders agreement.

"(7) Measures omitted, the adoption of which was as alleged required by good faith.—Meyer asserts that the Southern Pacific if it could not otherwise have obtained sufficient traffic for the debtor should have moved before us for a modification of our order entered in the Control case, supra, requiring that the South-

ern Pacific maintain and keep open all routes and channels of trade by existing gateways until otherwise authorized by us. He urges that the Southern Pacific should have moved for a modification of that order permitting it to close such routes and channels of trade as might be necessary to provide increased traffic moving over the debtor sufficient in amount to cover all interest charges on its bonds. We cannot tell in this collateral proceeding whether we would have found merit in a petition for a modification of the order in question, but the retention of the existing routes and channels of traffic to the utmost extent possible has always been considered by us as required in the superior public interest.

"Meyer also asserts that one-line solicitation for the joint routes would have greatly increased the amount of traffic carried by such routes, and that this the Southern Pacific refused to carry out. We have a showing of the advantages of one-line solicitation, but no evidence of refusal by the Southern Pacific to provide or carry it out."

most part, with some in Arizona. Shipments for such originated almost entirely on the Pacific. Transportation was in refrigerator cars of the Pacific Fruit Express —the stock in which was owned equally by the Pacific and the Union Pacific. Use of these cars was upon a mileage basis with refrigeration (icing) to be cared for by user railroad.

To understand this contention by Mr. Meyer, it is necessary to know the situation with which it deals. Prior to 1927, the normal routing for such traffic—in so far as Debtor participated therein—was Pacific to El Paso, Texas & Pacific (a Missouri Pacific line) to Big Sandy, Texas, where Debtor took further carriage to Memphis or to St. Louis. May 5, 1927, Pacific and Debtor (then under Southern control) established a scheduled route for such traffic by Pacific to El Paso, Texas & New Orleans (a Pacific line) to Corsicana, Texas, whence Debtor carried to Memphis or St. Louis. This involved substitution of the Texas and New Orleans for the Texas and Pacific thus giving Pacific a longer haul by 897 miles (the Texas and New Orleans) and the Debtor a slightly longer haul (from Corsicana to Big Sandy). This new route is more circuitous than that using the Texas & Pacific and is somewhat farther south than that road—the Texas & Pacific being a fairly direct route in Texas from El Paso to Dallas or Big Sandy while the Texas & New Orleans dips southerly from El Paso and nearer the Mexican border.

Mr. Meyer contends loss to Debtor on this traffic occurring mainly through rental charges for Pacific Fruit Express cars, return cost of empty cars and extra icing required by more southerly route.

Mr. Meyer urges that this traffic was forced upon the Debtor by the Pacific although at the time this arrangement was made Debtor was under stock control of the Southern.

The evidence is that Debtor desired this traffic. May 5, 1927 the traffic manager of Debtor sent a memorandum to its vice-president in charge of operations that the Pacific desired to establish a ninety-three hour schedule El Paso to St. Louis via Corsicana and asked prompt authorization "so as to telegraph the Southern Pacific our concurrence, otherwise they will use the Frisco or M-K-T for this service." The same day, the traffic manager wired Pacific it would join in schedule and asked advice "date first train leaves El Paso." As to one feature of this traffic, cantaloupes from the Imperial Valley, the evidence is clear as to the vigorous solicitation by Debtor, beginning in 1927. May 9, 1928, an official of Debtor wrote its traffic manager "Corsicana route had the honor of handling first car of cantaloupes shipped out of the Imperial Valley this year by freight." Also, in 1928, after this route had been established for a year and while Debtor was yet under Southern control, Debtor was fearful that a speeded-up route then installed by Pacific to Shreveport might draw from this traffic via Corsicana. In 1938, during this reorganization, the general freight agent of Debtor at St. Louis became apprehensive that the cantaloupe traffic from the Imperial Valley was being taken over by the Missouri Pacific and St. Louis-San Francisco. It is difficult to understand this solicitude of Debtor's informed freight officials (during years of action under this schedule and at different times when not under Pacific control) to retain and guard this traffic if it was producing loss, much less the very substantial loss asserted by Mr. Meyer.

▆▆▆ Statements in the report of the Commission are as set forth in the footnote.[12] The conclusion of the Commission

[12] "Meyer next asserts that routes initiated in 1927 by the Southern Pacific and the debtor for perishable traffic originating west of El Paso resulted in a great impairment of the debtor's earnings. On May 5, 1927, the debtor agreed to join the Southern Pacific in a 93-hour schedule from El Paso via Corsicana to East St. Louis, 43 hours being agreed to for the movement north of Corsicana, with no minimum number of cars specified. The schedules were initiated about June 14, 1927. Previous to the putting into effect of these schedules, perishable traffic from California originating on the Southern Pacific, and reaching the debtor, moved from El Paso to Big Sandy via the Texas & Pacific; and after the initiation of the new schedules the trains operating thereunder received perishable traffic from the

is that this traffic was carried at a small profit. The evidence is conflicting and we find there is material evidence supporting the conclusion of the Commission.

A related contention of Mr. Meyer is that the Debtor, as part of the Pacific system, is entitled to receive a share of the Pacific Fruit Express earnings, at least

Texas & Pacific at Big Sandy. The new route was longer than the older route, and because it was warmer, it required additional icing for perishable traffic.

"Meyer says that the debtor was required to assist the Southern Pacific in taking traffic from the Texas & Pacific by reporting to the Southern Pacific its deliveries to the Texas & Pacific at Big Sandy; but it does not appear that such reports were made until after the Southern Pacific acquired control of the debtor. Meyer also says that it was the opinion of both the debtor and the Southern Pacific that the new routes would not pay; but the evidence on which he relies is merely correspondence on the subject of the initial difficulties in capturing a share of the cantaloup traffic from older established routes.

"By June 11, 1928, the debtor-Southern Pacific-Colton block schedule from El Paso to East St. Louis by way of Corsicana was 89 hours. The time by Shreveport was 91 hours; but west of El Paso the schedule for the route via Shreveport was shortened by 2 hours, so that the same running time from the Colton block was accomplished by way of Shreveport as by Corsicana. The debtor was apprehensive when the change was made that the new schedule by Shreveport might detract from the business of its Corsicana route. But the Southern Pacific advised that the schedule by Shreveport was to take care of business in the Southeast in competition with the Texas & Pacific east of El Paso, and that no change in the handling of business in connection with the debtor was intended.

"The establishment of the new schedule by Shreveport is characterized by Meyer, however, as being an act of bad faith on the part of the Southern Pacific, since it served, so he says, to prevent the growth of perishable traffic moving over the debtor's line. He argues that the debtor was used as a tool by the Southern Pacific to divert traffic from the Texas & Pacific to the Texas & New Orleans, and in order to induce railroads competitive with the debtor to adopt faster schedules. He urges that the Southern Pacific having first induced the debtor to initiate the perishable-traffic schedules was guilty of sharp practice in intiating competitive schedules jointly with other railroads at Shreveport and New Orleans, and something more than sharp practice, since the debtor was under the control of the Kan-

sas City Southern and, therefore, as alleged, powerless to retaliate.

"That the apprehension of the debtor for its Corsicana route was of short life would appear from the absence from the record of correspondence indicating such apprehension dated more than a few weeks after the new schedule by Shreveport was installed; and that the apprehension was groundless would appear from the fact that the debtor's annual receipts from the Texas & New Orleans at Corsicana were more than trebled from 1927 to 1930. Meyer charges that the schedules by Corsicana were initiated in the expectation of losses from the business are unsupported by the evidence of record. His charges of bad faith and sharp practice in the initiation of faster schedules via Shreveport are without basis of record.

"There remains for consideration the question whether the perishable traffic received from the Southern Pacific by the debtor at Corsicana and Shreveport impaired the debtor's earnings and was carried at a loss. Meyer estimates that there was a loss for the 4 years 1928 to 1931 of $6,179,524, or $4,482,638 depending on the method of computing car hire. His computation is based on an average cost of 13.74 cents a mile for hauling loaded cars and 8 cents a mile for hauling an empty car, to which was added in each instance 2 cents a mile for car rental to produce the $6,179,524. Omitting the latter 2 cents a mile for car rental, $4,482,638 is produced. The unit cost of 13.74 cents for hauling loaded cars and 8 cents for hauling empty cars were taken from the dissenting expression of a member of the Commission in the Control case, supra, but such units are only a rough approximation based on the average costs of hauling a ton of anything and everything. On the other hand, studies made by the debtor of the cost of hauling this particular traffic indicate that it is carried at a small profit; and these studies appear to be borne out by the fact that the Southern Pacific and the debtor even now continue to compete intensively for the traffic. Meyer's contentions in this respect are not sustained."

"Meyer further asserts that the Pacific Fruit Express Company, in which the Southern Pacific has a one-half interest, charged the debtor extortionate car rentals, which served to impair its earnings. He also contends that the debtor should receive compensation for services rendered

in the proportion Debtor contributed to such earnings. There is no foundation for this position. While Pacific owns a controlling stock interest in Debtor just as it owns a half stock interest in Pacific Fruit Express, there is no legal basis for requiring Pacific to share its earnings in either company with the other. All three companies are separate corporations and are operated as such. The stockholders in Pacific are to be considered as well as those of Debtor.

### (1c) Wastage of Assets.

Mr. Meyer presses that there was wastage in the assets of Debtor resulting in reduced earnings and in reduction of assets which would otherwise have been available to produce income. He specifies three matters of wastage and two others he regards as related to wastage.

(1) *Reconstruction of Corsicana Line.* The first of the three matters of wastage claimed is the reconstruction of the Mt. Pleasant-Corsicana line at a cost of $5,493,282.00 in 1928 to 1930. That the road was much improved and modernized by this reconstruction cannot be successfully questioned. The line was made suitable for heavy fast running. This line was the hand reaching out toward the Pacific for all kinds of freight traffic, either via Texas & New Orleans or via Texas & Pacific. On the face of the situation it would seem to have been a wise move by Debtor, a bridge railroad.

However, the argument of Mr. Meyer is that this reconstruction was not for the general good of the Debtor. He urges it was made to facilitate movement of perishables entering Debtor at Corsicana from Pacific, via Texas & New Orleans, when the officials of Debtor knew there was a decided revenue loss to it on this kind of traffic.

That this nefarious purpose existed seems inconsistent with the evidence. The exact date when the plan for this reconstruction was begun does not appear or has escaped us. However, it is clear that Debtor's engineering forces were put in the field to make a detailed study and an estimate of cost of the plan in 1925 and construction under a plan started in June, 1928. Debtor was a Gould property until March 11, 1925, when the Rock Island bought the stock of Edwin Gould. The Rock Island retained the control until October, 1925, when it sold to the Southern which retained control until April 15, 1929, when it sold to the Syndicate. The Pacific did not begin serious buying of Debtor stock until late in 1929 and did not acquire stock control until July 15, 1930. This reconstruction was completed in June, 1930. Thus the plan for reconstruction was being worked out for several years before Pacific control and the construction under a plan was completed prior to such control. If handling perishable traffic from the Pacific was the moving impulse for this improvement, those who conceived this plan must have believed such traffic was desirable and profitable since Debtor was at none of this time

---

prior to July 1, 1936, in the hauling of ice for Pacific Fruit Express cars and switching of cars in connection therewith, and argues that the debtor as part of the Southern Pacific's system was and is justly entitled to receive some share of the earnings of the Pacific Fruit Express Company, at least in proportion to its contribution to such earnings. The record does not indicate that the debtor is charged any higher rentals by the Pacific Fruit Express Company than are other carriers using its cars, or that the debtor has performed incidental service in connection with the hiring of Pacific Fruit Express Company cars on a basis different from other carriers, or that the Pacific Fruit Express Company's charges are different from those exacted by other refrigerator-car lines."

"As to cantaloups from El Centro in 1938, it appears from a letter to an agent written by R. P. Harrington, general freight agent for the debtor at St. Louis, on June 4 of that year, that the Missouri Pacific and the St. Louis-San Francisco were making great inroads on business moving to consignees in the East which the debtor formerly handled. In former years the debtor had increased its business through reroutings on information furnished by the Pacific Fruit Express agent or otherwise, but in 1938 up to the date of the letter the debtor had lost by diversions rather than gained. Harrington requested a canvass of the receivers to ascertain why the debtor was not securing more of the cantaloup traffic."

within control of Pacific. In fact, the perishable traffic arrangement (via Texas & New Orleans) to Corsicana was not initiated until May, 1927. There is some further support in the situation that such traffic seems, as found by the Commission, to be profitable.

(2) *Acquisition of short lines.* Mr. Meyer urges wastage of $3,428,000.00 in 1929 and 1930, for the construction and the acquisition and reconstruction of short lines in the St. Francis Basin. Before this improvement, Debtor's line passed some miles west of Memphis and had access to that city only by trackage rights over the Rock Island from Brinkley. Brinkley was southwest of Memphis so that Debtor's line from St. Louis to Memphis was somewhat circuitous and relatively much longer than other St. Louis-Memphis lines.[13] By this improvement, Debtor's St. Louis-Memphis line was shortened about sixty miles to 347.4 miles.

This project was approved by the Commission. St. Louis S. W. Ry. Co. Construction, 150 I. C. C. 685; St. Louis S. W. Ry. Co. Acquisition, 158 I. C. C. 206 and 162 I. C. C. 625. A reading of these I. C. C. Reports convinces that the project seemed reasonable at those times and in the public interest. The fact that the project has not turned out to be as productive as hoped or has been even unproductive is proof that experience is better than anticipation but it falls far short of proof of conscious wastage.

(3) *Excessive maintenance of way expenditures.* Mr. Meyer claims that an average annual expenditure for maintenance of way and structures during the six years (1925-1930) of $4,550,773 was grossly excessive at a time when the revenues of Debtor were declining. He estimates that a more reasonable expenditure would have improved Debtor's position at the end of this period by $6,000,000. In short, this contention would mean an average annual expenditure of $3,550,773 during this period.

The exhibit from which Mr. Meyer takes his figures for actual expenditure is a "condensed income account and averages, years 1915 to 1937, incl." This table shows that prior to 1918, such annual expenditures were less than $2,000,000. From then on to 1937, such expenditures have been as follows:

| | |
|---|---|
| 1918—$3,240,696 | 1928—$4,642,108 |
| 1919—$4,168,790 | 1929—$5,177,658 |
| 1920—$6,385,071 | 1930—$3,351,655 |
| 1921—$3,962,520 | 1931—$1,963,175 |
| 1922—$4,299,557 | 1932—$1,838,052 |
| 1923—$4,251,897 | 1933—$1,438,431 |
| 1924—$4,232,984 | 1934—$1,507,456 |
| 1925—$4,626,890 | 1935—$1,733,466 |
| 1926—$4,864,847 | 1936—$2,461,053 |
| 1927—$4,641,477 | 1937—$3,412,747 |

While the expenditure for any particular one or two consecutive years might not be revealing unless something was known about the conditions necessitating such, yet several things may be fairly deduced from a comparison of annual expenditures over this continuous period of twenty years. The depression in this country came in 1930 and it may be reasonably assumed that the effect thereof was, for several years thereafter, reflected in a pronounced decrease in all expenditures wherever possible. This begins to show here in 1930 and becomes drastic during the following five or six years. Recovery in expenditures for this maintenance does not begin until 1937 and then is not quite up to the expenditure for 1918. The deferred maintenance of $3,173,500, found by the Commission as of several years after 1937, is a natural result of the under-maintenance during these lean years. It is unlikely that excessive over-maintenance of way and structures—which have a certain element of stability—would have resulted in such deferred maintenance. If there was excessive expenditures during the six year period (1925-1930) they must have been fortunate in aiding the Debtor during the succeeding trying years by requiring less than normal annual outlay for such maintenance. Another matter is that Mr. Meyer seems to

---

[13] The St. Louis-Memphis mileage of other roads was: Frisco, 305.8; Illinois Central, 316.1; Missouri Pacific, 326.6.

The old mileage of Debtor, via Brinkley, was 407.

regard this road as well managed before the Rock Island came into the picture in March, 1925. During the six year period (1919–1924) immediately preceding the period about which he objects, such average annual expenditure was $4,550,137—this is not far from the $4,550,773 which Mr. Meyer attacks.

Mr. Meyer approaches this matter from another direction, namely, a comparison of Debtor with the four other main north-south roads in this Gulf territory. This comparison takes the form of percentage of annual (1925–1930) expenditures for maintenance of way and structures to total operating revenue. Such comparison standing alone has no probative value, since it depends upon all the variances and influences and situations as to operating revenue and as to such maintenance applying to each particular railroad.

(4) *Purchase of M-K-T stock and provision for debt maturity.*

In conjunction with this subject and as illustrating "the entire lack of trustee spirit actuating those in control of the Debtor," Mr. Meyer urges two matters: purchase by Debtor of M-K-T stock and lack of provision to meet an important debt maturity. This purchase of 100,000 shares of the M-K-T was to aid Southern and its bankers in acquiring stock control of that road. It was engineered by Southern during its stock control of Debtor and was a part of Southern's plan to unify the three roads. The use of these funds of Debtor for this purpose was motivated by the desire of Southern to protect itself and was accomplished because of Southern stock control of Debtor. From the standpoint of Debtor, this transaction was indefensible. However, no actual loss was suffered by Debtor as Southern, under attack for this transaction, took over the stock at cost to Debtor and carrying charges.

The other matter has to do with the maturity of $20,727,750 of Consolidated Mortgage bonds due on June 1, 1932. It seems to be Mr. Meyer's contention that the failure to provide a sinking fund to meet this maturity resulted from deliberately contrived lessening of revenue and non-reduction of operating expenses. Just how far

before this maturity, provision for such sinking fund should have begun is not definite beyond a quotation (several times repeated by Mr. Meyer) from a letter to the stockholders of Debtor by Mr. Pierce, Chairman of the Board, dated April 28, 1927. This letter was sent out in reply to one by Mr. Meyer to the stockholders soliciting proxies and which contained serious charges against the good faith of the existing officials of Debtor. This somewhat lengthy Pierce letter dealt with the matters of attack in Mr. Meyer's letter—one of which was "Dividends" on common stock. In discussing this topic, Mr. Pierce wrote:

"Dividends upon the Preferred Stock of the Company at varying rates and times were paid between the years 1909 and 1914. During the period between 1914 and 1922 no dividends were paid upon the preferred Stock of the Company. In 1922 the vastly improved situation, due to the use of surplus earnings in improvement and equipment of the property, was considered by the Board in connection with the then uncompleted program of betterment and equipment, and the conclusion was reached that while a resumption of dividends upon the Preferred Stock was justified, effective use of surplus could not be discontinued. Those who have long followed the fortunes of the Company will remember the discussion of its affairs and the announcement of its policies in the communication of November 23, 1922 of Mr. Edwin Gould, then Chairman of the Board, to the stockholders, which concluded with the statement that the formulated policies of the company should have preference in the following order:

"First: A liberal budget for the maintenance of the property to a high standard of efficiency for the service of the public;

"Second: Seasonable provision, in proper measure, by way of sinking fund, for an important maturity at an early year, which must be now taken into account as a definitely approaching exigency; and

"Third: Dividends to stockholders in the order of their established rights.

"The policy thus outlined, and which the company has pursued, has afforded the best promise of future and maintained dividends

on the Common Stock and the appreciation of that stock itself is the best justification of that policy."

Mr. Meyer uses the "Second" paragraph of this quotation as proof that Mr. Pierce had in mind this particular maturity and recognized the necessity of providing therefor. The attack for failure to provide such sinking fund is apparently directed at the period following the stock sale by Gould, March, 1925, during which there was control of the Debtor by other roads.

As to *deliberate* lessening of revenue, this must largely have occurred through diversion, which has been dealt with hereinbefore and not sustained. As to total operating expenses, there is, apparently, no serious departure from the years before this period—either positively or in relation to operating revenue.[14]

Maintenance of way and structures, an important item of operating expenses, has been separately examined hereinbefore.

But entirely aside from what the figures and facts may show as constituting material evidence to sustain the conclusions of the Commission, the raw fact is that there resulted no ultimate detriment to Debtor from failure to establish this sinking fund even if it could have been established out of earnings—which it could not have. The maturing bonds were refunded under circumstances and upon conditions not harmful to Debtor.

At this place we will deal with three matters: conspiracy, anti-trust action and lease by Pacific.

### Conspiracy.

The basis of Mr. Meyer's position in this entire controversy is a series of conspiracies by those successively in stock control of Debtor to its detriment. That there were opportunities, through these controls, for some or all of such conspiracies seems evident. The Commission, in its report, devoted much consideration to this subject. It concluded, correctly we think, that the existence of such conspiracies was material in this reorganization proceeding only as the effect thereof bore upon the earnings and assets of Debtor. If the net earnings were reduced thereby or if a recovery of damages resulting from illegal conspiracies—anti-trust damages—such matters would affect the valuation for reorganization capitalization purposes.

Mr. Meyer has endeavored to show the actual harmful effects through diversion of traffic and the other respects which we have heretofore considered. The Commission found against Mr. Meyer in all of these matters and we have determined hereinbefore that there was material evidence to sustain such findings.

### Anti-Trust Action.

As to statutory damages from claimed violation of the Clayton Act, 38 Stat. 730, and, possibly, the Sherman Anti-Trust Act, 49 U.S.C.A. §§ 1–7, 15 note, the Commission stated that "Any such cause of action might prove to be a valuable asset affecting permissible capitalization, and perhaps the distribution of reorganization securities." The Commission then examined the evidence, as well as its own previous proceedings in other matters, to ascertain whether, as matter of law, there seemed any basis for a cause of action under the anti-trust law and concluded there was no substantial basis in the evidence upon which to found such an action. How thoroughly the Commission examined this and related contentions of Mr. Meyer may be surmised from the situation that, out of about 140 pages (as printed in this record) which it devoted to discussion of the contentions of all of the parties, approximately one-half had to do with these matters. The balance of the other half was devoted to other con-

---

14 

| Operating Revenue | Operating Expenses |
|---|---|
| 1916—$13,964,462 | $ 9,409,384 |
| 1917— 17,448,824 | 11,000,559 |
| 1918— 19,627,056 | 15,888,609 |
| 1919— 20,689,423 | 18,400,930 |
| 1920— 31,057,914 | 25,980,566 |
| 1921— 25,153,462 | 19,112,553 |
| 1922— 26,159,914 | 20,007,426 |
| 1923— 29,551,120 | 21,990,212 |
| 1924— 26,326,291 | 20,027,914 |
| 1925— 26,132,262 | 19,925,859 |
| 1926— 25,692,826 | 19,353,457 |
| 1927— 24,203,525 | 18,494,571 |
| 1928— 25,575,765 | 19,330,633 |
| 1929— 25,929,565 | 20,114,769 |
| 1930— 21,881,362 | 16,944,380 |
| 1931— 17,950,372 | 12,659,230 |
| 1932— 12,554,433 | 10,535,231 |

tentions of Mr. Meyer except about ten pages.

The United States has, by leave, filed a brief as amicus curiæ bearing upon this Anti-Trust action issue and counsel were heard orally. The concern of counsel is as "to the proper construction of the federal statutes forbidding restraints of trade and monopolization of interstate commerce." The contentions of the Government are stated as follows:

"The reorganization plan submitted by the Commission and approved by the district court involved an implicit assumption that the control of the debtor by the Kansas City Southern Railway was not unlawful. The United States contends that such control was clearly unlawful, under the applicable provisions of the antitrust laws. If such control was unlawful, then the plan of reorganization submitted by the Commission and approved by the district court is unfair and unequitable in failing to recognize that the debtor had a valuable cause of action for triple damages under the antitrust laws which it was prevented from bringing during its subsequent control by Southern Pacific. Assuming the existence of such a cause of action against Kansas City Southern which was known to Southern Pacific, the latter's refusal to permit the debtor to realize upon it, because inaction better served the interests of Southern Pacific, was a breach of trust which Southern Pacific is bound to account for in this reorganization proceeding. Such a breach of trust should result in the subordination of Southern Pacific's claims to those of the minority stockholders injured by Southern Pacific's wrongful conduct. Taylor v. Standard Gas Co., 1939, 306 U.S. 307, 322, 59 S.Ct. 543, 83 L.Ed. 669; Pepper v. Litton, 308 U.S. 295, 306 (1939); In re American Fuel & Power Co., 6 Cir., 1941, 122 F.2d 223.

"The Commission apparently decided that, because it did not find the existence of any 'conspiracy,' there was no cause of action which in the reorganization plan should be reserved and vested in a trustee for the purpose of bringing suit.

"The United States contends that upon a correct construction of the anti-trust laws the control of debtor by Kansas City Southern was illegal per se. No 'conspiracy,' wrongful intent, or specific frauds, irregularities, misconduct or mismanagement, was a condition precedent to the existence of debtor's cause of action against Kansas City Southern. The mere fact of control in and of itself gave rise to a cause of action.

"By failing to construe the antitrust laws correctly, and by failing to give effect in the reorganization plan to the consequences of the violations of those statutes, the Commission in effect approved the wrongful control of debtor by Kansas City Southern, even though the Commission has stated that it regards the question of whether this control violated the antitrust laws as an undecided question which need not be determined in this proceeding. However, it has, in effect, determined the question by approving a plan of reorganization which may not be regarded as fair and equitable if this control was illegal.

\* \* \* \* \* \*

"The Commission, and the trustee in his reports to the district court, in concluding that the debtor had no cause of action against the Kansas City Southern, impliedly assume that the acquisition of control of one road by a competing road for the express purpose of eliminating competition between them may be legal, even though approval of such control by the Interstate Commerce Commission is never obtained.

"The serious consequences to the United States arising from the acceptance of such an unsound interpretation of the anti-trust laws is obvious. Such an erroneous construction would seriously impair the activities of the Government in its program of law enforcement in the transportation field.

"The question of the legality of Kansas City Southern's control has thus escaped decision so far by the Commission and has apparently not been expressly considered by the Trustee. We believe that its illegality is apparent and was apparent to the Southern Pacific at the time it assumed control of the debtor. Such a conclusion is obvious on the basis of undisputed facts which were of record in prior Commission and judicial proceedings. But a determin-

ation of the question is essential to a correct decision on the reorganization plan.

\* \* \* \* \* \*

"The debtor's management, while under Southern Pacific control, had ample time to bring suit under Section 4 of the Clayton Act [15 U.S.C.A. § 15] against the Kansas City Southern, et al., for the damages sustained as a result of its control of the debtor in violation of the antitrust laws. As this illegal control did not terminate until April 15, 1929, suit could have been successfully filed at any time up to April 15, 1934, approximately four years after Southern Pacific first obtained control of the debtor with full knowledge of the cause of action against Kansas City Southern. It is unnecessary to speculate here about the amount of the damages which might have been recovered but there is no dispute that the debtor's average annual net railway-operating income for the three years 1927 to 1929, inclusive, was about $900,000 a year less than it had been for the preceding three-year period, from 1924 to 1926. The prima facie treble damages which the debtor was entitled to recover were thus considerable, especially in view of the fact that during the same two periods, the average net railway operating income for the Kansas City Southern was about $550,000 a year more for the latter three-year period than it was for the former.

"No suit having been brought, it is admittedly impossible to determine at this time the precise extent of the damages which it might have recovered, but this difficulty is solely the result of the Southern Pacific's refusal to let the proof be made in a law suit when the debtor was entitled to bring one. The damage to the debtor is now irrevocable except insofar as Southern Pacific may be held responsible for it in this proceeding, as the inaction of Southern Pacific has permitted those primarily liable to escape liability through the running of the statute of limitations.

"The loss of earnings sustained by the debtor during the period of its illegal control by Kansas City Southern started it on the road to this reorganization several years before the depression which affected all roads began. The manner in which the control of the debtor was passed back and forth for speculative purposes without regard to the interests of the public or minority security holders was a wrong against the public for which a time of reckoning has now arrived. If respect is to be maintained for the antitrust laws in the railroad field, such conduct cannot have the express or implied approval of the Commission or the courts, and this Court should sound a warning to those who may be tempted to repeat such procedure by holding that such conduct is clearly illegal."

The practical effect of this position is that the Government thinks an antitrust action against the Southern for treble damages was maintainable but, through inaction of the Pacific such action has become barred by limitation and, therefore, the Pacific should be penalized by subordination of its claims to those of the minority stockholders of Debtor injured by Pacific's wrongful conduct.

In some respects, this last hour appearance of the Government is extraordinary. If it deemed the Southern had violated the Anti-Trust Acts why did it not prosecute therefor? Why did it wait until this reorganization was on appeal to this Court before it appeared to protect the minority stockholders rather than earlier to prosecute? Such appearance smacks of irspiration. However this may be, it should be examined if there is merit in its position.

■■■ This position is not approved. If the Pacific destroyed, by preventing an Anti-Trust action against the Southern and others, there would be a breach of its duty to the Debtor and an action would lie to recover damages therefor. But without probability that such cause of action existed made to appear in this reorganization proceeding there would be no basis for its entrance into such proceeding. If such should be made to appear, the proper procedure would be to have such action placed in a trustee with proper provisions as to responsibility for expense and as to disposition of any recovery. With recovery and amount thereof uncertain, there is no

proper basis for subordinating the Pacific claims to stockholders who may never recover and if they do, where amount of recovery is entirely uncertain. Faced with this situation, the Commission did the only thing it could do in this reorganization proceeding. It examined the evidence to ascertain the probability of existence of such cause of action. This examination was painstaking and thorough and it determined adversely. We have tested that determination by the evidence before the Commission and find there is material evidence to support the Commission.

### Lease by Pacific.

Mr. Meyer urges that, after Pacific acquired control, it should have leased Debtor's lines. The evidence is that operation under a proper lease would have resulted in material saving to Debtor and a definite increase in earnings through making Debtor's line an integral part of the Pacific system. It is quite conceivable that such lease might have been advantageous both to Debtor and to Pacific.

There existed, however, certain practical considerations which entered into this matter. One of these was possibly the conditions which the Commission might attach to operation under a lease, if it allowed one. In the order permitting acquisition of stock control by Pacific, the Commission stated certain conditions which it deemed in the public interest. One of these was that Pacific should "maintain and keep open all routes and channels of trade via existing gateways unless and until otherwise authorized by us." Unless the Commission should change its view as to what the public good required in this regard, the revenue to Pacific would be affected by this limitation in a lease. However, as to Mr. Meyer's contention that Pacific should have sought modification of this condition, the Commission, in its original report, stated:

"He urges that the Southern Pacific should have moved for a modification of that order permitting it to close such routes and channels of trade as might be necessary to provide increased traffic moving over the debtor sufficient in amount to cover all interest charges on its bonds. We cannot tell in this collateral proceeding whether we would have found merit in a petition for a modification of the order in question, but the retention of the existing routes and channels of traffic to the utmost extent possible has always been considered by us as required in the superior public interest."

The contention of Mr. Meyer is that the refusal of Pacific to make such a lease is clear proof of its desire to put Debtor through reorganization so that the responsibility of Pacific to the creditors and stockholders of Debtor might be reduced and then it could make a more advantageous lease. That such results might well follow is evident. However, this does not prove such intent of Pacific. Mr. Holden, Chairman of Pacific board, testified before the Commission that the Pacific had intended, when it acquired control, to make Debtor eventually a part of Pacific but had been deterred by the situation.[15] As to this, the Commission stated, in its original report, as follows:

"As to the possibilities of a lease of the debtor by the Southern Pacific, as an

---

[15] "Q. Has the Southern Pacific Company given consideration to a possible merger of the St. Louis Southwestern properties into the Southern Pacific System, and by 'merger' I mean the conveyance of all the properties of the St. Louis Southwestern System to the Southern Pacific or the Texas and New Orleans Railroad Company, and has it also given consideration to a possible leasing of those properties at this time, and, if so, what conclusion has it reached? A. Southern Pacific Company has given deliberate consideration to the matter of a proposed merger with or a lease of the St. Louis Southwestern properties, but has reached the conclusion that no satisfactory plan for such merger or lease is available or practicable at this time.

✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻

"There has been considerable change in the character of the Cotton Belt as a railroad. Formerly it originated a fairly large volume of traffic that in later years has disappeared and will, in all likelihood, not return. More and more the property has come to be a bridge line, and as such, the extent to which it can be developed under normal business conditions and over a test period of reasonable length is not yet known.

✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻

alternative to reorganization, it appears that such an arrangement, or a consolidation of the properties, holds promise of large savings in operating expenses, with the further promise of some increase in traffic. The Southern Pacific apparently is of the view that the saving in expense and increase in traffic would not be suffi-

"At the time Southern Pacific Company acquired control through stock ownership of the St. Louis Southwestern, it was our declared intention that the latter should eventually become a part of the Southern Pacific System. That intention has never been abandoned, and we still feel that such result is logical and to the best interests, not only of the parties immediately concerned as creditors or owners, but to the general public as well.

"But, as I have in effect stated, there has appeared to us thus far no terms or basis worthy of present consideration or upon which that result may not be accomplished.

"In reaching this conclusion we have not overlooked the item of savings that might accrue from merger or lease of the properties and the single management and operation that would result therefrom. What such savings would amount to is problematical.

"They have been variously estimated, and there was once good reason to believe that they might amount to approximately $500,000 per year. However, by the joint use of terminal facilities at several junction points of the Cotton Belt with the Texas and New Orleans Railroad Company already carried out, and by cooperation in other respects, some of the savings originally estimated have already been accomplished. Then again, we are now confronted with wage dismissal agreements that would tend to defer for a long period the greater portion of the savings that might have been possible of accomplishment prior to the adoption of such agreements.

\* \* \* \* \* \* \* \*

"By Mr. Meyer:

"Q. I think you said last night that one-half million dollars of savings could be made through a lease? A. I said it had been estimated some time ago that that might be done.

"Q. When was the estimate made? A. Several years ago. I also stated that since that time the savings had been accomplished by consolidation of the terminals, and so forth.

"Q. The original estimate was very much larger than one-half million dollars? A. Are you testifying? I do not know anything about that.

"Q. Question: Were the original savings larger than one-half million dollars in the original estimate? A. I do not know.

"Q. I thought you might know. Is the five hundred thousand dollars which you speak about as a possibility in savings in a lease savings that now could be made, or was that the original sum, and have a good many of those items been availed of already. That is the question. A. I want to correct my statement. I do recall at some earlier time there was a larger estimate. I do not know who made it or what the basis was, but, as I said yesterday, the dismissal wage agreements which the railroads have entered into would very greatly delay any economies resulting from reduced forces. It would take considerable time to work out in a practical way just what all these savings might amount to.

"Q. Mr. Turney, the attorney for the St. Louis Southwestern and Vice President in charge of traffic, told me in 1931 that about one million dollars savings could be made through a lease. Did you ever have any conversations with Mr. Turney on that subject? A. I do not recall whether I did or not.

"Q. Did you ever have any conversations with any other official of the St. Louis Southwestern on that subject? A. I think I talked with Mr. Upthegrove about it.

"Q. Do you remember what those conversations were? A. No, I don't remember excepting in substance what you say, that something like one million dollars was rather thought probable at that time.

\* \* \* \* \* \* \* \*

Q. \* \* \* is it necessary when a railroad leases another line that it guarantee the entire interest on the bonds? A. I think not. Under a lease it pays a rental.

"Q. Under a lease it pays a rental? A. And the lessor does with the rental what the papers require.

"Q. In other words, it is just as if you and I leased a house with a mortgage on the house, we would pay the lease but not the interest on the mortgage? A. There are various forms of leases, and there are usually covenants to say that the rent does go to pay the interest.

"Q. But that is not necessarily always the case, as you have testified? A. I do not know whether it is always the case or not.

"Q. If that is so and it is not necessary to guarantee a company leasing another company in which it owns 80 per cent of the stock, to guarantee the interest on the bonds, then was not the only problem which confronted the St. Louis Southwestern how much, if anything, to pay on the 4000 shares of preferred and about 40,-

cient in amount to justify it in assuming the obligation of the debtor's fixed charges at their present level. It cannot be said in the light of the record that this view of the Southern Pacific is unreasonable. A possible lease cannot under the present law be forced on the Southern Pacific. Such a unification of operation is a step that may follow reorganization of the debtor, rather than a means by which a reorganization otherwise clearly necessary might be avoided. In any event it could not be accomplished without giving the States involved and the general public opportunity to be heard on the reasonableness of the terms and the underlying question of public interest."

In connection with Mr. Meyer's request for finding "14. That a lease of the debtor will result in increased economies in the amount of not less than $500,000 to $1,000,-000 annually," the Commission stated:

"For reasons hereinbefore appearing, the requests for findings 1 to 13 are denied. The request for finding 14 is also denied as immaterial to these proceedings, since it does not appear that a lease prior to reorganization is contemplated or practicable."

Also, Mr. Meyer urged that reorganization capitalization be affected by the effect of a lease by Pacific. As to this, the Commission, in its supplemental report, stated as follows.

"Walter E. Meyer's contention that we should base new capitalization on earnings which might be received after a lease of the property by the Southern Pacific is not sustained. Such a lease under present law cannot be forced upon the Southern Pacific, since there appear no prospects of such a lease until after reorganization is consummated, and since it is impossible to determine the earnings of the property under a lease until the terms of the lease are agreed upon and made known. * * *

"In support of the proposed new capitalization, the petitioner suggests a lease of the debtor by the Southern Pacific with one-line solicitation of traffic, which he estimates would provide an opportunity for economies or savings in operating expense of from $500,000 to $1,000,000 annually, and produce from $20,000,000 to $30,000,-000 of additional traffic for the debtor. The debtor's railway system operating revenues were $20,642,003 in 1940, and freight revenues were $19,422,734. The basis offered for the petitioner's estimate of increased revenues is in part an examination of 1931 traffic made by the debtor. On the basis of the traffic of that year it was estimated that the annual revenues of the greater system were some $30,000,-000 less than they would have been if that system had received its longest haul on all originated and terminated traffic. Of this $30,000,000, about $12,750,000 represented traffic moving under the Central Pacific agreement, and about $17,000,000 represented traffic not covered by that agree-

---

000 shares of common stock outstanding. A. No, it was not the only question by any means. We had more than the property, we had to maintain the taxes and see that the interest was paid on a heavy capitalization, and then to take into account what would be payable to the minority stock, and we were not able to find any basis under which we could deal with that particular element in the case.
* * * * * * * *
. "Q. * * * If there were savings of one-half million dollars, which you stated you had been informed, assuming you paid 5 per cent on the preferred stock of which there are 4000 shares outstanding, and suppose you paid 5 per cent on the common stock, of which there are 40,000 shares outstanding, that would have meant a charge to the Southern Pacific of $225,-

000, would it not? A. I guess you are mathematically correct.
"Q. Would not that have been a rather easy way of solving this great problem? A. We had the interest, the maintenance and the taxes to look out for before getting to that point.
"Q. Now, you say you are assuming the interest, but there are all kinds of leases, are there not? A. I do not know.
"Q. Do you not think that the bondholders would have preferred that you enter into such an arrangement? A. I cannot answer.
"Q. Rather than to resort to reorganization proceedings? A. I cannot answer.
"Q. You never consulted the bondholders or stockholders in that respect? A. I do not know that we did."

ment. The $17,000,000 was equal to somewhat more than 50 percent of the revenues which were then received from the traffic not covered by the agreement. The amount estimated as loss to the debtor through short-hauling the greater system on traffic not covered by the Central Pacific agreement was about $14,035,087, offset in part, however, through gains by the Pacific lines and the Texas & New Orleans through the same short-hauling of the system. It does not appear that these amounts were necessarily attainable. They represented merely the amount by which revenues might have been increased in 1931 if the routing of all originated and terminated traffic (other than traffic coming under the Central Pacific agreement) had been procured via the Southern Pacific-debtor long haul, and if there had been no retaliation by competitors on other traffic.

"Besides the $14,035,807 mentioned, the petitioner says it is reasonable to estimate that an additional $14,000,000 of traffic in the movement of which the Southern Pacific does not at present participate would be obtained by the Southern Pacific for the debtor if the Southern Pacific system through a lease of the debtor and one-line solicitation extended to Mississippi River bridgeheads. He thus arrives at an increase of $28,000,000 for carload traffic, to which he adds a somewhat less than proportionate increase of $2,000,000 for less-than-carload traffic, producing a total of $30,000,000. It is clear that the petitioner has misapplied the debtor's figure of $14,-035,807, and his own estimate of an additional $14,000,000 of carload traffic is merely an assertion unsupported by any analysis or computation. The evidence is not convincing.

"Apparently led to his conclusion by the estimate we have just rejected, the petitioner charges that the conduct of the Southern Pacific in failing to lease the debtor was unconscionable and inequitable. He urges that, in reorganization, the Southern Pacific should be required as an alternative to loss of all interest in the debtor, to enter into a lease of the debtor and to introduce one-line solicitation. Our views on these questions were stated in

our prior report. We adhere to those views and to the conclusion there stated, that the Southern Pacific was apparently of the view that the saving in operating expense and increase in traffic would not be sufficient in amount to justify it in assuming the obligation of the debtor's fixed charges at their present level, and that it could not be said in the light of the record that such view of the Southern Pacific was unreasonable."

Thus it appears that there was positive and frank evidence as to practical considerations which Pacific thought prevented lease or merger of Debtor. Obviously, the Commission was correct in its view in eliminating a possible future lease from its estimate of valuation for capitalization under a plan of reorganization.

Our conclusion is that the Commission was supported by material evidence in its determination of the valuation of Debtor for reorganization capitalization purposes, at the time such valuation was made.

### (2) Changed Conditions.

The basis of the contentions that the valuation for capitalization purposes should be increased because of changed conditions since the action of the Commission is based upon large increases in earnings occurring in 1941 to 1944, inclusive.

After submission of various proposed plans of reorganization, the Commission held hearings which closed April 24, 1937. On January 11, 1939, the Commission reopened the matter, on petition by Mr. Meyer, and further hearings were had ending September 30, 1939. After elaborate presentation by briefs, the matter was finally submitted October 3, 1940. The report and Plan of reorganization were filed June 30, 1941. Thereafter, various petitions for modification of the Plan were filed. Mr. Meyer filed, also, a petition seeking reopening of the proceeding and an investigation by the Commission. Briefs were filed and these petitions taken as submitted October 8, 1941. March 9, 1942, the Commission filed a Supplemental Report making some modifications in the earlier Plan but adhering to its valuation for reorgan-

ization purposes.[16] The effective date for the reorganization was January 1, 1942.

In some of the petitions to modify the Plan, it had been urged that the increased operating revenue for the first six months of 1941 and the further prospective increased earnings would compel a higher valuation. The Commission treated such increases as abnormal and temporary produced by the unusual augmentation of transportation in connection with war conditions and as no true guide for long time valuation for reorganization purposes.

■ The latter part of May, 1942, objections to the Plan and claims for equitable treatment were filed by various parties alleging, among other things, that the valuation should be enhanced in view of the increased operating revenue during 1941 and the yet more increased revenue during the first four months of 1942. In the hearing before the court upon the objections, evidence as to operating revenue and as to the financial condition of Debtor up to the then latest available date, September 30, 1942, was introduced. These hearings closed November 5, 1942. The opinion of Judge Moore (filed Feb. 9, 1944, 53 F.Supp. 914) shows he considered the revenues and financial condition of Debtor for 1941 and 1942 and, as far as then available to him, those for 1943. The record contains also the General Balance Sheet of Debtor as of December 31, 1943—filed by the Trustee February 16, 1944. In addition, Debtor has attached to its brief, as appendices, "Income Account Revenues and Expenses" for 1942, 1943 and ten months of 1944 with estimate for entire 1944 (using actual 1943 figures for November and December); comparative general balance sheet on August 31, 1942, December 31 of 1942 and 1943 and October 31, 1944, eliminating intercompany items; and petition of Trustee and order thereon, entered June 30, 1944, for payment of interest on certain securities. Also, there has been filed here by Debtor a motion to have made parts of this record certain statements of financial condition, similar, but differing in some respects, to the above matters in the appendices to Debtor's brief but containing

actual complete figures for 1944 instead of estimates for November and December of that year. These matters were filed in the District Court, in the regular routine procedure, after the opinion below. The motion is sustained. For purposes of our examination, we treat these matters as filed herein and as being as represented in the motion.

The urged effects of these increased earnings and of the changed financial status so brought about are two: (a) that these increased earnings prove that the Commission's estimate of prospective earnings was far too low; (b) that the much improved financial condition of Debtor proves (1) that it is now solvent or, at least, (2) that the valuation should be materially raised.

### (2a) Prospective Earnings.

In his petition to modify, petitioner Rosenberger requested the Commission to state, in a supplemental report, the following:

"(a) The average annual earning figure we adopted and for what period; (b) our finding for excess maintenance for any pertinent period we have relied on in arriving at true earning power; (c) the extent to which the earnings for the year 1941 have figured in our appraisal of the debtor's earnings power; (d) the prospective earning figures we relied on for the next few years; and (e) the value of the debtor's property and the earning formula we used in arriving at said figures."

In its supplemental report, the Commission stated, as to these requests, as follows:

"Except as shown in our prior report or elsewhere herein, the Commission has made no such findings, and sees no reason to make such findings now. Neither the total new capitalization approved nor the plan as a whole is based on a formula. Our agreement as to conclusions does not imply that all of us reached the conclusions by the same route, or were to the same extent affected by every one of the many considerations which moved us to those conclusions. Nor is it to be expected that the court, if it shall reach the same

---

[16] Minor adjustments changed the actual valuation from $75,000,375 to $74,999,879.

conclusions, will, in such a complex matter, necessarily follow precisely the same line of reasoning as any one of us."

In reorganization proceedings, the Commission is not required to formalize its determination of valuation into findings upon the data which results in its conclusion. Group of Institutional Investors et al. v. Chicago, M., St. P. & P. Railroad Co., 318 U.S. 523, 539, 63 S.Ct. 727, 87 L.Ed. 959.

The Commission had before it evidence of past earnings and past financial condition with voluminous evidence bearing thereon. The report shows that earnings up to and including at least the first six months of 1941 were before the Commission. Also, the prospective war earnings were urged upon the Commission and denied as a basis for the long time requirements of a reorganization valuation, although the United States had been in the war for three months when the Supplemental Report was filed.

What were then "prospective" earnings for the last half of 1941 to 1944, inclusive, have now become actualities. Tables showing (1917 to 1944, inclusive) gross operating revenues and net railway operating income and (1923 to 1944, inclusive) income available for fixed charges are in the footnote.[17] While statistics of almost every kind are subject to explanations which sometimes vitally affect the worth of deductions from them, yet a series covering many successive years of a business are quite likely to reveal, on their face, significant matters. A long series furnishes fairly solid foundation for deductions as to normals, abnormals and averages. Since reorganization proceedings must have the long range in view, such deductions are valuable. The statistics in the footnote are long range experience of the Debtor. They reveal clearly the abnormal character of the years 1942, 1943 and 1944. A jump from $28,256,046 in 1941 to $48,714,197 in 1942 and the further drastic rises in 1943 and 1944 speak for themselves. The average annual gross revenue for the twenty-eight years is, roundly, $26,103,000. The average, excluding 1942, 1943 and 1944, is $21,808,000, further reflecting the abnormal effect of those three years. The war effects began to manifest themselves in 1941 but did not reach real stride until 1942, after we entered the war.

The sole cause of these enormous increases is, for most part if not entirely, the war. This cause was temporary. That the end of hostilities would result in a pronounced decrease to peace-time normalcy is a certainty. That this decrease will

[17] Gross operating revenues for the twenty-eight years, 1917 to 1944, inclusive, are as follows:

| | |
|---|---|
| 1917—$17,448,824 | 1931—$17,950,372 |
| 1918— 19,627,056 | 1932— 12,554,433 |
| 1919— 20,689,423 | 1933— 12,953,394 |
| 1920— 31,057,914 | 1934— 14,125,660 |
| 1921— 25,153,462 | 1935— 15,742,227 |
| 1922— 26,159,914 | 1936— 19,363,507 |
| 1923— 29,551,120 | 1937— 21,115,982 |
| 1924— 26,326,291 | 1938— 18,492,202 |
| 1925— 26,132,262 | 1939— 19,609,965 |
| 1926— 25,692,826 | 1940— 20,642,003 |
| 1927— 24,206,525 | 1941— 28,256,046 |
| 1928— 25,575,765 | 1942— 48,714,197 |
| 1929— 25,929,565 | 1943— 64,378,913 |
| 1930— 21,881,362 | 1944— 72,586,941 |

The net railway operating income is as herebelow set forth. This takes account of tax accruals, rent income and rent payable, in fact all credit and debit items except "Other Income" and "Miscl. Ded. from Income"—the net of those two opposed items (not represented in net railway operating income) are not of material influence for reorganization purposes.

| | |
|---|---|
| 1917—$6,327,552 | 1931—$ 2,607,346 |
| 1918— 3,320,342 | 1932— 186,791 (deficit) |
| 1919— 1,516,841 | 1933— 1,789,740 |
| 1920— 4,511,938 | 1934— 1,958,645 |
| 1921— 4,786,087 | 1935— 2,644,318 |
| 1922— 4,455,657 | 1936— 3,271,248 |
| 1923— 5,630,285 | 1937— 2,227,179 |
| 1924— 4,741,012 | 1938— 2,020,021 |
| 1925— 4,817,854 | 1939— 1,142,599 |
| 1926— 4,891,778 | 1940— 2,795,591 |
| 1927— 4,164,372 | 1941— 7,495,070 |
| 1928— 4,093,463 | 1942— 8,615,365 |
| 1929— 3,536,192 | 1943— 10,677,148 |
| 1930— 2,219,328 | 1944— 10,807,120 |

Income available for fixed charges is tabulized by appellant Pacific (adjusted for 1944) as follows:

| | |
|---|---|
| 1923—$5,929,628 | 1934—$ 2,024,891 |
| 1924— 5,028,749 | 1935— 2,695,111 |
| 1925— 5,057,400 | 1936— 3,333,243 |
| 1926— 5,072,628 | 1937— 2,304,505 |
| 1927— 4,692,923 | 1938— 2,088,299 |
| 1928— 4,382,449 | 1939— 1,199,158 |
| 1929— 3,714,052 | 1940— 2,860,221 |
| 1930— 2,380,379 | 1941— 7,495,940 |
| 1931— 2,710,861 | 1942— 8,692,636 |
| 1932— 125,857 (deficit) | 1943— 10,562,547 |
| 1933— 1,840,184 | 1944— 11,133,608 |

not be immediate but will taper off for a few years because of war aftermath transportation needs is likely. That tax refunds for a couple of years may help is true. But that this change from war to peace levels and conditions of railway transportation, including Debtor, will take place within a very few years seems certain.

 It is urged that though there will be a falling off in revenue at the end of the war, yet there will be an increase of business for Debtor over that before war. The argument is that the increase of population into this territory during the war will result in many of these newcomers remaining; and that many of the numerous war industries established there will be converted into peace time uses. These results may occur but the measure of them is not even estimated. Such uncertain elements can find no place in estimated future earning for reorganization valuation purposes.

Also, it is suggested by Mr. Meyer that post war building and other recovery from war conditions will result in increased business for Debtor. This seems quite probable. However, such occurrences are but moves back to normal peace conditions and, therefore, are temporary and they are inestimable.

 Whatever may be the effects of these war-time revenues in other relations, they are too abnormal and too temporary to be taken as any gauge of prospective earning of Debtor during the long sweep of years intended by Congress to be planned for in a reorganization proceeding.

As stated by Mr. Justice Douglas (Group of Institutional Investors et al. v. Chicago, M., St. P. & P. Railroad Co., 318 U.S. 523, 543, 63 S.Ct. 727, 739, 87 L.Ed. 959):

"As we have noted the Commission conceived as its responsibility the devising of a plan which would serve 'as a basis for the company's financial structure for the indefinite future.' We cannot assume that the figures of war earnings could serve as a reliable criterion for that 'indefinite future.' As some of the bondholders point out, the bulge of war earnings per se is unreliable for use as a norm unless history is to be ignored; and numerous other considerations, present here as in former periods, make them suspect as a standard for any reasonably likely future normal year. Among these are the great increase in taxes and in certain costs of operation and the decrease in water and truck competition."

### (2b) Rise in Value.

Under this heading we treat the contentions based upon the improved financial condition of Debtor resulting from the large increase in war-time earnings. These conditions have to do mainly with accumulated liquid assets, additions to property, tax refunds, decrease of liabilities and elimination of under-maintenance. The broad contention is that the combined effect of these elements is to show solvency of Debtor and so to raise the valuation by the Commission as to prove existence of an equity for the stockholders and, therefore, as to require remand to it for reconsideration in the light of this improved condition. The matter for consideration is not the direct effect of the increase of earnings, in and of itself, as a basis for estimating prospective earnings and, therefore, as a reason for revaluation (hereinbefore just examined) but it is the existing improved financial status of Debtor.

The original report of the Commission stated system investment less depreciation (book value), as of December 31, 1939, to be $114,080,573 to which was added (at book value), as of December 31, 1940, cash and added supplies, investments in affiliated non-system companies and other items which brought the book value up to $122,604,969 as of the end of 1940. A valuation by the Commission's Bureau of Valuation, as of December 31, 1935, gave a reproduction cost less depreciation of $68,523,903 for road and equipment. A supplemental report of the Bureau showed deferred maintenance accumulation of $3,-173,500—presumably as of December 31, 1935.

As of January 1, 1938, the outstanding system interest bearing loan indebtedness

was $70,045,250.[18] Interest was not being paid, except on $20,000,000 First Mortgage bond 4% certificates, $957,000 Equipment obligations, $315,000 Texarkana Union Station 5% trust certificates, $500,000 Gray's Point Terminal Railway 5% bonds, and $450,000 Shreveport Bridge and Terminal 5% bonds. In addition, interest due January 1, 1936, on Second Mortgage 4% certificates, $3,042,500, was authorized by court order February 7, 1941. Also, credits from the marshalling and distributing fund have offset interest on the Railroad Credit Corporation loan of $1,500,000. Thus interest had accumulated unpaid for

As of December 31, 1940 (Commission Report), material and supplies were $2,461,493; as of same date 1941, $3,386,233; as of same date 1944, $5,600. Current liabilities had increased from $8,531,344 as of December 31, 1941, to $29,389,478.90 as of December 31, 1944—omitting tax accruals, 1944 would show a decrease in other current liabilities from 1941 of $4,292,664 (as shown by above comparative general balance sheet).

At the end of the years 1941 to 1944, inclusive, the cash and the liquid current assets of Debtor (comparative balance sheet) were as follows:

| | 1941 | 1942 | 1943 | 1944 |
|---|---|---|---|---|
| Cash | $2,453,907 | $ 4,815,634 | $ 3,905,452 | $1,368,775 |
| Temporary Cash Investments | 800,960 | 10,708,480 | 24,454,718 | 30,399,340 |

several years upon $48,323,250 with exception of the one payment (authorized February 7, 1941) on Second Mortgage certificates. $23,882,250 of this indebtedness had fallen due in 1935 or 1936.

As of December 31, 1941, the total interest in default was $13,862,823 which had been reduced, by December 31, 1944, to $10,056,493 (as shown by comparative general balance sheet attached to motion of Debtor). The total long term debts were $70,976,937 as of December 31, 1941, and $75,725,439.70 as of December 31, 1944 (as shown on such comparative general balance sheet; and see footnote 19).

Expenditures for maintenance of way and structures and equipment (as shown on income account attached to motion of Debtor) were $7,827,778 for 1941, $8,842,565 for 1942, $11,624,200 for 1943 and $14,152,686 for 1944.

The main arguments under this heading are presented by Debtor and by Pacific. While there are some differences in approach and in basic figures used by Debtor and by Pacific, we can dispose of the contention without discussing these differences as they have no vital effect.

First, accent is placed upon the solvency of Debtor, as claimed to be shown

---

18 "First mortgage bond 4-percent certificates due Nov. 1, 1989.. $20,000,000
Equipment obligations ......... 957,000
Second-mortgage income bond 4-percent certificates due Nov. 1, 1989 ...................... 3,042,500
First terminal and unifying mortgage 5 percent bonds due Jan. 1, 1952 ................... 8,063,000
General and refunding mortgage 5-percent series-A bonds due July 1, 1990 .............. 9,327,500
Loan from Railroad Credit Corporation due 1936 (approximate) ......................... 1,500,000
Loan from Chase National Bank due 1935 ............... 3,500,000
Loan from Mississippi Valley Trust Co. due 1935............. 1,000,000
Loan from Reconstruction Finance Corporation due 1935 (assigned to Southern Pacific Company) .................... 17,882,250

St. Louis Southwestern Railway Co. of Texas:
Texarkana Union Station 5-percent trust certificates due Dec. 1, 1957 ................... 315,000
Gray's Point Terminal Railway Co. first mortgage 5-percent bonds due Dec. 1, 1947........ 500,000
Shreveport Bridge & Terminal Co. first-mortgage 5-percent bonds due Aug. 1, 1955....... 450,000
Stephenville North & South Texas Railway Co. first-mortgage 5-percent bonds due July 1, 1940 ........................ 2,423,000
Central Arkansas & Eastern Railroad Co. first-mortgage 5-percent bonds due July 1, 1940 ......................... 1,085,000

Total ...................... $70,045,250."

by the above and related statistics from balance sheets of Debtor and elsewhere. By solvency they mean balance of assets over debts. Solvency in that sense is far from controlling in railway reorganization proceedings. The lack of solvency which justifies initiation of reorganization of railroads is inability to meet debts as they become due. The purpose of such proceedings is to produce a capital structure—as to amount and character—which will warrant continued ability, for a long period, to serve the public properly and to pay debts as they may mature and probably leave something for the new stock. Reconstruction Finance Corporation, et al. v. Denver & R. G. W. R. Co. et al., 66 S.Ct. 1282, "In conclusion" paragraph; Consolidated Rock Co. v. Du Bois, 312 U.S. 510, 525, 61 S.Ct. 675, 85 L.Ed. 982. The fact that the physical properties, including cash and liquid securities, may have a value beyond the total indebtedness is not controlling either at the beginning or during such reorganization proceedings. The only place for bettered conditions, after formation of a Plan by the Commission, is where such conditions have so altered the situation as to make the Plan inequitable to existing creditors or stockholders (Reconstruction Finance Corporation et al. v. Denver & R. G. W. R. Co. et al., 66 S.Ct. 1282.

Solvency in the sense of balance of assets over liabilities has small bearing on such equity.

The broad question is, do these changed conditions show such inequity in this Plan? These appellants start with a premise only partially, if at all, sustainable. That premise is that the Commission adopted, as the physical worth of the property, the valuation of $68,523,903 found by its Bureau of Valuation in 1935. That such valuation was one matter considered by the Commission in 1941 and 1942 may be accepted, since the Commission includes the figure in its report and declares therein that it "considered all the data of record." However, it is clear that the moving consideration with the Commission was earnings—as it should have been. There is no direct suggestion in either of the reports of the Commission that such physical valuation in 1935 was regarded by the Commission as the physical valuation as of 1941 or 1942. That it did so is highly unlikely because there were many changes therein before the supplemental hearing closed in October, 1941.

While the important matter is to what extent has the actual and potential earning power of Debtor been increased by this claimed improvement in physical value, yet it is not clear how much the physical value has been augmented—the balance sheets of Debtor, as of December 31, 1944, show current assets $43,566,776 and current liabilities of $29,389,479 or an asset balance of $14,177,297 which represents the accumulated operating profit for 4 years (1941-1944).

That there is a pronounced increase in cash and liquid assets is clear. That the default in interest has been decreased from $13,862,823 in 1941 to $10,056,493 in 1944, or $3,806,330 is shown; but it appears also that the total Long Term Debt has increased, as to principal, comparing January 1, 1938 ($70,045,250) with December 31, 1944 ($75,725,439), or $5,680,189.[19]

---

[19] The figures are taken from the Balance Sheet attached to Debtor's motion and from the Commission Report, R. 3505–6.

The petitions for rehearing have challenged the accuracy of this statement as to "Long Term Debt" on the ground that included in the figures $75,725,439 for December 31, 1944, are $6,957,500 of Second Mortgage Bonds in the treasury of Debtor. While the figures $75,725,439 are accurately taken from the liability side of the "General Balance Sheet" (R. 5261) for the above date, yet it is true that $6,957,500 of the $10,000,000 of Second Mortgage Bonds incuded in the total Long Term Debt were in the treasury of Debtor and not an outstanding indebtedness. Therefore, the figures $75,725,439 should be $68,767,939. Instead of an increase of $5,680,189 (as stated in the text) there was a decrease of $1,277,311. Since the $6,957,500 is carried in the General Balance Sheet as "Assets" (under "Investments") our error is of no consequence in the "Total Surplus," or grand net balance of assets, shown by this Balance Sheet. This is true because the same figures ($6,957,500) appear under Assets and are included under Liabilities—thus balancing—

As to additions to property, all we have are the book figures with no information as to what these additions are or how they may affect earning power.

As to tax refunds, appellant Pacific contends there will, according to Debtor's Income Accounts, be $744,073 excess profits tax refund bonds and post-war refund credits of $1,829,478 for 1943 and $2,302,054 which will come back to Debtor at the end of the second, third and fourth years after cessation of hostilities. Recognizing the present worth of such refunds is less than the above, Pacific estimates the total worth, as of January 1, 1945, to be $3,994,408. These appear as deferred assets.

As to liabilities it appears that allowed claims plus accrued interest (as of August 31, 1942) were $84,178,418. Debtor argues these had been reduced to $79,990,584 by December 31, 1943, and Pacific figures $78,364,296 as of October 31, 1944. We are not able to verify these last two figures. From the Comparative General Balance Sheet attached to Debtor's motion, it would seem that the October 31, 1944, showing should be $78,831,306.[20] If our method of calculation is correct, the figure for December 31, 1944 (arrived at as in footnote 20), is $79,013,802. At any rate, the non-operating indebtedness would seem to have been reduced approximately $5,000,000.

As to elimination of under-maintenance. In the original report of the Commission it is stated that the supplemental report of the Bureau of Valuation "shows that deferred maintenance amounting to $3,173,500 had accumulated." This supplemental report was approximately for December 31, 1935, which was the date for the valuation by the Bureau. At the same time, the Debtor made a survey of deferred maintenance and determined a slightly larger figure ($3,591,027). Colonel Green, Chief Operating Officer for Debtor, testified, before the Court, in October, 1942, that all deferred maintenance had been made up by January 1, 1942, and kept up to the time of his testifying. While a considerable portion of this deferred maintenance had to do with unproductive branch lines which were abandoned between the reports of the Commission and his testimony and although Colonel Green stated that no precise determination was made as to the deferred maintenance arising from these branch lines, yet he does testify that "All of the maintenance which had accrued through these improvements and maintenance work which had been accomplished left us, at the end of 1941, with a better railroad than we ever had before, and with the equipment in better shape than it ever was in before, and because of that, we were able to handle the very heavy increase in traffic which we have had to handle since the 1st of January, 1942, and even in 1941."

As to this matter the Court stated (53 F.Supp. at 930): "the showing of restoration of undermaintenance does not relieve the doubt that the physical condition of the road may be adversely affected by inability to make proper replacements and repairs during wartime—the figures cited give no indication as to whether proper allowance for depreciation and maintenance has been made during recent years." Since routine

and, obviously, bonds of the Debtor held in its treasury are not true assets in a reorganization proceeding.

The petitions for rehearing call attention to another matter of figures affecting accuracy but only slightly results. This has to do with a change in form of accounting (required by the Commission) as to the loans to Debtor from the Chase National Bank, the Mississippi Valley Trust Company and the Railroad Credit Corporation. In 1941, these appear under "Current Liabilities" in a total of $5,658,469. In 1944, they appear under "Long Term Debt" in a total of $5,057,989. This shift from "Current" to "Long Term" was overlooked. In opposite ways, it affects only the *comparative* figures (1941) and 1944) both of "Current" and of "Long Term" indebtedness. Except in one respect, the effect is immaterial in final results since, under either classification, these loans are indebtedness. The exception is that it affects final surplus results to the extent of the reduction of these loans from $5,658,469 (in 1941) to $5,057,989 (in 1944) or $600,480.

Both of these inaccuracies are not sufficiently important to affect at all the reasoned conclusions wherein they appear.

20 This figure is the sum of "Long Term Debt" and of "Deferred Liabilities" less $6,957,500 Second Mortgage 4% Certificates held in treasury of Debtor.

monthly condition reports were filed by the Trustee sixty days afterward, the Court could have known, when the opinion was prepared, of the report for October, 1943. The total maintenance expenditure for the first ten months of 1943 were $9,014,013— more than for the entire year 1942 by $171,448. For the entire year 1943 and for 1944 the expenditures were $11,624,199 and $14,152,686, respectively. A table showing maintenance from 1930 to 1944, inclusive, is in the footnote.[21]

The argument is that the testimony of Colonel Green establishes that deferred maintenance had been entirely overcome by January 1, 1942; that proper maintenance had been continued to the time of testimony (October, 1942); and the substantial increases in maintenance expenditures for all of 1942, for 1943 and for 1944 leave no room for belief that proper maintenance had not continued.

There is much plausibility in this argument. However, there are certain known factors—the extent of which are not measured before us—which weaken and make uncertain the force of this position. Our additional industrial activity because of the war in Europe had favorably affected American railroads in 1941, as is shown by the definite—though not extravagant—increase in operating revenues, largely freight, of Debtor. After Pearl Harbor (December 7, 1941), the sudden and tremendous marshalling of our power during 1942 with vastly increasing momentum thereafter made a call upon our railroads almost unbelievable. Over 1941, Debtor's freight revenue sprang from $26,644,830 to $45,192,481 in 1942, $58,968,245 in 1943 and $66,524,757 in 1944. Similarly, passenger revenue increased from $662,443 in 1941 to $2,306,578 in 1942, $3,874,724 in 1943 and $4,339,826 in 1944. That every wheel which would turn was put into service and that equipment which in other times might have been laid by was put into service are things which every one knows. This tremendous burden was suddenly thrust on the carriers and the fact that they carried it is to their lasting credit. These heavy extra demands required as constant full use of all equipment as was possible in a great emergency. Obviously, the extent of use has a direct bearing on the need for maintenance.

The measure suggested here is the dollar expenditure. In the Annual Report of the Commission (November 1, 1944) it is stated that: "In terms of maintenance work performed, *the effectiveness of current dollar expenditures has been substantially reduced by various factors,* among which are generally higher costs of labor and materials; the payment of increased wages at overtime rates; the cost of uneconomical repairs to old equipment which must be retained in service because of inability to obtain replacements owing to priorities controls; the reduced efficiency of the maintenance labor resulting from the rapid turn-over and inexperience of the personnel, and the increased traffic density, resulting in greater loss of productive time due to passing trains. While these factors, considered individually, are indeterminate as to the extent of their influence, obviously they have reduced the effectiveness of the current year's expenditure when compared with that of prior years."[22]

| 21 "Maintenance of Way and Structures | Maintenance of Equipment | Total |
|---|---|---|
| 1930.... $3,351,655 | $3,426,364 | $ 6,778,019 |
| 1931.... 1,963,175 | 2,613,083 | 4,576,258 |
| 1932.... 1,838,052 | 2,117,995 | 3,956,047 |
| 1933.... 1,438,431 | 1,826,539 | 3,264,970 |
| 1934.... 1,507,456 | 2,034,065 | 3,541,521 |
| 1935.... 1,733,466 | 2,154,521 | 3,887,987 |
| 1936.... 2,461,053 | 3,103,121 | 5,564,174 |
| 1937.... 3,412,747 | 3,538,578 | 6,951,325 |
| 1938.... 2,561,575 | 2,710,247 | 5,271,822 |
| 1939.... 3,946,835 | 3,507,467 | 7,454,302 |
| 1940.... 3,339,221 | 3,408,700 | 6,747,921 |
| 1941.... 4,073,085 | 3,754,692 | 7,827,777 |
| 1942.... 4,107,600 | 4,734,965 | 8,842,565 |
| 1943.... 5,266,614 | 6,357,555 | 11,624,199 |
| 1944.... 7,395,337 | 6,757,349 | 14,152,686." |

22 In its report of December 12, 1944, in Ex parte 148, involving rate increases, the Commission stated:

"Wage rate increases effective in December 1941 and January 1942 had the effect of increasing the average straight time rate of pay of all railroad employees from an average of 73.4 cents per hour in 1940 to 82.8 cents per hour in 1942, or approximately 12.8 percent. Further increases, which became effective in 1943, had the effect of raising the average

These factors of capacity usage requiring far beyond ordinary maintenance and of the decreased significance of dollar expenditure for maintenance, make entirely uncertain the effect of the much increased expenditures for 1942-1944, inclusive.

As to additions to the property and as to elimination of under-maintenance, we regard the showing as to their existence as too uncertain to be of use in determination of whether the Plan should be remanded to the Commission.

As to the existence of the cash and liquid assets, there is no doubt. As to the tax refunds, existence is certain but amount not. As to reduction in indebtedness there is question. As to current liabilities there has been large increase since 1941. As to long term debt, including interest in default and "other deferred liabilities" (not important comparatively and showing little change), the comparative general balance sheet, for 1941 to 1944, inclusive, shows $85,025,067 for December 31, 1941, $85,344,703 for same date 1942, $82,840,465 for 1943 and $85,971,302 for 1944.

In this condition as to existence of these three elements, it is obvious that the matter of changed conditions as affecting the Plan boils down to the effect of a relatively large accumulation of cash and liquid assets with an accumulation of a substantial tax refund. This situation is not new to the Commission (see the New Haven reorganization, 254 I.C.C. 405; Milwaukee, 257 I.C.C. 223; the Rock Island, 257 I.C.C. 265, also 257 I.C.C. 307, and the Missouri Pacific, 257 I.C.C. 479) and has been denied. Of course, our determination is not to be governed by what the Commis-

sion might or might not do on a remand to it. Also, our problem is not whether these actual and potential funds *might* make an increased valuation and capitalization better than those of the Plan. It is whether, if the Commission had before it all that has come in to the record before the District Court and before us, it would be arbitrary for it to adhere to its present Plan. That these much improved conditions as to cash, liquid assets and potential tax refunds *might* alter the picture as seen by the Commission at the time of its reports seems true. However, that they *must* do so because otherwise the sight of the Commission would have to be declared arbitrary, we think is not true.

In the foregoing adverse determinations that the Commission did not act arbitrarily in its valuation for capitalization at the time it acted and that subsequent changed conditions have not made that valuation arbitrary, we have not considered any effect of two matters thereon. These three appeals are for stockholders. Before stockholders can participate, all of the creditors must be cared for in full. The Act provides for elimination of stockholders and even of junior creditors where the valuation does not exceed senior indebtedness. The decisions preserve the full right to priority of senior creditors. Reconstruction Finance Corporation et al. v. Denver, R. G. W. R. R. Co. et al., supra; Ecker v. Western Pacific Railroad Corporation, 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892; Group of Institutional Investors v. Chicago M., St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959; Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982; Case

---

straight time rate of pay from 82.8 cents per hour in 1942 to 92.2 cents per hour in 1944, an increase of 11.4 percent. The estimated total increase in the 1944 payroll resulting from these increases, including additional costs for granting vacations, is $825,000,000.

"The index of the average unit price of materials and supplies, as compiled by the Association of American Railroads, for December 1939 and June 1940 combined stood at 131.35 as compared with 100 for May 1933. The combined average for December 1943 and June 1944 was 167.75,

an increase of 27.7 percent. Adjusting for the price changes between 1940 and 1944, the estimated total increase in the costs of materials and supplies for 1944 would be $325,000,000. The sum of the estimated increases in operating expenses represented by increased costs of material and supplies and wages, 1944 over 1940, is $1,150,000,000. The Price Administrator calculated that the annual expenses for materials other than fuel, after adjustment for price changes, increased from $621,000,000 in 1939 to $944,000,000 in 1943, an increase of $323,000,000."

v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Kansas City Terminal Railway Co. v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028; Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. The two matters have to do with this legal rule as applied to the factual situation.

The first of these is that the Plan left unprovided for $8,304,118 of junior indebtedness. This amount seems to be made up of the portions of General and Refunding bonds, Stephenville bonds and Central Arkansas bonds not fully covered by allotments of common stock in the Plan with accrued interest thereon to January 1, 1942 —the effective date of the Plan. The second is that arising from the character of securities pledged back of the bank and of the Reconstruction Finance Corporation loans—the last loan having been taken over and now owned by the Pacific. The principal amounts of these loans were, at the time of the Plan, Chase National Bank $3,500,000, Mississippi Valley Trust Company $1,000,000 and Reconstruction Finance Corporation $17,882,250—a total of $22,382,250. Back of the Chase note are pledged $4,921,500 General and Refunding Mortgage bonds and $98,000 First Mortgage 4% bonds of Southern Illinois and Missouri Bridge Company. Back of the Mississippi Valley note are pledged $1,405,500 General and Refunding Mortgage bonds and $28,000 S. I. & M. Bridge Company bonds. Back of the R.F.C. loan are pledged $23,903,000 General and Refunding bonds and $474,000 S. I. & M. Bridge Company bonds. A total security of $30,830,000 for all three loans.

██ The participation in the Plan allowed these three creditors seems to be based on the value of pledged security rather than face of loans plus accrued interest. But be this as it may, in the calculations of indebtedness of Debtor these three appellants use the face of the loans plus accrued interest.[23] In so far as these debts enter the valuation estimates of these appellants it would seem they have thus undervalued these loans by the difference between principal with accrued interest thereon and security with accrued interest thereon—a difference as to principal of $8,447,750. As of October 31, 1944, Pacific calculates the principal and interest on these three obligations as totaling $27,901,003. Appellee Chase National Bank states principal and interest of the pledged General and Refunding bonds then to be $39,802,933—a difference of $11,901,930. This difference is allowable to these creditors under In re Chicago & N. W. Ry. Co., 7 Cir., 126 F.2d 351, certiorari denied Chicago & N. W. R. Co. v. Mutual Sav. Bank Group Committee, 318 U.S. 793, 63 S.Ct. 987, 87 L.Ed. 1158 and In the Matter of New York, N. H. & H. R. Co., 2 Cir., 147 F.2d 40, 47, 48, certiorari denied Commonwealth of Massachusetts v. New York, N. H. & H. R. Co., 325 U.S. 884, 65 S.Ct. 1577, 89 L.Ed. 1999.

The effect of these two matters is to accentuate our determination.

## IV.

### Stephenville and Central Arkansas Appeals.

Horace A. Davis and others, as Protective Committees for bondholders of First Mortgage bonds of Stephenville North and South Texas Railway Company and of Central Arkansas and Eastern Railroad Company, respectively, appeal (Nos. 12,884 and 12,885).

Each of these companies are wholly stock owned subsidiaries of Debtor and as such filed petitions for reorganization in connection with Debtor. Each had its First Mortgage bonds outstanding, respectively, Stephenville $2,423,000 and Central $1,085,000—each issue being secured by mortgage upon all the property of the particular road. Payment of these bonds was guaranteed by Debtor. These lines have been abandoned; and, under order of the District Court in this proceeding, the entire property has been sold and the proceeds paid over to the holders of the bonds—such payments aggregating $188,096.89 to Stephenville bond-

---

23 In the figures hereinbefore used in discussing indebtedness of Debtor, we have followed those shown by the Debtor's statements which make no use of pledged security value in connection with these loans.

holders and $152,768 to Central bond-holders. No interest has been paid since July 1, 1935. Because of the guarantees by Debtor, each of these bond issue holders has been made a separate class (Classes 18 and 19) of creditors by the District Court.

The Plan provided (in round figures) for $37,500,000 indebtedness and $37,500,000 of stock (divided equally into $18,750,000 preferred and common). As to claims which were not taken care of by new bonds or preferred stock, the Commission stated (original report) as follows:

"The remaining $5,000,000 of new common stock should be distributed to the holders of the Central Arkansas & Eastern bonds, the holders of the Stephenville bonds, and the holders of general and refunding mortgage bonds in proportion to the unsatisfied principal amount of their claims, after deduction in the case of the Stephenville bonds of the estimated amount to be recovered upon salvaging the remainder of the line when abandoned, which should be paid in cash on reorganization.

"The principal amount of each $1,000 bond of the Central Arkansas & Eastern Railroad Company has been reduced through payment of the sums realized from liquidation of all the property to $859.20, producing a present total of $932,232 for the original $1,085,000, principal amount, of the bonds. The principal amount of each $1,000 Stephenville bond has been similarly reduced to $956.85 by payment of the sums realized from liquidation of a part of the property. It may be assumed with sufficient accuracy for the purposes of this reorganization that upon liquidation of the remainder of the property, the principal amount of each $1,000 bond will, through application of the sums thus realized be reduced to $859.20, the sum to which the principal amount of each $1,000 Central Arkansas & Eastern bond has been reduced. Thus, each holder of a $1,000 Stephenville bond should receive $97.65 in cash and new common stock on the basis of a remaining claim of $859.20 in principal amount for each $1,000 bond, or $2,081,842 for all $2,-423,000 of the principal amount of the Stephenville bonds."

In its supplemental report, the Commission stated as follows:

"Claims that cannot be taken care of by the issue of new bonds or preferred stock comprise $932,232, exclusive of interest, for the Central Arkansas & Eastern bonds, after credits for the distribution of the proceeds of salvage recovered on abandonment of property, $2,318,448, as of December 31, 1940, exclusive of interest, for the Stephenville bonds after similar credits in part, and $33,267,374, including all overdue interest, for the outstanding and pledged general and refunding mortgage bonds. The Stephenville claim would be reduced to $2,256,882 after further credits for the share of the holders of outstanding bonds in the $66,241.25 of deposits to July 12, 1941, of proceeds from sale of salvaged material and lands. The general and refunding claim would be reduced to $33,-092,979 by application of the share of the holders of general and refunding mortgage bonds in the $278,300 of interest due January 1 and July 1, 1936, on second-mortgage income-bond certificates paid to the trustee of the first terminal and unifying mortgage. But the amount of new common stock available is only $18,750,000 in all; and of that amount all but about $5,000,000 which appears to approximate the capitalizable value of the free assets, including the debtor's equity in collateral pledged with the Railroad Credit Corporation, is allocable to the holders of general and refunding mortgage bonds in recognition of their liens. The remaining $5,000,000 of new common stock should be distributed to the holders of the Central Arkansas & Eastern bonds, the holders of the Stephenville bonds and the holders of general and refunding mortgage bonds in proportion to the unsatisfied principal amount of their claims.

"The total principal amount of all general and refunding mortgage bonds outstanding and pledged is $39,557,500, against which have been allocated thus far $7,208,-742 of new bonds, $11,937,571 of new preferred stock, and $13,750,000 of new common stock, a total of $32,896,313, leaving an unsatisfied balance of $6,661,187. The remaining $5,000,000 of new common stock should accordingly be allocated on the basis

of total unsatisfied claims for principal of the holders of Central Arkansas & Eastern bonds, the Stephenville bonds, and the general and refunding mortgage bonds, of $932,232, $2,256,882 and $6,661,187 respectively. There would thus be allocated $473,200 total, or $436.13 for each $1,000 bond, of new common stock to the holders of Central Arkansas & Eastern bonds, $1,145,590 total, or $472.80 for each $1,000 bond, to the holders of Stephenville bonds, and $3,381,210 total, or $85.47 for each $1,000 bond, to the holders of general and refunding mortgage bonds. The additional allocation heretofore referred to of $13,750,000 of new common stock to the holders of the general and refunding mortgage bonds in recognition of their liens would amount to $347.60 for each $1,000 bond. The total of common stock allocated to the bonds of the several issues would thus be $18,749,961.

"The cash distributable in respect of pledged Stephenville bonds ratably with outstanding bonds of the same issue should be deposited with the mortgage trustee of the new mortgage.

\* \* \* \* \* \*

"The amount of cash deposited or to be deposited with the trustee of the first terminal and unifying mortgage as interest due January 1 and July 1, 1936, on pledged second-mortgage bond certificates is $80.64 short of the amount required for distribution therefrom called for by the plan. In the discretion of the reorganization managers, the deficiency may be made up from the cash above mentioned or from other cash of the debtor. \* \* \*

"Also, holders of Stephenville bonds will receive such cash as may be actually due in respect of salvage recovered from the property. Should further recovery be made beyond that represented by cash deposited to July 12, 1941, the amount of stock to be received will, if so determined by the court, be reduced at the rate of $50.76 for each $100 of such additional recovery."

In their objections to the Plan, these appellants contended broadly that the amount of stock allocated to these bondholders was "inadequate" and they were entitled "to common stock having a par value equal, at least, to the principal amount of their bonds." Appellants particularized this general contention into two matters: First, that capitalization (valuation) should be increased; second, that these bond claims should be for full principal and not reduced by the property salvage payments.

Both of these contentions had been presented to the Commission on petitions to modify and had been denied in the supplemental report. As objections, they were denied by the District Court.

Here, appellants add to and in connection with the point of increased earnings that there has been a reduction of indebtedness, prior to them, of about $5,000,000 and, therefore, there is room for greater allowance to them. Also they add a third point, namely, that the claim of the Pacific (taken over from the R. F. C.) should be subordinated.

As to the contention that capitalization should be increased over the Plan, they argue that even at the time the valuation was made it was too low by $5,000,000 but that subsequent increased earning and improved financial position make the inequity of the capitalization more evident. Their presentation of these matters is by no means so complete as that for the stockholders. We have hereinbefore disposed of them in connection with the other appeals by the Debtor, Pacific and Mr. Meyer. As to decrease in indebtedness prior to them, the contention makes no proper allowance for several millions of General and Refunding bonds not covered in full in the Plan and the accrual of interest subsequent to the Plan.

As to subordination of the claim of Pacific, they present nothing but state "These appellants feel there is nothing to be gained by duplicating the efforts of appellant Meyer" and rely upon his greater familiarity with that issue. Hereinbefore, we have disposed of this.

The remaining issue is that the claims of these bondholders should have been allowed for the full principal of their bond and not reduced by the payments they received arising from sale of the respective railway

properties. As to this contention the Commission stated, in its original report, as follows:

"It is argued on behalf of the Stephenville bondholders that they should receive new securities as general creditors of the St. Louis Southwestern in addition to and without reference to new securities representing a fair value of any property to be taken over by the new company and cash they may receive as proceeds of salvage recovered in the abandonment of other property. Similar contention is made on behalf of the Central Arkansas & Eastern bondholders. The contention is based on the rule of law (following from the definition of 'secure creditor' in section 1, sub. a (28) of the Bankruptcy Act [11 U.S.C.A. § 1, sub. a (28)] that when a claim is secured by the property of a person other than the debtor against whom the claim is sought to be proved, the amount of the security may not be deducted from the claim. Ivanhoe Bldg. & Loan Ass'n v. Orr, 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419. This rule would appear to be inapplicable in the present case, since distributions of the proceeds of the Stephenville and Central Arkansas & Eastern properties in the present proceedings will discharge pro tanto not only the debts of those companies but also the obligations of the St. Louis Southwestern as guarantor of the payment of such debts."

This position was reaffirmed in the supplemental report. In determining this manner, the District Court stated as follows:

"The Commission has accordingly reduced the claim of the Stephenville bonds by the amount of salvage realized on that property to $2,256,882 for the purpose of this allocation: in like manner, the claim of the Central Arkansas bonds was reduced to $932,232. Thus the $5,000,000 of common stock has been allocated as follows: $3,381,210 to refunding bondholders, $1,145,590 to Stephenville bondholders and $473,200 to Central Arkansas bondholders. It is urged in behalf of the latter two that their position is that of unsecured creditors of the debtor, that they are entitled to prove the full amount of their claim, unreduced by the amount received upon liquidation of security not the property of the debtor, and

that, therefore, they should receive an allotment of stock based on the full amount of their claim. Section 1, subsection 28 of the Bankruptcy Act, 11 U.S.C.A. § 1, provides:

"'(28) "Secured creditor" shall include a creditor who has security for his debt upon the property of the bankrupt of a nature to be assignable under this Act or who owns such a debt for which some endorser, surety, or other person secondarily liable for the bankrupt has such security upon the bankrupt's assets.'

"But where the creditor has for security property other than that of the principal debtor in addition to the latter's promise to pay, the creditor is unsecured as to the principal debtor and may prove the full amount of his claim, unreduced by any set-off for amount realized upon liquidation of the security (Ivanhoe B. & L. Ass'n v. Orr, 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419), and the rule applies even though the security consists of property of a wholly-owned subsidiary of the principal debtor, In re United Cigar Stores, 2 Cir., 73 F.2d 296. This point was raised before the Commission and attention was called to the Ivanhoe case. We agree with the Commission that the conclusion urged does not necessarily follow from the rule of that case. The rule is applicable here insofar as pertains to proof of the claims of these parties, but we do not think it compels the Court or the Commission, when allocating securities in a reorganized railroad company, to disregard the fact that a claimant has been partially reimbursed during the pendency of the proceedings. The obligation of debtor on the Stephenville bonds and the Central Arkansas bonds is that of guarantor and the obligation of a guarantor is reduced pro tanto by reduction of the principal debt. Mann v. Mt. Union, etc. Co., D.C.M.D.Pa., 267 F. 448; Pennsylvania Trust Co. v. McElroy, 3 Cir., 112 F. 509; In re Pulsifer, D.C., 14 F. 247; Eddy v. Sturgeon, 15 Mo. 199; 38 C.J. 1245. The Commission thus justified its treatment of these parties and we think their disposition of the matter was fair and equitable. It is true that the allocation of new securities would leave these claimants partially unsatisfied even though it were based on the

full amounts of their claims, and using the lesser amounts as a basis of computation reduces the degree of satisfaction still further. It must be borne in mind, however, that the other distributee, the refunding bondholder group, likewise lacks several million dollars of seeing its claim fully satisfied."

These appellants rely upon the section in the Bankruptcy Act, as amended, 11 U.S.C.A. § 1 (28), quoted by the District Court and not upon anything in the railroad reorganization provisions. 11 U.S.C.A. § 205. Ivanhoe Building & Loan Ass'n v. Orr, 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419; New York Trust Co. v. Palmer, 2 Cir., 101 F.2d 1, 3 and In re United Cigar Stores Co. of America, 2 Cir., 73 F.2d 296, certiorari denied Irving Trust Co. v. Bankers' Trust Co., 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243, hold, in substance, that where a creditor of a bankrupt has recovered a portion of his debt from security not owned by bankrupt, he may prove his claim in bankruptcy for the full amount of the debt (without such deduction) but that he may not collect and retain dividends which would make his total payment more than the amount of his debt.

Judge Moore held that the rule was applicable here in so far as proof of claims but did not require disregard of partial reimbursement (occurring during the reorganization proceedings) in the allocation of securities in a reorganized railroad.

■ At the time Judge Moore so determined, there was no controlling direct decision as to whether the Ivanhoe Bldg. & Loan Ass'n rule was applicable in § 77 proceedings and there is much plausibility in his position. However, the Supreme Court (Reconstruction Finance Corporation et al. v. Denver, R. G. W. R. R. Co. et al., 66 S.Ct. 1282) has recently (June 10, 1946) stated: "The rule is settled in bankruptcy proceedings that a creditor secured by the property of others need not deduct the value of that collateral or its proceeds in proving his debt. Ivanhoe Bldg. & Loan Ass'n v. Orr, 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419. We see no reason why the same should not be true under § 77." We cannot see that the application of the rule, so announced, is affected by the fact that realization on the collateral occurred during the reorganization proceedings when it is clear, as it is here, that the bonds represented by these appellants will not be paid in full even with the help of the proceeds from the collateral. The conclusion is that, under the circumstances here, the participation of these bonds should not be lessened by the salvage payments.

■ The $5,000,000 of common stock is the sole source for participation of these two issues of bonds. A large amount of the General and refunding bonds must look to the same source. This amount is not sufficient to satisfy even the principals of these three indebtednesses. In this situation and in view of our determination that the Central Arkansas and the Stephenville bonds are entitled to consideration of claims unaffected by salvage payments, we think the Commission alone would have power to alter its plan if there were any room for discretion. However, the only problem produced by our decision is purely mathematical. It involves merely the recalculation of the participation of the three kinds of bonds in this $5,000,000 stock fund using the principal amounts of the Central Arkansas and of the Stephenville bonds instead of such principal amounts reduced by salvage payments.

## V.

### Conclusion.

The case is remanded to the District Court for the purpose of amending the Plan in this one respect and, as so amended, the order of the District Court in approving the Plan is affirmed.